# **Exhibit 1**

# Montgomery County Clerk of Superior Court File No. 22CVS220



STATE OF NORTH CAROLINA
COUNTY OF MONTGOMERY

IN THE GENERAL COURT OF
JUSTICE
SUPERIOR DIVISION
FILE NUMBER: 22 CVS 220

## RETURN OF SERVICE

I certify that a copy of this Order to Show Cause, the attached Motion to Show Cause (including Exhibits A through E, Exhibits A and E are filed under seal because they are confidential pursuant to N.C. Gen. Stat. § 7B-2109) was received and personally served upon BROOK MCINTOSH CRUMP.

Date Received: *06-07-2022*

Date Served: *06-13-2022*

Time Served: *10:42 AM*

Date Returned: *06-13-2022*

*Chris Watkins, Sheriff*
Name of Officer

*Montgomery Co Sheriff's*
Department or Agency

*Montgomery*
County of Department Agency

STATE OF NORTH CAROLINA  IN THE GENERAL COURT OF
COUNTY OF MONTGOMERY  JUSTICE
  SUPERIOR DIVISION
  FILE NUMBER: 22 CVS 220

MONTGOMERY CO.,

BY

IN THE MATTER OF  ORDER
BROOKE MCINTOSH CRUMP,  TO SHOW CAUSE
Attorney

       Upon motion of the Chief District Court Judge of Judicial District 20A, the undersigned Superior Court Judge, pursuant to the Court's inherent authority to regulate the conduct of attorneys as officers of the court and N.C. Gen. Stat. § 84-36, Orders that Brooke McIntosh Crump appear before the Court on the 5th day of July, 2022, in the Montgomery County Courthouse Superior Court for a hearing to determine if any of the allegations of professional misconduct in the attached Motion for Order to Show Cause are true and, if so, what discipline or sanction is appropriate. Based upon the Motion and this Court's inherent authority, the Court finds and concludes as follows:

       1.     Brooke McIntosh Crump (hereafter "Attorney Crump") was licensed to practice law in North Carolina in October 2017 and issued North Carolina Bar License #52684. Attorney Crump is, and was at all times referred to in the Motion for Order to Show Cause, an attorney at law licensed to practice in North Carolina, subject to the laws of the State of North Carolina, the Rules and Regulations of the North Carolina State Bar and the North Carolina Rules of Professional Conduct. During the relevant periods, Attorney Crump was engaged in the practice of law in the State of North Carolina and maintained a law office (d/b/a "Lake Tillery Law") in Montgomery County, North Carolina, located within Judicial District 20A.

       2.     In light of the actions and events described in the Motion for Order to Show Cause, which is attached hereto and incorporated as if fully set forth herein, the Court concludes that Attorney Crump should show cause as to why she is not in violation of the North Carolina Rules of Professional Conduct.

       3.     Judicial authority to discipline attorneys is well-established in North Carolina common law and "is not dependent upon statutory authority. It arises because of a court's inherent authority to take disciplinary action against attorneys licensed before it; an authority which extends even to matters which are not pending in the particular court exercising the authority. This power is based upon the relationship of the attorney to the court and the authority which the court has over its own officers to prevent them from, or punish them for, acts of dishonesty or impropriety calculated to bring contempt upon the administration of justice." *In re*

*Nw. Bonding Co., Inc.*, 16 N.C. App. 272, 275 (1972). Accordingly, this Court has jurisdiction over Attorney Crump and the subject matter of this proceeding.

4.    The Superior Court's authority to appoint an attorney to prosecute another lawyer for professional misconduct was addressed in *In the Matter of the Right to Practice Law of Harold Robinson, Esq.*, 37 N.C. App. 671 (1978), *on reh'g*, 39 N.C. App. 345, 250 S.E.2d 79 (1979), where the Court of Appeals held that the Superior Court has the authority to designate any licensed attorney to present evidence regarding the alleged Rule violations in a hearing regarding the professional misconduct of a lawyer. *Id.*, 37 N.C. App. at 678.

5.    The Court, in its inherent authority, appoints the North Carolina State Bar's Office of Counsel to investigate and present evidence regarding the alleged Rule violations in this matter.

6.    The undersigned requests that an out of division superior court judge be designated to preside over the matter to its completion.

Based upon the foregoing, the Court enters the following ORDER:

1.    Attorney Crump shall appear, with counsel if she so chooses, on the 5th day of July, 2022 in the Montgomery County Courthouse Superior Court, or such other date to be determined by the judge appointed to preside with due notification to Attorney Crump, for a hearing to determine if she violated any of the Rules of Professional Conduct outlined in the attached Motion and, if so, what discipline or sanction is appropriate;

2.    The State Bar's Office of Counsel shall also appear on that date and present evidence regarding the potential Rule violations outlined in the Motion for Order to Show Cause;

3.    The hearing will be governed by the North Carolina Rules of Evidence;

4.    The judge designated to hear this matter will preside over the hearing, serve as the finder of fact, enter judgment, and, if applicable, determine what discipline or sanction is appropriate;

5.    Attorney Crump and the State Bar's Office of Counsel may stipulate to facts and the authenticity of documents or evidence by filing with the Court signed stipulations by consent at any point prior to the hearing;

6.    The hearing will be comprised of two phases; the first phase will be entirely focused on determining if Attorney Crump violated the Rules as outlined in the Motion for Order to Show Cause;

7.    During the first phase of the hearing, Attorney Crump and the State Bar's Office of Counsel may call witnesses, submit evidence, and, at its conclusion, make closing arguments as to the potential Rule violations outlined in the Motion for Order to Show Cause;

8.    At the conclusion of the first phase of the hearing, the Court will announce which, if any, of the potential Rule violations alleged in Motion for Order to Show Cause have been proven by clear, cogent, and convincing evidence;

9.    The second phase of the hearing, necessary only if the Court determines that Attorney Crump violated any of the Rules as alleged in the Motion for Order to Show Cause, will be entirely focused on what discipline or sanction is appropriate;

10.    During the second phase of the hearing, Attorney Crump and the State Bar's Office of Counsel may call witnesses, submit evidence, and, at its conclusion, make closing arguments as to what discipline or sanction is appropriate;

11.    During the second phase of the hearing, the Court will consider any evidence relevant to what discipline or sanction is appropriate, including but not limited to the factors outlined in 27 N.C. Admin. Code, Chapter 1B, § .0116(f);

12.    At the conclusion of the second phase of the hearing, the Court will announce what discipline or sanction it is entering and may direct Attorney Crump or the State Bar's Office of Counsel to draft an order consistent with its holding;

13.    The procedure of the trial as set forth in no way limits or restricts the trial judge's discretion to modify or change these procedures; and

14.    A copy of this Order to Show Cause, the attached Motion to Show Cause, and the Exhibits to the Motion to Show Cause (including Exhibits A through E, Exhibits A and E were filed under seal because they are confidential pursuant to N.C. Gen. Stat. § 7B-2109) shall be served on Attorney Crump and the State Bar's Office of Counsel. Attorney Crump and the State Bar's Office of Counsel shall maintain the confidentiality of the documents filed under seal.

So ORDERED, this the __7+h__ day of June, 2022.

Honorable Patrick Nadolski
Superior Court Judge

STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF
COUNTY OF MONTGOMERY           JUSTICE
                                  SUPERIOR DIVISION
                            FILE NUMBER: 22 CVS 220

## RETURN OF SERVICE

I certify that a copy of this Order to Show Cause, the attached Motion to Show
Cause (including Exhibits A through E, Exhibits A and E are filed under seal
because they are confidential pursuant to N.C. Gen. Stat. § 7B-2109) was received
and personally served upon BROOK MCINTOSH CRUMP.

Date Received: _____

Date Served:      _____

Time Served:      _____

Date Returned: _____

_____
Name of Officer

_____
Department or Agency

_____
County of Department Agency

STATE OF NORTH CAROLINA

COUNTY OF MONTGOMERY

FILED

IN THE GENERAL COURT OF JUSTICE
SUPERIOR DIVISION

FILE NUMBER: __22 CVS 220__

IN THE MATTER OF
BROOKE MCINTOSH CRUMP,
Attorney

MOTION FOR ORDER
TO SHOW CAUSE

 

The Undersigned Chief District Court Judge of Judicial District 20A, pursuant to the inherent authority of the judiciary to regulate the conduct of attorneys and the Court's duty to safeguard the efficiency and integrity of the administration of justice, submits the following motion to the Montgomery County Superior Court, requesting that the Superior Court initiate proceedings to determine whether an attorney has engaged in professional misconduct and, if so, whether professional discipline should be imposed.

As set forth more specifically below, Montgomery County lawyer Brooke McIntosh Crump (hereafter "Attorney Crump") has, on multiple occasions, made claims and contentions unsupported by fact or law, made false statements of material fact to the court, engaged in conduct involving dishonesty, deceit, or misrepresentation, and otherwise violated the North Carolina Rules of Professional Conduct. Attorney Crump's misconduct has significantly disrupted and impaired the orderly administration of justice in this District and poses an ongoing threat of significant harm to the administration of justice.

## BACKGROUND

Attorney Crump was licensed to practice law in North Carolina in October 2017 and issued North Carolina Bar License #52684. Attorney Crump is, and was at all times referred to herein, an attorney at law licensed to practice in North Carolina, subject to the laws of the State of North Carolina, the Rules and Regulations of the North Carolina State Bar and the North Carolina Rules of Professional Conduct. During the relevant periods referred to herein, Attorney Crump was engaged in the practice of law in the State of North Carolina and maintained a law office (d/b/a "Lake Tillery Law") in Montgomery County, North Carolina, located within Judicial District 20A.

## FACTS WARRANTING INQUIRY INTO WHETHER ATTORNEY CRUMP ENGAGED IN PROFESSIONAL MISCONDUCT

### I.   21 MARCH 2022 MOTION TO INTERVENE (*IN RE A.H.*, 21 JA 10)

1.     On 21 March 2022, Attorney Crump filed a Motion to Intervene/Petition for Placement on behalf of Michela and Tyler Rush in *In re A.H.*, an ongoing juvenile abuse/neglect/dependency case. The 21 March 2022 motion (attached as Exhibit A[1]) requested

---

[1] The undersigned submits the documents attached hereto as Exhibits A and E under seal, as they are filings in juvenile matters which are confidential pursuant to N.C. Gen. Stat. § 7B-2901(a).

1

that Attorney Crump's clients be allowed to intervene in the case and that the minor child be placed with them.

2.    Under Chapter 7B of the General Statutes, foster parents are not parties to abuse/neglect/dependency actions and "may be allowed to intervene only if the foster parent has authority to file a petition to terminate the parental rights of the juvenile's parents pursuant to G.S. 7B-1103." N.C. Gen. Stat. § 7B-401.1(e1).

3.    A foster parent only has authority to file a petition under section 7B-1103 if the minor child has continuously resided with the foster parent for a period of 18 months preceding the filing of the petition. N.C. Gen. Stat. § 7B-1103(a)(5).

4.    Attorney Crump's Motion to Intervene stated that the minor child had been placed in foster care with the Rushes in May 2021 and had lived with them until 21 December 2021. Since the child had only lived with Attorney Crump's clients for a total of approximately 7.5 months, there was no legal basis to file a motion to intervene on their behalf.

5.    By filing a motion that had no basis in law, Attorney Crump displayed incompetence in violation of Rule 1.1 of the North Carolina Rules of Professional Conduct and asserted an issue without legal basis in violation of Rule 3.1.[2]

## II.    21 MARCH 2022 "MOTION IN THE CAUSE"

6.    On 21 March 2022, Attorney Crump delivered a document labeled "Motion in the Cause" to the Montgomery County Clerk of Court (attached as Exhibit B). The motion, which was captioned *In Re Brooke Crump* requested that "the Honorable John Nance [and] any other district court judges under his authority with which [sic] he has communicated . . . concerning his potential bias against Attorney Crump" be recused from hearing any case in which Attorney Crump served as counsel. Because the "Motion in the Cause" did not bear the caption or file number of any pending case, it was returned to Attorney Crump with the Clerk's file stamp crossed out and a note from the Clerk of Court reading "This needs to be addressed to a specific case or cases."

7.    Attorney Crump asserted issues in the 21 March 2022 "Motion in the Cause" and accompanying affidavit without basis in law or fact in violation of Rule 3.1, as explained in paragraphs 8 through 15, below.

8.    The North Carolina Code of Judicial Conduct provides that a judge should disqualify himself in any proceeding "in which [the judge's] impartiality may reasonably be questioned." N.C. Code Jud. Cond., Canon 3C.

9.    Disqualification of a judge requires a showing of personal bias or prejudice against or in favor of a party. *Dunn v. Canoy*, 180 N.C. App. 30, 38 (2006).

---

[2] Subsequent references herein to the Rules of Professional Conduct will be in this format: That is, instead of citing "Rule 1.1 of the NC Rules of Professional Conduct," the motion will simply reference "Rule 1.1."

2

10.     Under North Carolina law, "the burden is upon the party moving for disqualification to demonstrate objectively that grounds for disqualification actually exist," and that such showing "must consist of substantial evidence that there exists such a personal bias, prejudice or interest on the part of the judge that he would be unable to rule impartially." *Lange v. Lange*, 357 N.C. 645, 649 (2003).

11.     Attorney Crump's "Motion in the Cause" did not even <u>allege</u> any acts by Judge Nance that would be grounds for disqualification, nor did it allege any facts at all suggesting bias on the part of the other two district court judges she sought to recuse from all her cases. At no time did Attorney Crump allege that any of the judges were biased against a <u>party</u> to any matter before the court.

12.     The allegations in the "Motion in the Cause focused primarily on the theory that Judge Nance had (a) formed an opinion that Attorney Crump had engaged in professional misconduct involving dishonesty; (b) discussed his concerns about Attorney Crump's dishonesty with other members of the bar and bench; and (c) reported the alleged misconduct to the State Bar. Assuming for the sake of argument that this theory was accurate, it would not reflect improper bias against Attorney Crump; on the contrary, it reflects a judge's obligation to safeguard the integrity of the adjudicatory process and duty to report professional misconduct by attorneys.

13.     The allegations in the "Motion in the Cause" regarding Judge Nance's purported actions and statements were so vague as to evade meaningful rebuttal. For example, Attorney Crump insinuated that Judge Nance "cut her off from speaking because she was a woman" and stated that Judge Nance "has been known to roll his eyes when Attorney Crump speaks." Attorney Crump also speculated that Judge Nance would be a necessary witness in any not-yet-existent disciplinary proceeding against Attorney Crump.

14.     Attached to Attorney Crump's "Motion in the Cause" was an affidavit which read, in its entirety: "Other attorneys have informed me that Judge Nance accused me of acts [sic] dishonesty. Further, my clients have noticed a sense of bias and that I am interrupted when speaking. Officers of the court have commented on the seeming bias against me from the local bench in this district, as well as my clients. I fear my clients are not being fairly heard due to bias. A reasonable person would question bias, if they knew some of the comments Judge Nance has made about me in my my [sic] absence. Further, Judge Nance and those under his authority will be material witnesses in any disciplinary proceedings initiated against me."

15.     Attorney Crump's affidavit attached to the "Motion in the Cause" contained hearsay, subjective impressions, vague allegations about unspecified negative comments by Judge Nance, and speculation. It did not point to any admissible evidence, let alone "substantial evidence" of "personal bias, prejudice or interest" on the part of any of the judges Attorney Crump sought to disqualify.

16.     In paragraph 8 of the "Motion in the Cause," Attorney Crump implied that Judge Nance is sexist. In support of this insinuation, she offered only the claim that an unidentified person once "asked if The Honorable John Nance cut her off from speaking because she was a woman." By suggesting without basis that Judge Nance is sexist, Attorney Crump made a statement

3

concerning the integrity of a judge with reckless disregard for its truth or falsity in violation of Rule 8.2(a).

## III. 4 APRIL 2022 PETITION FOR WRIT OF PROHIBITION (*IN RE A.H.*, 21 JA 10)

17. On 4 April 2022, Attorney Crump filed in the Court of Appeals a Petition for Writ of Supersedeas, a Petition for Writ of Prohibition, and a Motion for Temporary Stay in *In re A.H.*, the juvenile case in which she had filed the 21 March 2022 Motion to Intervene referenced in section I, above. The 4 April 2022 Petition for Writ of Prohibition is attached as Exhibit C and referred to hereafter as the "4 April 2022 Petition."

18. Attorney Crump's 4 April 2022 Petition asked the Court of Appeals to enter an order "enjoining The Honorable John Nance and those serving under his supervision from presiding over [*In re A.H.*] and any other matters in which the undersigned appears."

19. The Court of Appeals summarily denied Attorney Crump's motion and petitions on 6 April 2022.

### A. <u>Attorney Crump's 4 April 2022 Petition Was Unsupported by Law or Fact</u>

20. The 4 April 2022 Petition contained hearsay, rumor, subjective impressions, an irrelevant aside regarding toothaches, vague allegations about Judge Nance's "attitude" and "temperament" towards Attorney Crump, and speculation. It did not point to any admissible evidence, let alone "substantial evidence" of "personal bias, prejudice or interest" on the part of any of the judges Attorney Crump sought to disqualify. By again requesting recusal of judges without basis in fact, Attorney Crump violated Rule 3.1.

21. By filing the 4 April 2022 Petition, Attorney Crump made assertions without legal basis in violation of Rule 3.1, in that:

    a. Attorney Crump was not counsel of record for any party in *In re A.H.* and therefore could not seek appellate review of the case;

    b. The Petition asked the appellate court to review an issue that was not presented to the trial court (i.e., a validly filed motion to recuse Judge Nance from presiding over *In re A.H.*); and

    c. Attorney Crump did not and could not present any legal authority for the extraordinary proposition that all of the District Court judges in her district should be recused from all of her cases.

### B. <u>The 4 April 2022 Petition Contained False Assertions of Fact</u>

22. In the 4 April 2022 Petition, Attorney Crump made false and misleading statements to the Court, thereby making false statements of material fact to the tribunal in violation of Rule 3.3(a)(1) and engaging in conduct involving dishonesty, deceit, or misrepresentation in violation

4

of Rule 8.4(c). Specific instances of Attorney Crump's violations of Rules 3.3(a) and 8.4(c) are described in paragraphs 23 and 24, below.

23.     In paragraph 12 of the 4 April 2022 Petition, Attorney Crump falsely asserted that "all three district court judges recus[ed] themselves" for unknown reasons from a case in which Attorney Crump served as counsel.

24.     In paragraph 14 of the 4 April 2022 Petition, Attorney Crump asserted that on 21 March 2022, "instead of addressing her recusal motion when [Attorney Crump] presented it to him, [Judge] Nance continued the underlying hearing and acted as if the motion for recusal didn't happen." Likewise, in the last page of the Petition, Attorney Crump accused Judge Nance of "ignoring [Attorney Crump]'s motion completely." These assertions were misleading, in that:

   a. The recusal motion referenced in these paragraphs was the "Motion in the Cause" that had been rejected by the Clerk, but—by accusing Judge Nance of "ignoring" the motion or pretending it "didn't happen"—Attorney Crump implied it was a validly filed motion properly before the trial court.

   b. Paragraph 14 omits material facts, including that the court could not hear the motion to intervene that Attorney Crump sought to have heard on 21 March 2022 (the same day she filed it) because Attorney Crump had not properly served all parties with the motion.

   c. Since Attorney Crump was not counsel for any party to *In re A.H.*, even a validly filed and meritorious recusal motion would not have been properly before the court unless and until her clients' motion to intervene was allowed.

## IV.     11 APRIL 2022 MOTION TO RECUSE (*BEAN V. BEAN*, 21 CVD 451)

25.     Attorney Crump represents Nancy Bean in her domestic case against Bret Bean.

26.     Bret Bean initiated a child support enforcement action (hereinafter "IV-D case") against Nancy Bean (Montgomery County file no. 21CVD451) and Nancy Bean was served with notice of an 11 April 2022 hearing in the IV-D case.

27.     During calendar call at 9:30 am on 11 April 2022, Nancy Bean was present in court but Attorney Crump was not present.

28.     Representatives of DSS involved in child support enforcement contacted Attorney Crump, who stated that she did not intend to appear for the hearing in the IV-D case because—although her client had been served—Attorney Crump had not personally been served with the child support action.

29.     When the presiding judge, The Honorable Thai Vang, learned that Attorney Crump did not intend to appear at the hearing, leaving her client unrepresented, he directed the Deputy Clerk to summon Attorney Crump to the courtroom to discuss the matter.

5

30.     When the Deputy Clerk contacted Attorney Crump, she responded by saying that she intended to file a motion to recuse Judge Vang from the matter.

31.     Later in the morning of 11 April 2022, Attorney Crump filed a Motion to Recuse Judge Vang accompanied by her affidavit (attached as Exhibit D) just before she appeared in the courtroom where the IV-D case was to be heard.

32.     Because Attorney Crump's Motion to Recuse needed to be addressed before the substance of the case could be reached, the IV-D case was continued to a later date.

## A.     The Motion to Recuse Contained False and Misleading Assertions of Fact

33.     In the 11 April 2022 Motion to Recuse and accompanying affidavit, Attorney Crump made false and misleading statements to the Court, thereby making false statements of material fact to the tribunal in violation of Rule 3.3(a)(1) and engaging in conduct involving dishonesty, deceit, or misrepresentation in violation of Rule 8.4(c). Specific instances of Attorney Crump's violations of Rules 3.3(a) and 8.4(c) are described in paragraphs 34 through 40, below.

34.     Attorney Crump falsely asserted in the 11 April 2022 Motion to Recuse that "Judge Vang was refusing to recuse himself, even though Attorney . . . Crump asked for a recusal in a previous motion filed with the court . . . despite said allegations, he did not recuse himself from a IV-D matter involving Attorney . . . Crump's spouse." (Exhibit D, ¶6)

35.     In her affidavit attached to the 11 April 2022 Motion to Recuse, in the section titled *"1st Baseless Grievance: 'Craigslist Stand-In Attorney' Personal Attack"* Attorney Crump alleged that Judge Vang had reported her to the North Carolina State Bar "because of absences." She further stated that when she met with Judge Vang in chambers, Judge Vang stated to her that he "saved me from a bar complaint" and "[t]hat statement was knowingly false." Attorney Crump further stated "Judge Vang contacted the North Carolina State Bar and he informed other members of the court that he contacted the bar [sic] to file a grievance against me, not to save me from one." This section of Attorney Crump's affidavit omitted material facts and grossly mischaracterized the circumstances of an in-chambers discussion between Judge Vang and Attorney Crump necessitated by the fact that Attorney Crump sent a lawyer who was not part of her firm to appear in court on behalf of her court-appointed clients.

36.     In her affidavit attached to the 11 April 2022 Motion to Recuse, in the section titled *"Nephew as Prosecuting Witness,"* Attorney Crump falsely claimed that she was "put on the spot in the courtroom" when Judge Vang informed counsel of a family relationship he had with the charging officer in one of Attorney Crump's clients' cases. In fact, during the hearing described by Attorney Crump, Judge Vang informed counsel that he did not have a familial relationship with the charging officer.

37.     In her affidavit attached to the 11 April 2022 Motion to Recuse, in the section titled *"State v. Collin Auty,"* Attorney Crump alleged that Judge Vang "failed to avoid impropriety" because an unidentified individual purportedly overheard Attorney Jeannie Blake call Attorney

6

Crump a "mouthy cunt" while having lunch with Judge Vang. Attorney Crump further stated that Attorney Blake "recently confirmed to me that such a lunch and conversation occurred but apologized for her behavior and comment. She and I now have a positive working relationship and understanding as officers of the court." These statements regarding Attorney Blake were false: Attorney Blake did not confirm that she made the vulgar and derogatory comment described by Attorney Crump, nor did the two have a "positive working relationship and understanding" at the time Attorney Crump submitted the affidavit.

38.     In her affidavit attached to the 11 April 2022 Motion to Recuse, in the section titled "*Sherri Allgood and Tonya Troublefield*," Attorney Crump alleged that Judge Vang discussed the case of *Wyn Dozier v. Sherri Allgood and Tonya Troublefield* (a civil superior court matter), saying Attorney Crump "forged her client's signature on her answer." Attorney Crump further stated "Judge Vang does not have authority over a superior court matter, [sic] accused me of dishonesty again." This section of the affidavit is misleading because it omits material facts tending to show that Attorney Crump engaged in misconduct in connection with the *Allgood/Troublefield* matter, as addressed in more detail in paragraph 42, below

39.     In her affidavit attached to the 11 April 2022 Motion to Recuse, in the section titled "*Hitt*," Attorney Crump alleged that Judge Vang failed to perform his duties impartially when he refused to sign a consent order in a child custody matter (Montgomery County file no. 20-CVD-299). Attorney Crump claims without explanation "I have reason to believe that if the Plaintiffs were not lesbians, and if Judge Vang was not biased, the consent order would have been signed." This section of the affidavit is misleading because it omits material facts, as addressed in more detail in paragraph 41, below.

40.     In her affidavit attached to the 11 April 2022 Motion to Recuse, in the section titled "*Amber Sellers,*" Attorney Crump alleged without basis that Judge Vang engaged in improper *ex parte* communications concerning pending proceedings. She further contended that Judge Vang "sanctioned me on a motion to compel without even reviewing the discovery being compelled" after accusing Attorney Crump of forging her client's signature. This statement was false: Judge Vang did not accuse Attorney Crump of forging a signature. In addition, this section of the affidavit is misleading because it omits material facts, as addressed in more detail in paragraph 43, below.

## B.  Matters Raised in the Motion to Recuse Indicate Other Misconduct by Attorney Crump

41.     In the custody matter referenced in the section of Attorney Crump's affidavit titled "*Hitt*," (discussed previously in paragraph 39, above), when Judge Vang declined Attorney Crump's request to enter the order, Attorney Crump accused him without basis of being biased against her clients due to their sexual orientation. Attorney Crump then presented the same consent order regarding custody to the Honorable John Nance, who also declined to enter it: When Judge Nance asked the *pro se* defendant whether she understood the terms of the consent order, she said she did not, and didn't remember signing anything. Judge Nance also determined that the defendant had not been properly served with the complaint and that the consent order presented by Attorney Crump falsely stated that the identity of the child's father was unknown. Attorney Crump engaged in misconduct in connection with the *Hitt* matter in that:

7

a. By submitting to the Court a consent order that falsely stated the identity of the child's father was unknown, Attorney Crump made a false statement of material fact to the Court in violation of Rule 3.3(a)(1); and

b. By accusing Judge Vang of bias against litigants based on sexual orientation without factual basis, Attorney Crump made a statement with reckless disregard as to its truth or falsity concerning the integrity of a judge in violation of Rule 8.2(a).

42.     In the case of *Wyn Dozier v. Sherri Allgood & Tonya Troublefield* (discussed in paragraph 38, above), Attorney Crump notarized Allgood's signature on the verification of her discovery responses on 8 May 2021. On 28 June 2021, Attorney Crump filed what purported to be a verified Answer on behalf of Allgood. The verification page attached to Allgood's Answer was actually an altered copy of Allgood's 8 May 2021 verification, with the dates on both the signature and the notarization whited-out and modified. By filing a forged document with the Court, Attorney Crump engaged in conduct involving dishonesty, deceit, or misrepresentation in violation of Rule 8.4(c), committed a criminal act (forgery) reflecting adversely on her honesty, trustworthiness, or fitness as a lawyer in violation of Rule 8.4(b), and engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d).

43.     In the case referenced in the section of Attorney Crump's affidavit titled *"Amber Sellers"* (discussed in paragraph 40, above), Attorney Crump received discovery requests and two follow-up emails from opposing counsel but did not provide discovery or respond to the emails. In January 2021, opposing counsel filed a Motion to Compel Discovery and Motion for Sanctions, which was heard by Judge Vang in March 2021. When she arrived at the hearing, Attorney Crump delivered to opposing counsel discovery responses that were verified by her client in January 2021. Judge Vang questioned the client to confirm that she had in fact verified the discovery responses in January. During the hearing, Attorney Crump initially falsely denied having received the discovery requests or the emails. Attorney Crump engaged in misconduct in connection with the Sellers matter in that:

a. By failing to timely produce discovery responses, Attorney Crump failed to make a reasonably diligent effort to comply with a legally proper discovery request by an opposing party in violation of Rule 3.4(d)(2); and

b. By initially claiming to the Court that she had not received the discovery requests or follow-up emails regarding discovery, Attorney Crump made a false statement of material fact to the tribunal in violation of Rule 3.3(a)(1) and engaged in conduct involving dishonesty, deceit, or misrepresentation in violation of Rule 8.4(c).

44.     In her affidavit attached to the 11 April 2022 Motion to Recuse, in the section titled *"State v. Pratt, Montgomery County File No. 19-CR-50695,"* Attorney Crump alleged that during her client's trial on charges of sexual battery, Judge Vang did not allow her "to introduce evidence that the prosecuting witness has accused other individuals of rape and the charges were dismissed and/or defendants were found not guilty." Attorney Crump further alleges that Judge Vang loudly shouted "'Enough! You know better Ms. Crump.'" The incident referenced by Attorney Crump in

8

this section of her affidavit does not demonstrate judicial bias, but it did involve professional misconduct by Attorney Crump, in that:

    a. Her attempt to elicit testimony regarding prior sexual conduct by the complainant without first seeking leave of the court is specifically prohibited by North Carolina's Rape Shield Statute, which provides: "Before any questions pertaining to such evidence are asked of any witness, the proponent of such evidence shall first apply to the court for a determination of the relevance of the sexual behavior to which it relates." N.C. Gen. Stat. § 8C-1, Rule 412(d). Attorney Crump's ignorance of this statute while representing a client on sex offense charges reflects a lack of competence in violation of Rule 1.1.

    b. After Judge Vang informed Attorney Crump that this line of questioning was prohibited, she persisted in asking about the complainant's sexual history, thereby failing to yield gracefully to the Court's ruling in violation of Rule 12 of the North Carolina General Rules of Practice for Superior and District Court. By violating Rule 12 of the General Rules of Practice, Attorney Crump knowingly disobeyed an obligation under the rules of a tribunal in violation of Rule 4.4(c).

### C. The Motion to Recuse Was Frivolous and Raises Questions Regarding Attorney Crump's Competence

45.     Attorney Crump asserted issues in the 11 April 2022 Motion to Recuse and accompanying affidavit without basis in law or fact in violation of Rule 3.1, as explained in paragraphs 46 through 50, below.

46.     As indicated in section II above, a party seeking to disqualify a judge is required to show substantial evidence objectively demonstrating that the judge has a personal bias or prejudice against or in favor of a party.

47.     Attorney Crump ostensibly filed the 11 April 2022 Motion to Recuse on behalf of her client Nancy Bean, but the Motion to Recuse did not contain a single allegation suggesting that Judge Vang had any personal bias or prejudice against Nancy Bean.

48.     Attorney Crump contended—without legal basis or explanation for the arbitrary time limit—that because she was "one of the main members" of Judge Vang's opponent's campaign in the 2018 election, Judge Vang "should have recused himself for a minimum of six months."

49.     Throughout the Motion to Recuse and accompanying affidavit, Attorney Crump cites to hearsay, rumor, purported statements by unidentified people, subjective impressions, and pure speculation (which in one instance she admits having no proof of). This pattern suggests that Attorney Crump lacks a basic understanding of the concepts of "factual support" and "admissible evidence," and thus lacks competence as a lawyer in violation of Rule 1.1.

9

50.     Many of the anecdotes provided by Attorney Crump as the basis for her 11 April 2022 Motion to Recuse are unremarkable instances in which the Court made a benign comment, ruled in a manner that displeased Attorney Crump, questioned Attorney Crump, or admonished Attorney Crump for tardiness. These anecdotes describe routine daily events in courtrooms across North Carolina and do not contain any cognizable allegation of bias by Judge Vang. See, e.g., the following sections in the affidavit attached to Attorney Crump's 11 April 2022 Motion to Recuse:

   a.  In the section titled "*State v. McIntyre, Montgomery County File No.*," Attorney Crump claims she was denied a continuance and forced to have a trial on the matter in which her client was found guilty. Attorney Crump also claims that her motion to withdraw as counsel was denied.

   b.  In the section titled "*Kelly Hinson,* Attorney Crump alleged that Judge Vang "failed to maintain order and decorum in proceedings before the judge" because he decided to hear criminal charges in conjunction with civil actions filed under Chapters 50B and 50C when all matters involved the same parties and underlying facts. She observed that her objections were overruled and objections to her questions were sustained.

   c.  In the section titled "*Mauldin v. Mauldin, Montgomery County File No. 14DVD470*," Attorney Crump recounted that Judge Vang admonished her for being late for child support court.

   d.  In the section titled "*Montgomery County Child Support v. James Valentine*," Attorney Crump alleged that in a child support matter Judge Vang questioned Attorney Crump, saying "Tell me this Mrs. Crump, ANSWER ME THIS Mrs. Crump!"

   e.  Also in the section titled "*Montgomery County Child Support v. James Valentine*," Attorney Crump alleged that when she sought an *ex parte* custody order on behalf of Dale Cook, alleging that "the children, one as young as four, were having to care for themselves and prepare their food while their mother slept[,] Judge Vang made statements like, 'well even my girls cook noodles for themselves.'"

## V.  2 MAY 2022 MOTION TO INTERVENE (*IN RE S.B.*, 21 JA 54)

51.     On 2 May 2022, Attorney Crump filed the following motions on behalf of Adam and Jennifer Bowles in *In re S.B.*, an ongoing juvenile abuse/neglect/dependency case: Motion to Intervene, Motion to Stay, Motion to Disqualify Counsel, and Motion for Montgomery County DSS to Transfer Case. The motions are attached as Exhibit E[3] and referred to hereafter as "2 May 2022 motions."

---

[3] The undersigned submits the documents attached hereto as Exhibits A and E under seal, as they are filings in juvenile matters which are confidential pursuant to N.C. Gen. Stat. § 7B-2901(a).

10

### A.     <u>Attorney Crump's 2 May 2022 Motions Were Unsupported by Law</u>

52.     In the 2 May 2022 motions, Attorney Crump displayed incompetence in violation of Rule 1.1 and asserted issues without basis in law in violation of Rule 3.1. Specific instances of Attorney Crump's violations of Rules 3.1 and 1.1 are described in paragraphs 53 through 60, below.

53.     As stated in section I above, foster parents do not have standing under North Carolina law to intervene in a juvenile abuse/neglect/dependency action unless the child has been residing with them for the previous 18 months.

54.     Attorney Crump's 2 May 2022 motions stated that the minor child had been placed in foster care with the Bowles in December 2021 and had lived with them until 29 April 2022. Since the child had only lived with Attorney Crump's clients for a total of approximately 4.5 months, there was no legal basis to file a motion to intervene on their behalf, nor did they have standing to request any of the other relief sought in the motions.

55.     There was no basis in law for Attorney Crump's request that S.B.'s matter "be transferred to another agency."

56.     There was no basis in law for Attorney Crump's request that DSS Attorney Jeannie Blake be disqualified from representing the agency in S.B.'s case.

57.     There was no basis in law for Attorney Crump's assertion that her clients were entitled to S.B.'s Social Security number so they could claim her as a dependent on their tax returns: A foster parent may only claim a foster child as a dependent for tax purposes if the child resided with the foster family for more than six months in a calendar year. S.B. had only lived with the Bowles for a few weeks in 2021 and approximately 4 months in 2022.

58.     There was no basis in law (or fact) for Attorney Crump's assertion that Montgomery County Sheriff's Deputy Ray Dawson and Montgomery County DSS engaged in "obstruction of justice, a class H felony in North Carolina." (Exhibit E, ¶16 and ¶19) By making spurious allegations of felonious conduct against those she viewed as opposing her clients' wishes, Attorney Crump used means in representing a client that had no substantial purpose other than to embarrass or burden a third party, and therefore also violated Rule 4.4(a).

59.     There was no basis in fact for Attorney Crump's assertion that her clients "know of no other reason why Montgomery County DSS would refuse to provide [S.B.'s social security number] unless it was possible for them to receive a financial benefit." (Exhibit E, ¶36)

60.     There was no basis in law for Attorney Crump's assertion that "the Minor Child's removal from the Petitioners' home was not authorized or signed by a judge" (Exhibit E, ¶46): The Court granted Montgomery County DSS placement authority over S.B., so the agency was legally authorized to make decisions about where the child would reside.

11

**B.    Attorney Crump's 2 May 2022 Motions Contain False Assertions of Fact**

61.    In the 2 May 2022 motions, Attorney Crump made false and misleading statements to the Court, thereby making false statements of material fact to the tribunal in violation of Rule 3.3(a)(1) and engaging in conduct involving dishonesty, deceit, or misrepresentation in violation of Rule 8.4(c). Specific instances of Attorney Crump's violations of Rules 3.3(a) and 8.4(c) are described in paragraphs 62 through 65, below.

62.    In paragraph 11 of the 2 May 2022 motions, Attorney Crump falsely asserted that "the parents do not want the Minor Child to be placed with any of the Fathers' [sic] family members." This statement was false, as once paternity was established, S.B.'s father had continuously advocated that she be placed with his family.

63.    Paragraph 17 of the 2 May 2022 motions was misleading in that—by noting that Captain Kerney was unaware of who requested or authorized Deputy Dawson's involvement in S.B.'s change of placement—it falsely implied that Deputy Dawson is supervised by or reports to Captain Kerney within the Montgomery County Sheriff's Office.

64.    In paragraph 28 of the 2 May 2022 motions, Attorney Crump falsely asserted that "Montgomery County DSS has not held a MAPP [foster parent training] class in years." This statement was false, as Montgomery County DSS had conducted two MAPP classes during the year before the motions were filed.

65.    In paragraph 34 of the 2 May 2022 motions, Attorney Crump asserted that DSS had not "express[ed] intent to transfer the . . . child until AFTER the Petitioners' inquired as to the . . . [c]hild's social security number." This statement is misleading, as her clients were informed from the outset that kinship placements for S.B. were being explored.

**VI.    PREJUDICE TO THE ADMINISTRATION OF JUSTICE**

66.    Attorney Crump's course of conduct, as outlined above, has significantly disrupted the orderly and efficient administration of justice in this District in violation of Rule 8.4(d). Specifically:

    a.  Frivolous motions lacking factual and legal basis needlessly consume court time and resources.

    b.  Frivolous requests to recuse judges delay substantive disposition of cases and undermine public faith in the judiciary

    c.  Judges' and lawyers' ability to rely on an attorney's word is integral to the proper functioning of the adjudicative process. When an attorney makes false statements to the court, it impairs the orderly and efficient administration of justice.

12

## CONCLUSION/REQUEST FOR RELIEF

To protect the administration of justice, the public, and the profession, the Court should exercise its inherent authority to determine whether Attorney Crump engaged in misconduct as indicated herein, and whether professional discipline is warranted.

WHEREFORE, the Undersigned requests that the Superior Court issue an Order to Show Cause requiring Attorney Brooke McIntosh Crump to appear before the Court for a hearing to determine if the allegations of professional misconduct outlined herein are true, and if so, what discipline or sanction is appropriate.

This the 6th day of June, 2022.

The Honorable John Nance
Chief District Court Judge
District 20A

13

# EXHIBIT A


21 March 2022 Motion to Intervene/Petition for Placement,

*In re A.H.*, 21-JA-10


## FILED SEPARATELY UNDER SEAL

STATE OF NORTH CAROLINA

MONTGOMERY COUNTY

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION



MOTION IN THE CAUSE

In Re Brooke Crump

MONTGOMERY COUNTY
FILED
MAR 2 2022
AT 10:06 O'CLOCK A M
CLERK OF SUPERIOR COURT

1. NOW COMES THE Undersigned, Brooke Crump, Attorney at Law, and respectfully moves that the Honorable John Nance, Chief District Court Judge, recuse himself from all of Attorney Crump's matters pursuant to Cannon 3 of the Code of Judicial Conduct and N.C.G.S. § 15A-1223. The Undersigned shows the Court as follows:

2. North Carolina General Statute § 15A-1223 provides that "[a] judge, on motion of the State or the Defendant, must disqualify himself from presiding over a criminal trial or other criminal proceeding if he is "prejudiced against the moving party or in favor of the adverse party" or "for any other reason unable to perform the duties of him in an impartial manner".

3. Further, the Code of Judicial Conduct provides that "[a] Judge should disqualify himself in a proceeding in which his impartiality might be questioned…". Code of Judicial Conduct Canon 3C (1)(a), 2002 Ann, R.N.C. 306. In State vs. Fie, 320 NC 626, 359 S.E.2.d. 774 (1987) the Court held that even if the judge is not actually prejudiced against the defendant, or in fact unable to preside fairly over the trial, "The appearance of a preconception of the validity of the charges against these defendants is sufficient to require a new trial.." and thus

**EXHIBIT**

B

the appearance of partiality by the judge assigned to decide the merits of the case is a basis for recusal.

4. A basic requirement of the Due Process Clause of United States and North Carolina Constitution is the right to a fair trial in a fair tribunal.

5. As illustrated by the affidavit attached hereto and referenced herein, as Exhibit A of Attorney Brooke M. Crump, a reasonable person would question the impartiality of the Honorable John Nance because said Judge has communicated allegations of unprofessional conduct to multiple members of the bar.

6. The Honorable John Nance has communicated allegations of untruthfulness to other attorneys and judges.

7. The Honorable John Nance is a material witness in any proceedings initiated by the North Carolina State Bar, making him the fact-finder over the attorney's matters improper.

8. In one matter, a witness to a child custody matter in which Attorney Crump appeared as counsel asked if The Honorable John Nance cut her off from speaking because she was a woman.

9. The Honorable John Nance used his inherent authority to remove Attorney Crump from court-appointed matters in March 2021 based on his allegation of a pending investigation being conducted by the North Carolina State Bar.

10. Attorney Crump had no knowledge of any pending investigation at that time, nor in the immediately preceding months.

11. The bias, prejudice or interest which requires a trial judge to be recused from a trial has reference to the personal disposition or mental attitude of the trial judge, either favorable or unfavorable, toward a party to the action before him." *Scott*, 343 N.C. at 325 (emphasis added). The Undersigned has reason to believe The Honorable John Nance is biased against counsel.

12. The Honorable John Nance has communicated his reasons of bias to the other members of the bench within the district, giving rise to a reasonable basis of bias for Judge Vang and Judge Cornett.

13. The Honorable John Nance has been known to roll his eyes when Attorney Crump speaks.

14. The Honorable John Nance has presided over matters involving Attorney Crump's husband's legal matters.

15. Should the Court determine that the Undersigned has delayed in presenting this motion for recusal, the undersigned only recently learned of conversations having occurred between the Honorable John Nance and others reaffirming said bias; further, the undersigned submitted pleadings on March 21, 2021 to a tribunal that would cause a reasonable person to question The Honorable John Nance's bias against counsel. The Undersigned alleges that the following circumstances warrant good cause for delay:

   A. The Undersigned was just retained in a matter calendared for March 21, 2021 two days prior.

B. Further, Counsel for the Defendant does not enter into such a request lightly and at all times, respects the autonomy of the Bench. Due to the potential sensitivities regarding Attorney Crumps matters, the Undersigned alleges that good cause for delay exists.

WHEREFORE, the Undersigned respectfully prays:

1. That the Honorable John Nance issue a standing order for recusal for himself over Attorney Crump's matters as well as any other district court judges under his authority with which he has communicated information about any facts concerning his potential bias against Attorney Crump.

2. Further, if the Honorable John Nance declines to recuse himself, the Undersigned requests that the matter be heard and decided by a Judge from a county other than a Montgomery County judge.

This the 21st day of March, 2022.

Respectfully submitted,

**LAKE TILLERY LAW**

Brooke M. Crump
*Counsel for Plaintiff*
NC State Bar No. 52684
brooke@laketillerylaw.com
PO Box 396
Mount Gilead, NC 27306
Telephone: 910.439.3070
Facsimile: 910.889.8229

## CERTIFICATE OF SERVICE

I, Brooke Crump, do hereby certify that on the 21st day of March 2022, I served a copy of the foregoing motion and order and order upon The Honorable John Nance as follows:

[ ]     Email

[ ]     By Fax at:

[X]     Personal-Delivery

[ ]     By deposit in the U.S. Mail addressed as follows and with the correct first-class postage affixed thereto:

This the 21st day of March, 2022.

Respectfully submitted,

**LAKE TILLERY LAW**

Brooke M. Crump
NC State Bar No. 52684
brooke@laketillerylaw.com
PO Box 396
Mount Gilead, NC 27306
Telephone: 910.439.3070
Facsimile: 910.889.8229

## AFFIDAVIT

North Carolina

County of _Montgomery_

_Brooke Crump_, appearing before the undersigned notary and being duly
*Name of principal*
sworn, says that:

Other attorneys have informed me that Judge Nance accused me of acts dishonesty.

Further, my clients have noticed a sense of bias and that I am interrupted when speaking.

Officers of the court have commented on the seeming bias against me from the local bench in

this district, as well as my clients. I fear my clients are not being fairly heard due to that bias. A

reasonable person would question bias, if they knew some of the comments Judge Nance has

made about me in my my absence. Further, Judge Nance and those under his authority will be

material witnesses in any disciplinary proceedings initiated against me.

_____
*Principal's Signature*

Sworn to (or affirmed) and subscribed before me this the _21_ day of _March_, 20_22_.

(Official Seal)

_____
*Official Signature of Notary*

_James Crump_, Notary Public
*Notary's printed or typed name*

My commission expires: _6-27-26_

JAMES MATTHEW CRUMP
Notary Public
Montgomery
County
My Comm. Exp.
06-27-2026
NORTH CAROLINA

No. 21-_____                          JUDICIAL DISTRICT 20A

## NORTH CAROLINA COURT OF APPEALS
**********************************************

In Re: Atlas Hamilton,                    )
       Minor Child,                   )
                                      )
                                      )        <u>From Montgomery County</u>
v.                                        )             <u>21-JA-10</u>
                                      )
Micaela Rush and Tyler Rush,               )
       Petitioners.                   )

**********************************************
## EMERGENCY PETITION FOR WRIT OF PROHIBITION
**********************************************

TO THE HONORABLE NORTH CAROLINA COURT OF APPEALS:

NOW COMES the Petitioners by and through counsel, pursuant to Rules 22 of the

North Carolina Rules of Appellate Procedure and N.C. Gen. Stat. § 7A-32(b) and

(c), and respectfully petitions this Court to issue a writ of prohibition. In support

thereof, Petitioners show the following:

### **INTRODUCTION**

     On March 21, 2022, the Undersigned filed a motion to intervene on behalf of

the Petitioners while simultaneously filing a motion to recuse the Honorable John

Nance from all of counsel for the Petitioner's matters. The Honorable John Nance

did not address her recusal motion and continued the hearing set for March 21,

2022 until April 4, 2022. Her recusal motion was returned to her courthouse

**EXHIBIT**

**C**

mailbox with the time stamp marked out. The Undersigned was calendared to appear before the Honorable John Nance on March 25, 2022 but instead of appearing and ruling on the recusal motion, the Honorable John Nance canceled IV-D court the morning of March 25, 2022 due to a toothache. The Honorable John Nance is a material witness against the Undersigned in a bar grievance that he notified the undersigned of four months prior to the Undersigned receiving from the North Carolina State Bar. The grievance includes allegations of dishonesty made by the Honorable John Nance. The Honorable John Nance has heard dozens of the Undersigned matters since he notified her of the pending bar investigation in a signed order on March 24, 2022, it is becoming increasingly more difficult to not ascertain bias from his rulings and his temperament against counsel. Petitioner and counsel seek this writ for this court to act in order to prevent undermining public confidence in the judiciary by exercising its general power to supervise and control the proceedings of any of the other courts of the General Court of Justice (N.C. Gen. Stat. § 7A-32 (2014).

## STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY

1. On March 21, 2022, the Undersigned also filed a Motion to Recuse the Honorable Judge Nance (A copy of this motion is attached to this petition as Exhibit "B" and incorporated as if fully set out herein).

2. On March 21, 2022, the Honorable Judge Nance was presiding over Juvenile court, in which the above-captioned matter was scheduled for

hearing.

3. On March 21, 2022, the Undersigned, along with the Assistant Clerk of Court, served the Honorable John Nance and counsel with both the motion to recuse and the Motion to Intervene, as reflected in the attached certificate of service.

4. The Honorable John Nance, while in chambers with counsel in the matter except for the undersigned, had the Assistant Clerk of Court communicate to the undersigned that the matter would be continued and placed on the April 4, 2022 court calendar.

5. The Honorable John Nance was scheduled to be the judge presiding over the April 4, 2022 calendar.

6. On March 22, 2022, the Undersigned retrieved the recusal motion from her box at the courthouse with the timestamp crossed out with a note stating to instead file a motion with every matter the Undersigned has pending.

7. On March 25, 2022, the Undersigned was calendared to appear in court on two separate matters; one involving a matter now docketed before this honorable court and another involving her spouse's financial matter.

8. On March 25, 2022, the Honorable John Nance was the presiding judge on the calendar; however, the undersigned learned that all matters were continued around 9 am on March 25, 2022 because the Honorable John Nance would not be appearing due to a toothache.

9. The Undersigned has had toothaches on days she was scheduled to appear in court; this court, of which the Honorable John Nance is chief district court judge instructed the Undersigned appear as soon as her root canal was complete- which she did.

10. The spouse of the undersigned is currently experiencing extreme health issues and post-covid complications; he was admitted to UNC Hospital on March 25, 2022 and the undersigned spent the majority of the week in the hospital with her husband.

11. On March 31, 2022, Judicial Assistant Angie Jones sent out an updated calendar for April 4, 2022 including the above-captioned matter with the Honorable John Nance still named as the judge presiding.

12. The April calendar reflects all three district court judges recusing themselves from a matter the Undersigned appears in, with the cause unknown.

13. The Honorable John Nance has indicated some acknowledgement of bias toward counsel when he recused himself from another one of her matters without providing any reason and when canceling court instead of presiding over her matters due to a seemingly minor issue.

14. Further, instead of addressing her recusal motion when the Undersigned presented it to him, the Honorable John Nance continued the underlying hearing and acted as if the motion for recusal didn't happen.

15. The Honorable John Nance is the chief district court judge and as stated in the attached motion, the Undersigned has knowledge that he communicated his reasons for bias against counsel to the two district court judges within the district and under his authority.

16. The Honorable John Nance has given no indication he plans to voluntarily recuse himself or have the motion for disqualification be heard before another judge.

17. On March 23, 2021, after proper notification, the Undersigned was not present in criminal district court with the Honorable John Nance presiding due to her husband's emergency heart surgery.

18. On March 26, 2021, the Undersigned found an administrative order in her box at the courthouse signed by the Honorable John Nance that stated, "WHEREAS, based on the inherent authority of the Chief District Court Judge and due to an ongoing investigation by the North Carolina State Bar, Attorney Brooke Crump is hereby suspended from the court appointed list for all cases" (a copy marked as Exhibit "C" is attached to this Petition and is incorporated as if fully set out herein).

19. The Undersigned attempted to call the North Carolina State Bar because she had no knowledge or notice of any ongoing investigation conducted by the North Carolina State Bar, but was unable to speak with anyone because everyone was working remotely due to Covid.

20. The Undersigned spoke with other members of the local bar and learned that on March 23, 2021, the Honorable John Nance gathered the members of the district's criminal defense bar and instructed them to remove the Undersigned from the Court-Appointed List.

21. The Undersigned was told by another member of the local bar that the Honorable John Nance first instructed the Clerk of Court to do so who declined, as it is not in line with the rules as set out by the district and IDS.

22. The Undersigned believes the local defense bar did not find such action proper, and also declined to do so.

23. Therefore the Honorable John Nance used his inherent authority to remove the Undersigned from the court-appointed list for district court matters.

24. However, he did not remove her from her previously appointed matters and the Undersigned is still appearing in matters that she was appointed in prior to March 23, 2021.

25. Further, on at least one occasion, the Honorable John Nance appointed her to another district court matter after March 23, 2021.

26. The Undersigned was never removed from the felony court-appointed list, matters in which she still is appointed and appears.

27. Multiple members of the legal community have informed the undersigned that the Honorable John Nance has discussed accusations he's made against her which are now pending before the North Carolina State Bar.

28. The Honorable John Nance began averting the Undersigned and her requests to sign orders.

29. Although the Undersigned had no notice of any bar investigation in April 2021, May 2021, and June 2021, a member of the judiciary continuously reported the Undersigned to the Bar until she finally received notice of a grievance in July 2021.

30. The Grievance includes felonious accusations made by the Honorable John Nance, involving using her iPad as a method of display for an exhibit during a hearing in November 2020, before the Honorable John Nance.

31. The Honorable John Nance has communicated allegations of untruthfulness about the Undersigned to the North Carolina State Bar and other members of the legal community, as evidenced in the grievance she received from the North Carolina State Bar in July 2021, filed by Carmen Bannon, State Bar judicial-liaison.

32. The Honorable John Nance will be a material witness in any proceedings initiated by the North Carolina State Bar against the Undersigned.

33. On April 16, 2021, a Randolph County judge indicated the Honorable John Nance had informed him of the allegations pending against her that he either initiated or the investigation which he contributed to.

34. On August 26, 2021, when the Undersigned reached out to now retired Judge William Tucker about potentially consulting with her on a case, he

stated his involvement would be inappropriate due to his knowledge of allegations of professional misconduct now pending against her.

35. The Undersigned has stated all of the above to the North Carolina State Bar along with her intent to file a complaint with Judicial Standards Commission; the only reason she has not yet done so is because it has been extremely difficult to continuously appear before a judge making accusations against her character to members of the bar and bench while protecting her clients' interests and dealing with her spouse's health issues.

36. The Undersigned had an excellent rapport with the community and although the Undersigned is not a seasoned attorney, she was proud of her reputation. The Honorable John Nance's attitude toward her in court has caused clients to seek other counsel that never would have otherwise and for witnesses to make comments such as asking if the Honorable John Nance cut her off from speaking because she was a woman.

## REASONS WHY THE WRIT SHOULD ISSUE

Absent Voluntary Recusal When Disqualification is Clear on the Merits, this court can and should act to prevent undermining public confidence in the judiciary. The Appellate Courts have the power to enter an order of disqualification. Based on the facts alleged in this petition, the North Carolina Code of Judicial Conduct and the Norms of Judicial Ethics Require Disqualification and due to the Honorable John Nance's refusal of voluntary recusal, evident by him continuing to

preside over matters in which the Undersigned appears for over a year, and ignoring the the undersigned's motion completely, the undersigned has come to this court with its power to issue its writ of prohibition as a form of last resort and should issue.

## RELIEF REQUESTED

For the foregoing reasons, Petitioners respectfully requests that this Court issue its writ of prohibition enjoining Judge Nance, and those serving under his supervision, from presiding over the above-captioned matter and any other matters in which the undersigned appears. Petitioners also requests this court to enter a temporary stay and Writ of Supersedes until this Writ of Prohibition has been finally determined, and time for review to the North Carolina Supreme Court of any such determination has expired.

This the 4th day of April, 2022.

Respectfully submitted,

**LAKE TILLERY LAW**

/s/ Brooke Crump
Brooke M. Crump
NC State Bar No. 52684
brooke@laketillerylaw.com
PO Box 396
Mount Gilead, NC 27306
Telephone: 910.439.3070
Facsimile: 910.889.8229

## CERTIFICATE OF SERVICE

I, Brooke Crump, do hereby certify that on the 4th day of April 2022, I served a copy of the foregoing petition upon related parties as follows:

[ ]    Email

[X]    By Fax at:

Honorable John Nance
*Stanly & Montgomery Counties/ District 20A*
P.O. Box 1607
Albemarle, NC 28002
O  704-986-7085
F  704-986-7013

Jeannie Blake
*Counsel for DSS*
115 Courthouse Square
Troy, NC 27371
p. 910-576-0630
f 1-888-882-2076
[ ]    Personal-Delivery

[ ]    By deposit in the U.S. Mail addressed as follows and with the correct first-class postage affixed thereto:

Respectfully submitted,

**LAKE TILLERY LAW**

/s/ Brooke Crump
Brooke M. Crump
NC State Bar No. 52684
brooke@laketillerylaw.com
PO Box 396
Mount Gilead, NC 27306
Telephone: 910.439.3070
Facsimile: 910.889.8229

Bret Bean,
    Plaintiff,

v.

Nancy Bean (now Lewis),
    Defendant.

)
)
)
)
)
)
)
)

MOTION TO RECUSE

NOW COMES THE Undersigned, Brooke Crump, Attorney at Law, and respectfully moves that the Honorable John Nance, Chief District Court Judge, recuse himself from all of Attorney Crump's matters pursuant to Cannon 3 of the Code of Judicial Conduct and N.C.G.S. § 15A-1223. The Undersigned shows the Court as follows:

1. North Carolina General Statute § 15A-1223 provides that "[a] judge, on motion of the State or the Defendant, must disqualify himself from presiding over a criminal trial or other criminal proceeding if he is "prejudiced against the moving party or in favor of the adverse party" or "for any other reason unable to perform the duties of him in an impartial manner".

2. Further, the Code of Judicial Conduct provides that "[a] Judge should disqualify himself in a proceeding in which his impartiality might be questioned...". Code of Judicial Conduct Canon 3C (1)(a), 2002 Ann, R.N.C. 306. In State vs. Fie, 320 NC 626, 359 S.E.2.d. 774 (1987) the Court held that even if the judge is not actually prejudiced against the defendant, or in fact unable to preside fairly over the trial, "The appearance of a preconception of the validity of the charges against these defendants is sufficient to require a new trial.." and thus the appearance of partiality by the judge assigned to decide the merits of the case is a basis for recusal.

3. A basic requirement of the Due Process Clause of United States and North Carolina Constitution is the right to a fair trial in a fair tribunal.

4. As illustrated by the affidavit attached hereto and referenced herein of Attorney Brooke M. Crump, a reasonable person would question the impartiality of the Honorable Thai Vang as it relates to any cases of Attorney Brooke M. Crump's matters; particularly that he has accused her of being dishonest to a tribunal to others and the North Carolina State Bar. Should Attorney Brooke M. Crump be subject to a hearing before the North Carolina State Bar regarding any of the matters of untruthfulness that Judge Vang has accused her, he would be a material witness against her in those matters.

5. The bias, prejudice or interest which requires a trial judge to be recused from a trial has reference to the personal disposition or mental attitude of the trial judge, either favorable or

EXHIBIT

D

unfavorable, toward a party to the action before him." *Scott*, 343 N.C. at 325 (emphasis added). The Undersigned has reason to believe The Honorable Thai Vang is biased against counsel.

6. Bringing this matter before the court has been extremely stressful for the undersigned. The undersigned has spoken with Judicial Standards on two prior occasions, but was afraid of retaliation if she were to proceed. The undersigned became emotionally prepared to proceed today; personal attacks made upon counsel from the bench are stressful, emotionally taxing, and make one feel powerless. However, Attorney Brooke M. Crump has now filed a complaint with North Carolina Judicial Standards today after learning that Judge Vang was refusing to recuse himself, even though Attorney Brooke M. Crump asked for a recusal in a previous motion filed with the court and presented to Montgomery County Chief District Court Judge, John Nance. Further, despite said allegations, he did not recuse himself from a IV-D matter involving Attorney Brooke M. Crump's spouse; even if Judge Vang thought he was able to proceed without bias to her clients, he has indicated to others a bias against her personally, therefore making it improper to hear any matters as it relates to her or her spouse.

WHEREFORE, the Undersigned respectfully prays that the Honorable Thai Vang issue a standing order for recusal for himself over Attorney Crump's matters as well as any other district court judges under his authority with which he has communicated information about any facts concerning his potential bias against Attorney Crump. Further, if the Honorable Thai Vang declines to recuse himself, the Undersigned requests that the matter be heard and decided by a Judge from a county other than a Montgomery County judge.

This the 11th day of April, 2022.

Respectfully submitted,

LAKE TILLERY LAW

Brooke M. Crump
NC State Bar No. 52684
brooke@laketillerylaw.com
PO Box 396
Mount Gilead, NC 27306
Telephone: 910.439.3070

STATE OF NORTH CAROLINA

MONTGOMERY COUNTY

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
21 CVD 000451

## CERTIFICATE OF SERVICE

I, Brooke Crump, do hereby certify that on the 11th day of April, 2022, I served a copy of the foregoing motion and order and order upon The Honorable Thai Vang and IV-D Counsel Kent Trull as follows:

[X]    Email

[ ]    By Fax at:

[ ]    Personal-Delivery

[ ]    By deposit in the U.S. Mail addressed as follows and with the correct first-class postage affixed thereto:

This the 11th day of April, 2022.

Respectfully submitted,

**LAKE TILLERY LAW**

Brooke M. Crump
NC State Bar No. 52684
brooke@laketillerylaw.com
PO Box 396
Mount Gilead, NC 27306
Telephone: 910.439.3070
Facsimile: 910.889.8229

# ๑

# AFFIDAVIT

North Carolina
County of <u>Montgomery</u>

Brooke M. Crump, appearing before the undersigned notary and being duly sworn, alleges the following:

I filed a complaint with Judicial Standards alleging the following against Judge Vang regarding the following violations of the North Carolina Code of Judicial Conduct:

## Canon 3(C)(1)(c): Failure to disqualify
<u>Extra-Judicial Statements</u>
When I asked Jeannie Blake if Judge Vang makes extra-judicial statements criticizing me, she said that he does talk about me when I am not present, so that his bias is well-known in the legal community. Yet he does not disqualify himself.

<u>2018 Judicial Campaign</u>
On June 27, 2018, HB717 passed in the House; our judicial district was being redrawn and it appeared as if Montgomery would merge with Stanly County; At the time, our district consisted of the Montgomery, Randolph and Moore. Montgomery was also being allotted a district court judge seat. My mentor at the time, Beverly Spencer, informed me that she intended to file to run for judge should the bill pass in the Senate. At the time, Attorney Spencer told me it was rumored that Stanly County ADA/ current Judge T. Thai Vang, was also filing for the new district court judge's seat.

On June 27, 2018, I appeared in Stanly County for the first time; I represented Talia Drake for a speeding ticket in *State v. Drake*, File Number 18CR701524. Although calendared for June 28, 2018, Stanly County allows attorneys to meet with ADAs outside of court to handle administrative matters. Judge Vang was the ADA that met with me that day. Judge Vang introduced himself, mentioned the new judgeship, informed me of his intent to file and asked for my support. I felt uncomfortable but managed to avoid a definitive statement.

Attorney Spencer and Judge Vang filed to run for the Montgomery County district court judge's seat. On July 21, 2018, I attended the Candor Peach Festival; my family and I rode on Attorney Spencer's float in the parade. I was the only other attorney campaigning with Attorney Spencer at the Peach Festival and Judge Vang witnessed this. For the next three and a half months, I was the only attorney in our district visible on Attorney Spencer's campaign team. Although another attorney did campaign for her on Election Day, I was the only one who went to festivals with her, walked in color runs, ate with her at barbecues, introduced her at charitable events, and attended local meetings with her. My husband and I even Stanly County Republican meetings with her although we are both active in the Democratic Party (I was the Montgomery County Democratic Party chair in 2019).

Judge Vang won the election on November 6, 2018. Soon thereafter, Attorney Spencer suffered an acute pancreatic attack, was hospitalized and has not returned to work since. As one of the main members of Beverly Spencer's campaign team, Judge Vang should have recused himself from my case for a minimum of six months, but he did not.

2022 Judicial Campaign
On August 1, 2019, Bailiff Jeff Branch informed me that attorney Jeannie Blake told everyone I was running for Judge. I did not want anyone thinking I was running for judge. I asked former ADA and now Judge Cornett if he heard this statement; he replied, "Yes. Jeannie Blake said that you were running for judge". At the time, I wasn't interested in running for judge and I told him so. I also asked him to please inform Judge Vang that. He replied, "okay, I'll tell him". I am not running for district court judge. I am, however, running for North Carolina Senate.

**Canon 2A: Failure to Avoid Impropriety**
*State v. Harris*
On August 23, 2019, I called the local police to my office because a client with mental health issues wouldn't leave. I can count on one hand the clients I recall firing me but Lisa Harris, whom I represented on a stalking charge. In court she stated that she fired me because *"the Judge and the DA don't like you"*. Her cousin, David Kime, is a Montgomery County Sheriff's deputy who, ironically is the one who originally told her to hire me, told her that Judge Vang did not like me.

**Canon 1: Failure to uphold the independence of the judiciary**
1st Baseless Grievance: "Craigslist Stand-In Attorney" Personal Attack
On May 22, 2019, I was told that Judge Vang reported me to the North Carolina State Bar. I called the State Bar to inquire about the issue, but was told that I had not done anything and a grievance would not be initiated against me. I went to court and asked to speak with Judge Vang in his chambers and Judge Vang stated to me that he "saved me from a bar complaint". That statement was knowingly false; Judge Vang contacted the North Carolina State Bar and he informed other members of the court that he contacted the bar to file a grievance against me, not to save me from one. I never received anything from the State Bar concerning Judge Vang's grievance. When I spoke with Attorney Christerfer Purkey about what happened because he was also in court that day, he stated that he heard that Judge Vang reported me to the bar because of absences but he's always seen me in court.

Canon 3(C)(1)(c): Failure to disqualify
*Person within the third degree of relationship as material witness in the proceeding*
Nephew as Prosecuting Witness
I am unable to locate the client, file number or date after a diligent search of my records nor can I recall these details. However, in early 2019 I represented an indigent client charged with stealing a monster energy drink and a jar of meat. Judge Vang was on the bench and Kisha Scott was the ADA that day. My client did not have a prior record. My client was served with the warrant at his home after the incident date. He had no recollection of having gone to Food Lion on the day in

question which is where the monster energy drink and jar of meat went missing. He said that his daughter had gone to pick up his prescription that day.

Prior to the trial beginning, Judge Vang called the ADA and I up to the bench. He said that he was required to inform us that his nephew was the charging officer but that "they didn't talk about this case or anything". He said that I could have my client waive the conflict. I was put on the spot in the courtroom. My client verbally waived the conflict. During the trial we watched grainy security footage in black and white of a man entering Food Lion in a cowboy hat and glasses. He got a monster energy drink out of the cooler and began drinking it. It was claimed that he did not pay for the drink upon exiting. Further, one of the aisles he went down had an empty jar of meat. Afterward, the Judge Vang's nephew, former Troy police officer and now Locust police officer, Sheelone Vang went to the CVS next door and without a warrant they got CVS' records of the customers who had gotten prescriptions that day. They determined from that list my client was the individual who had committed the crime. From what I can recall, Judge Vang overruled most, if not all, of my objections as he almost always does and found my client guilty. Upon information and belief, Judge Vang worked with Kisha Scott for years and is believed to have a strong friendship with her.

**Canon 3(A)(4): Failure to accord the full right to be heard according to law**
*State v. McIntyre*, Montgomery County File No.
On October 22, 2019, I represented JIM FRANK MCINTYRE, III for assault. On September 25, 2019, Judge Tucker had heard the same alleged facts in a custody hearing. Our clients were granted temporary joint custody with the permanent custody hearing pending. It had been the practice of the District Attorney's office at that time if a case was pending in a civil matter, then the district attorney's office would not prosecute with the civil matter pending. October 22, 2019 was my first time appearing in the matter although my client had his first appearance prior to; however, I had been granted a continuance for the first court date due to the fact that I had been diagnosed with laryngitis and the flu. I went to court and wanted to speak to the ADA. She refused to speak with me because I was late. I asked Judge Vang for a continuance because it was my first time appearing. I also told him that I needed to issue subpoenas in the matter; the DA's office is regularly granted a continuance in order to issue a subpoena. He denied my motion to continue. I moved to withdraw from the matter and stated my grounds being so that my client could have time to retain counsel because I did not have sufficient time to prepare. Judge Vang overruled all of my objections and found my client guilty. After the trial, ADA Kisha Scott asked to speak with me. During that meeting that lasted over twenty minutes and was very heated, ADA Kisha Scott told me that she did not like me because I had been late. I told her that shouldn't be held against my client. I had only appeared on matters with Ms. Scott a handful of times prior. Attorney Jeannie Blake informed me that Judge Vang has made similar comments about me when not in my presence. After the incident, I met with the District Attorney and said that I did not believe my matters should be calendared on days in which Ms. Scott was the ADA. That request was originally verbally denied; however, I've only seen Ms. Scott in the courtroom once in the two years since the incident.

*State v. Pratt,* Montgomery County File No. 19CR50695

On November 21, 2019, I represented Corey Pratt for sexual battery in State v. Pratt. At trial, the prosecuting witness testified that she gave my client permission to get in her car and he kissed her. During the hearing, I attempted to introduce evidence that the prosecuting witness has accused other individuals of rape and the charges were dismissed and/or the defendants were found not guilty. Judge Vang was extremely harsh to me when sustaining prosecution's objection. I asked Judge Vang to allow me to present case law that stated the rape shield doctrine should not be afforded a higher protection for the witness than the defendant's constitutional protection to question the state's witnesses against him. Judge Vang loudly shouted at me "Enough! You know better Ms. Crump!" He found my client guilty. We appealed the case to superior court where the charge was dismissed.

*State v. Reyes,* Montgomery File No. 19CR50996

I represented Marino Reyes in State v. Marino Reyes. On September 3, 2019, I was present in court on an unrelated matter when I witnessed the Defendant appear in custody for his bond hearing. He was in need of an interpreter and the court was calling one remotely. He was denied counsel based on his income. The Defendant was in visible distress; he was crying and couldn't speak English. I knew just enough Spanish to communicate what was going to happen with phoning an interpreter so I offered to him and the court to represent him *pro bono* to which the court allowed and the Defendant gladly accepted. Judge William Tucker, now retired, presided over the hearing. I spoke with him privately in chambers with the interpreter. My legal opinion was that the prosecuting witness initiated charges as a tactic to get custody of the Defendant's minor child. The bond was not lowered.

On November 26, 2019, over two and a half months later, my name was listed on the calendar for Defendant Reyes. However, I never received a sheet for the appointment. When I appeared in court and realized it was the same defendant, I asked the court for a continuance because I needed to issue a subpoena and I wanted to speak to an ADA outside of court about the situation. I felt that a trial was warranted but feared Judge Vang's bias against me; I couldn't risk my client's guilty verdict with the immigration issue. I can not recall all of the reasons for my request, but I was concerned that if the defendant was found guilty, he would be deported. I told the court that although the calendar stated there had been multiple continuances in the matter, I was not the attorney of record at the time nor did I know I would be representing the Defendant until I reviewed the court calendar for that day, whereas I didn't have an appointment sheet for him. Judge Vang denied my request for a continuance; he also accused me of lying, and said that he remembered the last court date and that I said the same thing then.

Afterward, I reviewed the calendars for the dates listed on the Defendant's shuck and noted the following: on September 3, 2019, with the Honorable William Tucker presiding, Jeannie Blake was provisionally appointed but upon the Defendant submitting his affidavit of indigency, he was denied counsel. On September 24, 2019, Judge Vang appointed Jeannie Blake. On October 1, 2019, with the Honorable William Tucker presiding, Jeannie Blake withdrew. The appointment

sheet that was in the file denying the Defendant counsel had Jeannie's name marked out with my name written above it. Further, the court date was also crossed out with November 26, 2019 listed. I never received that copy nor did I receive an email notification for court-appointments as I often do. Further, when I made the limited appearance *pro bono,* ADA Kisha Scott was the prosecutor. My client was harmed and I was personally attacked and accused of lying in open court based on unverified "facts".

## Canon 3. Failure to perform the duties of the judge's office impartially
*Hitt*

I represented Emily and Constance Hitt in a child custody matter, File Number 20CVD299. On October 5, 2020, the parties signed a child custody consent. Afterward, I approached Judge Vang and asked that he sign the consent. He inquired as to the two female named Plaintiffs. I stated that they were married. He refused to sign the order and said that this was just a "back-door to adoption". I was at a loss for words while standing there with a signed consent in my hands and asked how he would like me to proceed further. He stated, "that's why they pay you the big bucks". Previously, when I was trying to get the message through to Judge Vang that I didn't want to run for Judge, I have commented that I plan to make more money than a district court judge. I do not have direct proof of the correlation, but due to the timing, I have reason to believe there is a correlation between his comment, refusal to sign the order and my statement to another. Further, district court judges in Montgomery County regularly sign off on consent orders. I have reason to believe that if the Plaintiffs were not lesbians, and that if Judge Vang was not biased, the consent order would have been signed.

## Canon 2B: Failure to avoid impropriety.
*State v. Collin Auty*

On October 27, 2020, I was purchasing hand sanitizer from Uwharrie Soap Company when I was approached by someone I didn't know and asked to step outside. She asked to hire me; upon inquiry, I recognized the opposing party's name, someone I previously represented and told her I was sorry but I had a conflict. I represented Collin Auty on a criminal charge where Kristen West was the prosecuting witness; both parties had taken out cross-warrants. She said, "I know, that is why I stopped you." This person pleaded to me for help regarding the same attorney with a potential conflict similar to the aforementioned one. I am unable to represent this person as I also have a conflict and I informed her of that. She told me that she knows, because I represented the father of her child, Collin Auty, and Attorney Jeannie Blake represented her. She said that Attorney Blake was now representing Collin Auty on a probation violation and the reason that she sought me out was because she just came from the courthouse and she saw me in court. She said that she could see I work hard for my clients and that she approached me because I have a reputation for not being "shady" like some others in the court system. She said that Collin Auty had stolen her minivan with her minor child in the car while she was pumping gas. He then drove her minivan to his parents home where they then called and filed a report against her involving child abuse with Montgomery County DSS. She also stated that Mr. Auty's mother worked for Stanly County DSS but previously worked for Montgomery County. She also said that Mr. Auty's stepfather was a deputy with the Montgomery County Sheriff's Office, Deputy Jim

Lewellen. Attorney Blake is the contract attorney for Montgomery County DSS and is also friends with Collin Auty's parents. She then pleaded for my help because I was the only one that seemed like I would help her. She said that she was a waitress at Sweet Tea Grille where she has served officers of the court eating lunch. She said that she overheard Attorney Blake, while sitting next to and conversing with Judge Vang, refer to me as a "mouthy cunt". Jeannie Blake recently confirmed to me that such a lunch and conversation occurred, but apologized for her behavior and comment. She and I now have a positive working relationship and understanding as officers of the court. However, she specifically stated that Judge Vang has made comments about me while not in my presence that indicate his personal bias against me.

_April Mendez_

I was appointed to represent April Mendez in State v. Mendez on December 8, 2020 while I was on secured leave and quarantined from the court due to an outbreak of COVID at my son's school. Upon information and belief, I received the appointment sheet on December 14, 2020. While I was in court on December 21, 2020 for another matter, I witnessed the juvenile delinquency proceeding for Defendant Mendez's minor child, who was in custody. Defendant Mendez was charged with Misdemeanor Failure to Store Firearm to Protect a Minor. The juvenile had shot and killed another minor child, not in self-defense. Defendant Mendez was present in court on December 21, 2020 while I observed the proceedings. What I witnessed in court made me to feel that my feelings of repugnance were so strong for the alleged conduct, that it was grounds for withdraw based on good cause. I also had not appeared for the Defendant and my withdrawal could be accomplished without material adverse effect on the interests of the client. I asked Defendant Mendez if she would object to my withdraw and she did not. I asked the ADA Donadio and ADA Sullivan, who were both present, if they objected, to which they did not.

Since all of the parties were present, the DA's office asked the court to send up a criminal clerk, to which they did. Judge Vang was presiding and I orally moved the court to withdraw based on a conflict and for good cause. He asked me the basis of my conflict. I felt as if I had no choice but to disclose the truth for the basis of my repugnance with the manner in which I was questioned. I told the court that my father committed suicide with someone else's gun and my moral convictions regarding the incident were recently exacerbated by a four year old bringing a loaded gun into my child's pre-k classroom. Judge Vang called counsel to the bench and asked me what was the difference between this gun charge and any other; that if he let me withdraw for this, he shouldn't be able to appoint me on any other firearm charges. I told him that my moral convictions were specific to Defendants facing charges involving firearms that were the weapon used in a homicide by someone other than the Defendant, specifically minor children. Judge Vang briefly left the courtroom but ruled against my motion upon his return. He stated that I could renew my motion with Judge Nance, because he might be more amenable to it.

I have never asked the court to withdraw for a reason of my own convictions; moreover, the times in which I have moved to withdraw based on any conflict are few. I found his ruling disturbing because the Defendant would be more likely to be harmed if such withdrawal was

postponed. The North Carolina Professional Rules of Conduct specifically include the following: "The main issue we emphasize is that any termination by the attorney should be done sooner rather than later. It is a fool's errand to wait and hope that some unreasonably difficult client situation will resolve itself or get better with time. The longer you wait to terminate, the more likely it is that the client will be prejudiced by the withdrawal."

Soon thereafter, Defendant Mendez retained another attorney and I was released. The North Carolina Professional Rules of Conduct state that the lawyer's statement that professional considerations require termination of the representation ordinarily should be accepted as sufficient". Judge Vang probed into my personal convictions, further so than the rules seemingly deem necessary. Furthermore, he did not make any findings justifying his ruling. Moving the court in front of a different judge could constitute "judge shopping" and I feel as if that would be an unethical consideration to have one judge deny such a motion and then make the same motion based on the same facts in front of a different judge.

## Canon 3(A)(2): Failure to maintain order and decorum in proceedings before the judge
### _Kelly Hinson_
On May 13, 2021, I appeared in criminal district court for Kelly Hinson whereas I represent her in _Leon Hinson v. Kelly Hinson_, File No. 19CVD145. Kelly Hinson filed a motion _pro se_ for contempt in a custody matter as well as a complaint for a domestic violence protective order and retained me afterward. In turn, her husband also filed a motion for contempt and her sister-in-law had a criminal summons issued against her. Her husband also filed a motion to modify the custody order recently entered. Attorney Jim Senter was court-appointed to represent her on the criminal charges. I was her attorney for the civil matters. Attorney Christerfer Purkey represents Leon Hinson in the civil matter and Attorney Max Garner represents Leon Hinson in the criminal matter. Judge Vang called all counsel into chambers on May 13, 2021 in criminal district court and said that this looked and smelled like custody. He told us that we should have our clients dismiss the criminal charges; otherwise if he found our clients guilty, her would give them a 30 day active sentence. My client wanted to move forward. Judge Vang said he was hearing "the whole kit and kaboodle" at once. So a trial was held with 5 attorneys, 2 parties and both civil and criminal issues in which ADA Arthur Donadio had to prosecute Kelly Hinson in the criminal charge against her in one line of questioning and advocate for her as a prosecutions witness against Mr. Turner in the other. He found both Kelly and Leon Hinson guilty but did grant Kelly Hinson a protective order. My objections were overruled but sustained when my questions were objected to.

## Canon 5(C)(2): Failure to regulate extra-judicial activities
### _Financial interest in a party to the proceeding_
### _Kearns v. Kearns_, Montgomery County File Nos. 21CVD104, 21CVD189, 21CVD189
On March 10, 2021, I appeared with my client Sherry Kearns who was seeking a DVPO in _Kearns v. Kearns_, File No. 21CVD104. Judge Vang granted her motion; the parties later settled the matter with a memorandum of judgment. On April 29, 2021, I filed a custody action with the same parties, Montgomery County File No. 21CVD189. While chatting with our clerks

afterward, opposing counsel, Brook Stuntebeck entered. I hand-delivered a copy of the complaint and she signed an acceptance of service. She then proceeded to file a separate action, Montgomery County File No. 21CVD190 asking for the same relief as well as an Equitable Distribution action seeking a TRO and preliminary injunction. We did not have a district court judge present that day. On May 5, 2021, Attorney Brook Stuntebeck appeared requesting the preliminary injunction before Judge Vang; Judicial Assistant Tennelle Hann emailed counsel stating, "Judge Vang has a conflict with this case, so I am going to take the proposed temporary restraining order back with me to Stanly to see if one of the other judges can hear it. If so I will then call both of you to have you on the phone to address the court on the temporary restraining order request." The clerk and/or judge's office informed me that Judge Vang's reason for recusal was that the defendant, Todd Kearns, owns a septic company that services Judge Vang's chicken houses. Judge Nance signed the TRO on May 12, 2021.

On July 7, 2021, I received a civil calendar for August 4, 2021. I was listed on the calendar for a matter in which I had withdrawn; therefore I assumed I was on the calendar in error. The Kearns matter was set for a status conference, but Judge Vang was listed as the judge but he had already recused himself from the matter. On August 4, 2021, opposing counsel Lisa LeFante called my office and my assistant thought she said there was a conflict; however, what she actually said was "conference". My husband, who also assists me in my office, went to file something that morning and the clerks' office told him that the Kearns matter was on the calendar. When I found out, I texted the Deputy Clerk and said "Are y'all needing me there? Sorry I didn't get a calendar notice also Vang recused himself from this matter so I didn't think there was anything on for today". The clerk replied back, "Yes we are waiting on you". I arrived at the courthouse at approximately 10:30 AM. I apologized for my delay and vaguely mentioned the conflict/ conference mixup. Afterward, Judge Vang stated, "I'm going to warn you about your tardiness. Ms. LeFante was on time. If it happens again, I may issue sanctions against you".

## Canon 3. Failure to perform the duties of the judge's office impartially
*Mauldin v. Mauldin,* Montgomery County File No. 14CVD470
On August 9, 2021, I was listed on the calendar as the court-appointed client for Rudy Mauldin on a first appearance. The calendar said that he had not been served. Also, in regards to first appearances, my understanding was that defendants would be issued a new attorney; I was no longer on the IV-D court-appointed list. I sent a text to caseworker, Cathy Thompson, at 10:11 AM and asked if my client was present. She said that he was not and that it was his first appearance. I followed up to inquire if they would re-appoint him a new attorney. At 10:49 AM, Cathy Thompson texted me to say that "Rudy is here, Kent said to please come!" I walked into the courtroom approximately ten minutes later at the same as another attorney. Our simultaneous arrival was notable because the bailiff, Jeff Branch, jokingly commented about our simultaneous arrival. I spoke with my client, Attorney Kent Trull and the caseworker. Attorney Trull called the calendar, and my client's case was the last to be called, as it often is. My client was pleased with the deal I arranged for him and his schedule was unaffected whereas he was in custody. As I was gathering my things to leave, Judge Vang stated in front of my client, "Ms. Crump, I just warned you about being late to court; if it happens again, I might issue an order to show cause against

you". I apologized and left. As for my colleague with whom I crossed the courtroom threshold simultaneously- to him, no warnings of future contempt was rendered. The court found in *State v. Lemmond* that when the judge reprimanded counsel in front of the jury, doing so indicating an antagonistic attitude toward the defense. *Id. at 12* N.C. App. 128, 182 S.E.2d 636 (1971). My client exited the courtroom in custody immediately following the reprimand.

## Canon 3(A)(4): Improper *ex parte* communications concerning pending proceeding
### *Amber Sellers*

I represent Amber Sellers in *Amber Sellers v. Jase Parson*. My client, Amber Sellers, reported DSS Attorney Jeannie Blake to the North Carolina State Bar. Jeannie Blake told me that she told Judge Vang (and Judge Nance) about the bar complaint she received. She told me in a text message nearly a year after doing so. She said, "I don't think they blamed you". Judge Vang accused me of forging my client's signature and swore my client in, to which my client confusingly but vehemently denied. He had no basis for doing so. He sanctioned me on a motion to compel without even reviewing the discovery being compelled. I have the transcript to provide for this form.

### Sherri Allgood and Tonya Troublefield

I represent Sherri Allgood and Tonya Troublefield in *Wyn Dozier v. Sherri Allgood and Tonya Troublefield*, a civil superior court matter. On August 25, 2021, Judge Vang, a district court judge was discussing the case at the courthouse and saying I forged my client's signature on her answer. A report was made to the North Carolina State Bar that I did so the next day. My client signed an affidavit before a different notary stating that I did not forge her signature. Judge Vang does not have authority over a superior court matter, accused me of dishonesty again. The case was removed to federal court.

## Canon 3. Failure to perform the duties of the judge's office impartially
### Departing from a "cold neutrality of the law" indicating an antagonistic attitude

### Montgomery County Child Support v. James Valentine

I was in a child support show cause hearing representing James Valentine, in *Montgomery County Child Support v. James Valentine*, defending my client who had just gotten out of the hospital that morning and was being treated for cancer, when Judge Vang started asking all of the questions to me, "Tell me this Mrs. Crump, ANSWER ME THIS Mrs. Crump!" I was grilled and put down. I eventually cried. Bailiff Deputy Jeff branch was a witness. I was told by another client of mine that when Judge Vang was campaigning, he told the public he took a hard stance against "deadbeat dads". Just as in *State v. McCormick, h*is extensive questioning tended to belittle and humiliated defense counsel, *Id.* At 36 N.C. App. 521, 244 S.E.2d 433 (1978); Judge Vang departed from the "cold neutrality of the law" bolstering testimony *State v. Medlin*, 15 N.C. App. 434, 190 S.E.2d 425 (1972).

I represent Dale Cook in *Cook v. Cook*, the file to be sent forthwith. As you can see, serious allegations are mentioned but when being heard on the *ex parte* in chambers with opposing counsel on the line, Judge Vang made statements like, "well even my girls cook noodles for themselves" because the complaint alleges that the children, one as young as four, were having to care for themselves and prepare their food while their mother slept.

Failure to maintain professional competence in the law

After the hearing, I gave notice of appeal (as my client was screaming and begging for help because he would not be able to receive medical treatment at the jail. I was crying. Judge Vang said the appeal would go to the North Carolina Court of Appeals. IV-D Counsel Kent Trull informed him that it would be an appeal to Superior Court, whereas Judge Vang ordered the defendant to confinement. Judge Vang made a ruling that incarcerated a Defendant without knowing what court of law the Defendant was appealing to.

*Principal's Signature*

Sworn to (or affirmed) and subscribed before me this the 11th day of April, 2022.

(Official Seal)

*Official Signature of Notary*

James M. Crump_____, Notary Public

My Commission Expires: June 27, 2026

# EXHIBIT A

21 March 2022 Motion to Intervene/Petition for Placement,

*In re A.H.*, 21-JA-10

## FILED SEPARATELY UNDER SEAL

STATE OF NORTH CAROLINA                    IN THE GENERAL COURT OF
JUSTICE MONTGOMERY COUNTY                  DISTRICT COURT DIVISION
                                           21-JA-10

FILED

2022 MAY -6  P 1: 59

MONTGOMERY C., C.S.C

BY

IN THE MATTER OF:

                                                        ORDER

In re: A.H.
                                      )

---

The Court *sua sponte* enters the following Order in the above-referenced case(s) granting access to juvenile court records pursuant to N.C. Gen. Stat. § 7B-2901(a).

## THE COURT MAKES THE FOLLOWING FINDINGS OF FACT:

1. The above referenced case(s) is/are pending in Montgomery County District Court.

2. Attorney Brooke Crump has filed on or about March 21, 2022 a Motion to Intervene, Petition for Placement on behalf of Micaela and Tyler Rush.

3. The Court has been informed by the North Carolina State Bar that the audio recordings and filings in the above-referenced case(s) may be relevant to the investigation, consideration, and/or hearing of allegations of professional misconduct by Attorney Brooke Crump.

**BASED ON THE FOREGOING FINDINGS OF FACT, THE COURT CONCLUDES AS A MATTER OF LAW:**

1. That the Court has both subject matter and personal jurisdiction in this case.

2. Because the proper administration of justice requires effective regulation of the legal profession, the North Carolina State Bar should have access to the records of the above-referenced matter(s).

3. In accordance with N.C.G.S. 7B-2901, it is necessary that an Order be entered preserving the confidentiality of documents obtained by the North Carolina State Bar and addressing the State Bar's use of those documents.

---

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED:**

1. The audio recordings and the record of the above-referenced case(s) may be received by the North Carolina State Bar, including the Office of Counsel, the Grievance Committee, and the Disciplinary Hearing Commission, and by the named Respondent/Defendant/Petitioners attorney, Brooke Crump, at their own expense, in the course of the investigation, consideration, and/or hearing on allegations of professional misconduct against Brooke Crump with the following limitations:

   a) If the recordings, any transcript of hearing, or record, in whole or in part, is to be admitted into evidence in any public proceeding, it shall be received, considered and maintained under seal and shall not be played or displayed in any public matter during the proceeding; and

   b) The State Bar, the named Respondent/Defendant/Petitioners attorney, Brooke Crump, and their counsel shall keep any such materials confidential, and shall use such materials only in the investigation, consideration, prosecution or defense of the allegations of misconduct and any related subsequent disciplinary proceedings, and only in the manner specified above.

Ordered and signed this the ___6___ day of May, 2022.

HONORABLE PHILLIP L. CORNETT
DISTRICT COURT JUDGE – 20A

**STATE OF NORTH CAROLINA**    **IN THE GENERAL COURT OF JUSTICE**
**COUNTY OF MONTGOMERY**    **DISTRICT COURT DIVISION**
**JUDICIAL DISTRICT 20A**
**21-JA-10**

FILED

2022 MAY -6 P 1:57

MONTGOMERY CO., C.S.C.

BY

In Re: A.H.

---

Due to the recusal action of Judge John R. Nance and due to the pending motion to recuse against Judge T. Thai Vang, Judge Phillip Cornett is allowed to sign an order granting access to juvenile court records in the above mentioned file.

This the _____ day of May, 2022.

JOHN R. NANCE
*CHIEF DISTRICT COURT JUDGE*
*JUDICIAL DISTRICT 20A*

**NORTH CAROLINA**

**MONTGOMERY COUNTY**

IN THE GENERAL COURT OF JUSTICE
JUVENILE COURT DIVISION
21 JA 10

2022 APR -5 A 9: 51

**IN MATTERS OF:**

**HAMILTON, ATLAS**

)
)
)
)
)
)
_____ )

**ORDER**

---

**THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

This the ____ day of April, 2022.

**JOHN R. NANCE**
**CHIEF DISTRICT COURT JUDGE**
**JUDICIAL DISTRICT 20A**

CERTIFICATE OF SERVICE

A Copy of the Foregoing order is placed in the attorney's and the agency's baskets in the Montgomery County Clerk of Superior Courts Office by the undersigned.

Montgomery County Department of Social Services

Jeannie Blake

Guardian ad Litem

Vernon Cloud

Chris Purkey

Brooke Crump

CERTIFICATE OF SERVICE

This is to certify that the undersigned has this date deposited a copy of the Order in a properly addressed and sealed envelopes in the care and custody of the United States Postal Service in accordance with Rule 58 as follows:

Natasha Nazario
312 South School Rd
Candor, NC 27209

This the 6th day of April, 2022.

By: _____
Angie Jones
Court Manger

STATE OF NORTH CAROLINA   IN THE GENERAL COURT OF JUSTICE
COUNTY OF MONTGOMERY   DISTRICT COURT DIVISION
                 21-JA-10

```
                    ┌────────────────────────┐
                    │   MONTGOMERY COUNTY     │
                    │      F I L E D          │
In Re: Atlas Hamilton,          )                  │
                    │      MAR 2 1 2022       │
   Minor Child,     )                  │
                    │  AT ___10:06___ O'CLOCK _P_ M
                    │   CLERK OF SUPERIOR COURT
                    │────────────────────────┘
                                )        MOTION TO INTERVENE
                                         PETITION FOR PLACEMENT
Micaela Rush and Tyler Rush,    )
                                )
   Petitioners.                 )
```

   Now comes the Petitioners, (Referred to herein as "Petitioners"), through undersigned

counsel, says and alleges as follows:

1. The names of the juvenile/minor child as it appears on the birth certificate is Atlas Hamilton,

  born May 7, 2021 (Referred to hereinafter as "Minor Child").

2. The minor child was born to Natasha Nazario (Referred to herein as "Respondent-Mother")

  and Chase Hamilton (Referred to hereinafter as "Father"), referred to herein collectively as

  "parents".

3. The minor child is currently in the custody of Montgomery County Department of Social

  Services (hereinafter referred to as DSS).

4. Petitioners are citizens and residents of Montgomery County, North Carolina, and have been

  for more than six (6) months immediately preceding the commencement of this action.

5. From birth until December 21, 2021, the minor child resided solely with Petitioners in

  Montgomery County, the foster parents.

6. On or about July 19, 2021, while in Petitioners' care, the minor child was adjudicated

  neglected and dependent.

```
┌─────────────────────────┐
│       EXHIBIT            │
│                         │
│          A              │
│ _____        │
└─────────────────────────┘
```

7. Upon information and belief, the parents have since moved-out-of-state.

8. Petitioners are licensed foster parents through Children's Home Society of North Carolina.

9. On December 16, 2021, Petitioners notified DSS they tested positive for Covid-19 as a status update.

10. On December 17, 2021, a Montgomery County Sheriff's Deputy visited Petitioners' home stating the parents called in a welfare check because they were aware of the positive Covid test results.

11. Petitioners then notified DSS.

12. DSS removed the minor child from the home on December 21, 2021, stating their reasoning as one of a precautionary measure for safety purposes, and that the investigation would take approximately two weeks.

13. In the three months since the removal, DSS has changed the minor child's placement two additional times.

14. The minor child has not returned to Petitioners' home, and DSS haven't provided a reason.

15. Upon information and belief, the parents did not call in a welfare check, whereas Montgomery County Telecommunications does not reflect any calls ever having been made for any assistance from the Montgomery County Sheriff's Office from Petitioners' home.

16. Further, an agent of DSS directly stated that she could not remember the last time anyone called to report allegations at a foster home in Montgomery County.

17. Upon information and belief, the minor child's current placement has the minor child enrolled in daycare at Country Kids Daycare.

18. Petitioners' have knowledge of the minor child's enrollment because another minor child in Petitioners' care and not a subject to this action also attends Country Kids Daycare.

19. Petitioners' enrolled said minor child in their care at Country Kids Daycare prior to A.H. current placement providers' enrolling A.H.

20. The minor child requires extraordinary medical care including breathing treatments for his asthma.

21. Upon information and belief, the minor child is not receiving those breathing treatments at Country Kids because said daycare does not administer such medical care.

22. Petitioners' own a consignment store located in Montgomery County; shortly after the minor child was placed in his current foster home, the male placement provider took the minor child's belongings the Petitioners' purchased and attempted to consign said items at Petitioners' own store.

23. Petitioners' allege that it is in the minor child's best interest that he receive his daily breathing treatments and use his personal affects purchased by the Petitioners' that his current foster parent tried to sale.

24. While the minor child was in the home of the Petitioners', he was able to receive one-on-one attention, whereas one petitioner stayed at home full-time with the minor child.

25. Petitioners have a strong bond with the minor child as he was in their care throughout infancy, and upon information and belief the minor child was inconsolable after DSS continuously changed his placement.

26. Upon information and belief, DSS' motive for not returning Minor Child to Petitioners' home is for the department's financial interest rather than his best interest.

27. Petitioners' allegations are based on a direct statement made by an agent of Montgomery County DSS, who specifically stated placements in foster homes licensed through Children's Home Society of North Carolina cost Montgomery County more money.

28. Upon information and belief, Montgomery County DSS did not conduct any investigation related to the removal of the minor child; Petitioners' allegations are based on the agent's direct statement that if any allegations involving the Petitioners' ability to keep the minor child safe were substantiated, Petitioners' foster home license would be revoked.

29. Petitioners' foster home licensed has not been revoked; Petitioners' have another placement in their home who is in the custody of Randolph County DSS.

30. Upon information and belief, Montgomery County plans to change Minor Child's plan from reunification to adoption at the next Permanency Planning Hearing.

31. Petitioners' have communicated their desire to adopt Minor Child, making his placement with Petitioners' appropriate.

32. Agents of DSS have communicated that if Petitioners' inquire any further about the Minor Child, they will file a report with the State of North Carolina in an attempt to have their foster license revoked.

33. Petitioners' do not currently have any placements of minor children in the custody of Montgomery County DSS, making said warning inappropriate and not in the best interest of any children.

WHEREFORE Petitioner prays as follows:

1. That this verified Petition be received by the Court as an affidavit for all purposes.

2. That the Petitioners' be allowed to intervene.

3. That the minor child be placed with Petitioners.

4. That Montgomery County DSS or any agents thereof be ordered not to retaliate against the Petitioners or file any complaints related to Petitioners' foster license.

Respectfully submitted,

**LAKE TILLERY LAW**

Brooke M. Crump
*Counsel for Petitioners*
NC State Bar No. 52684
brooke@laketillerylaw.com
PO Box 396
Mount Gilead, NC 27306
Telephone: 910.439.3070
Facsimile: 910.889.8229

## VERIFICATION

The undersigned, being duly sworn and authorized to make this Verification, deposes and says that they have read the foregoing pleading in this matter and knows the contents thereof; that the same is true of their own knowledge except as to those matters and things alleged upon information and belief, and as to those matters and things, they believe them to be true.

This the 21st day of March, 2022.

By: Micaela Rush

By: Tyler Rush

State of NORTH CAROLINA
County of MONTGOMERY

Subscribed and sworn to before me
this the 21st day of March, 2021

Signature of Notary Public

James Matthew Crump
Printed Name of Notary Public

6-27-26
Date My Commission Expires

[SEAL]



## CERTIFICATE OF SERVICE

I, Brooke Crump, do hereby certify that on the ___21__ day of March, 2022___, I served a copy of the foregoing of the foregoing document on the following persons, either by deposit in the U.S. Mail, addressed as follows and with the correct first-class postage affixed thereto, or be deposit in the designated courthouse mailbox, or by hand-delivery, as indicated below:

Name:

[ X ]   Hand-delivery

[  ]   Deposit in the designated courthouse mailbox

[  ]   By deposit in the U.S. Mail addressed as follows:

Chisterfer R. Purkey

Jeannie Blake

Vernon E. Cloud Jr.

This is the __21__<sup>th</sup> day of __March_, 2022.

_____
Brooke M. Crump, Attorney at Law

NORTH CAROLINA

MONTGOMERY COUNTY

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
21-JA-54

IN Re: Ava Baldwin

MONTGOMERY COUNTY
**F I L E D**

MAY 0 2 2022

AT 9:57 O'CLOCK A M
CLERK OF SUPERIOR COURT

)
)
)
)
)
)
)

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a copy of the foregoing was served upon all other parties to this action or counsel, either by depositing a copy in the US Mail in a properly addressed, postpaid envelope, or by hand-delivery, e-mail, or facsimile as indicated below:

[X]  Hand-delivery:  Jeannie Blake, Counsel for DSS

Christerfer Purkey, Counsel for Mother

[X]  By depositing a copy in the US Mail in a properly addressed, postpaid envelope to: Antonio Vera Rodriquez

[ ]  Fax:

[ ]  E-Mail:

This the 2nd day of May, 2022.

LAKE TILLERY LAW

Brooke Crump, Attorney at Law
NC Bar # 52684
*Attorney for Petitioners*
PO Box 396
Mount Gilead, NC 27306
Tel: (336) 964-9625
Fax: (910) 889-8229
brooke@laketillerylaw.com

*IN RE BROOKE McINTOSH CRUMP*

MOTION FOR ORDER TO SHOW CAUSE

# **EXHIBITS TO BE FILED UNDER SEAL:**

- EXHIBIT A: 21 March 2022 Motion to Intervene/Petition for Placement, *In re A.H.*, 21-JA-10

- EXHIBIT E: 2 May 2022 Motion to Intervene, Motion to Stay, Motion to Disqualify Counsel, and Motion for Montgomery County DSS to Transfer Case, *In re S.B.*, 21-JA-54

EXHIBT E


2 May 2022 Motion to Intervene, Motion to Stay, Motion to Disqualify
Counsel, and Motion for Montgomery County DSS to Transfer Case,

*In re S.B.*, 21-JA-54


**FILED SEPARATELY UNDER SEAL**

STATE OF NORTH CAROLINA        IN THE GENERAL COURT OF
JUSTICE MONTGOMERY COUNTY    DISTRICT COURT DIVISION

FILED

2022 MAY -6 P 1:59

MONTGOMERY CO., C.S.C

BY

21-JA-54

IN THE MATTER OF:

In re: S.B.

ORDER

---

The Court *sua sponte* enters the following Order in the above-referenced case(s) granting access to juvenile court records pursuant to N.C. Gen. Stat. § 7B-2901(a).

## THE COURT MAKES THE FOLLOWING FINDINGS OF FACT:

1. The above referenced case(s) is/are pending in Montgomery County District Court.

2. Attorney Brooke Crump has filed on or about May 2, 2022 a Motion to Intervene, Motion to Stay, Motion to Disqualify Counsel, Motion for Montgomery Count DSS to Transfer Case on behalf of Adam and Jennifer Bowles.

3. The Court has been informed by the North Carolina State Bar that the audio recordings and filings in the above-referenced case(s) may be relevant to the investigation, consideration, and/or hearing of allegations of professional misconduct by Attorney Brooke Crump.



EXHIBIT

E

**BASED ON THE FOREGOING FINDINGS OF FACT, THE COURT CONCLUDES AS A MATTER OF LAW:**

4. That the Court has both subject matter and personal jurisdiction in this case.

5. Because the proper administration of justice requires effective regulation of the legal profession, the North Carolina State Bar should have access to the records of the above-referenced matter(s).

6. In accordance with N.C.G.S. 7B-2901, it is necessary that an Order be entered preserving the confidentiality of documents obtained by the North Carolina State Bar and addressing the State Bar's use of those documents.

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED:**

4. The audio recordings and the record of the above-referenced case(s) may be received by the North Carolina State Bar, including the Office of Counsel, the Grievance Committee, and the Disciplinary Hearing Commission, and by the named Respondent/Defendant/Petitioners attorney, Brooke Crump, at their own expense, in the course of the investigation, consideration, and/or hearing on allegations of professional misconduct against Brooke Crump with the following limitations:

   a. If the recordings, any transcript of hearing, or record, in whole or in part, is to be admitted into evidence in any public proceeding, it shall be received, considered and maintained under seal and shall not be played or displayed in any public matter during the proceeding; and

   b. The State Bar, the named Respondent/Defendant/Petitioners attorney, Brooke Crump, and their counsel shall keep any such materials confidential, and shall use such materials only in the investigation, consideration, prosecution or defense of the allegations of misconduct and any related subsequent disciplinary proceedings, and only in the manner specified above.

Ordered and signed this the ___6___ day of May, 2022.

_____
HONORABLE PHILLIP L. CORNETT
DISTRICT COURT JUDGE – 20A

**STATE OF NORTH CAROLINA**    **IN THE GENERAL COURT OF JUSTICE**
**COUNTY OF MONTGOMERY**    **DISTRICT COURT DIVISION**
**FILED**          **JUDICIAL DISTRICT 20A**
**21-JA-54**

' 2022 MAY -b P 1: 5⁻

In Re: S.B.

MONTGOMERY CO., C.S.C.

BY

       Due to the recusal action of Judge John R. Nance and due to the pending

motion to recuse against Judge T. Thai Vang, Judge Phillip Cornett is allowed to

sign an order granting access to juvenile court records in the above mentioned file.

This the _6th_ day of May, 2022.

*JOHN R. NANCE*
*CHIEF DISTRICT COURT JUDGE*
*JUDICIAL DISTRICT 20A*

STATE OF NORTH CAROLINA
COUNTY OF MONTGOMERY

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
21-JA-54



In Re: Sky Baldwin,

Minor Child,

Adam and Jennifer Bowles,

Petitioners.

)
)
)
)
)
)
)
)
)

MONTGOMERY COUNTY
FILED

MAY 02 2022
R. Manew

AT 9:45 O'CLOCK A M
CLERK OF SUPERIOR COURT

MOTION TO INTERVENE
MOTION TO STAY
MOTION TO DISQUALIFY COUNSEL
MOTION FOR MONTGOMERY
COUNTY DSS TO TRANSFER CASE

Now comes the Petitioners, (Referred to herein as "Petitioners"), through undersigned

counsel, says and alleges as follows:

1. The names of the juvenile/minor child as it appears on the birth certificate is Sky Baldwin,

    born December 18, 2021, (Referred to hereinafter as "Minor Child").

2. The minor child was born to Christy Baldwin (Referred to herein as "Mother") and (Referred

    to hereinafter as "Father"), referred to herein collectively as "parents".

3. The minor child is currently in the custody of Montgomery County Department of Social

    Services (hereinafter referred to as DSS).

4. Petitioners are citizens and residents of Montgomery County, North Carolina, and have been

    for more than six (6) months immediately preceding the commencement of this action.

5. From birth until April 29, 2022, the minor child resided solely with Petitioners in

    Montgomery County, (hereinafter referred to as "the Petitioners").

6. Petitioners are licensed foster parents through Children's Home Society of North Carolina..

7. DSS removed the minor child from the home on April 29, 2022, after 5:00 PM on the Friday

    before this matter was scheduled for hearing, stating that DSS was changing placement.

8. When DSS arrived at the Petitioners' home, they were escorted by Ray Dawson. Ray Dawson is a reserve officer with Montgomery County Sheriff's Office and married to Dana Dawson, Montgomery County Commissioner; as county commissioner, Dana Dawson supervises and authorizes Montgomery County DSS' actions.

9. Prior to the minor child's removal, the Petitioners' spoke with County Manager Frankie Maness and informed him of DSS' intent to place the minor child with an illegal immigrant and their objection to the minor child's placement transfer.

10. Social Worker Nala Brown (hereinafter "SW Brown") continually stated the Department's intent to "find a loophole" to place the Minor Child with one of the Parent's relatives who is an illegal citizen.

11. Upon information and belief, the parents do not want the Minor Child to be placed with any of the Fathers' family members.

12. As county commissioner, Commissioner Dawson would have knowledge that their was a disagreement regarding the child's transfer.

13. When Deputy Dawson appeared at the home of the Petitioners' after 5 PM on the Friday before the next court hearing, Monday May 2, 2022, he was in plain clothes and in an unmarked vehicle.

14. When Deputy Dawson entered Petitioners' home, he stated he was there on official duty for Montgomery County Sheriffs' Office but also as a "child advocate".

15. Upon information and belief, Ray Dawson is not sworn before any court of law as a "child advocate" and had no authorization from the Guardian Ad Litem agency to enter Petitioners' home and assist DSS in removing the minor child as a "child advocate".

16. Because Deputy Dawson asserted his authority as a Montgomery County Sheriff Deputy in a dispute between Montgomery County DSS, an agent authorized to conduct actions as authorized and supervised by County Comissioner Dawson, his wife, Deputy Dawsons' actions constitute an obstruction of justice, a class H felony in North Carolina.

17. Petitioners' spoke with Captain James Kerney on April 30, 2022 after the minor child was removed and he was unaware who authorized Deputy Dawson to assist DSS with the removal; further, Captain Kerney was unaware at the time of Deputy Dawsons' actions who requested Deputy Dawson's involvement.

18. When the Petitioners' contacted Deputy Dawson on April 30, 2022 after he left their home, Deputy Dawson stated that DSS did not allow him to escort the agents in taking the minor child to their next placement; DSS is required to provide law enforcement with the information of the child's whereabouts upon request and they refused to do so.

19. Their failure to do so also constitutes an obstruction of justice, a Class H Felony in North Carolina.

20. Upon information and belief, Montgomery County DSS did not make the decision on where they would transfer the minor child until nearly 4:00 PM on April 30, 2022, indicating that there was no time for them to have conducted a welfare check of the minor child's current placement.

21. While the minor child was in the home of the Petitioners', he was able to receive one-on-one attention, whereas one petitioner stayed at home full-time with the minor child.

22. This would not be the case for any known kinship placements for the minor child at this time.

23. Petitioners have a strong bond with the minor child as he was in their care throughout infancy, and upon information and belief the minor child was terrified during the removal.

24. The minor child had a strong bond with Petitioners' eleven year old daughter who was inconsolable during the removal.

25. Upon information and belief, DSS' motive for not returning Minor Child to Petitioners' home is for the department's financial interest rather than his best interest.

26. Petitioners' allegations are based on a direct statement made by Montgomery County DSS Attorney, Jeannie Blake, who specifically stated placements in foster homes licensed through Children's Home Society of North Carolina cost Montgomery County more money.

27. Attorney Blake also stated that it is "whew, expensive" for the county if they place the child with anyone licensed through any agency other than Montgomery County DSS.

28. For the record, Montgomery County DSS has not held a MAPP class in years, which is a required component to become a licensed foster parent in Norht Carolina.

29. On April 30, 2022, Attorney Blake stated that it is good now that kinship placements can become licensed while the minor child is placed in their home; meaning that the placement provider is not required to have passed any other safety requirements before Montgomery County transfers a child to a kinship placement.

30. Upon information and belief, Montgomery County DSS also removed the minor child from Petitioners' home not because a kinship placement was in the best interest of the minor child but in retaliation for Petitioners' asking for the minor child's social security number to which they were entitled so that they could claim the minor child on their tax return as they were entitled, per IRS guidelines.

31. Former Montgomerty County GAL supervisor stated that it is protocol for foster parents to receive the minor child's social security number.

32. Montgomery County DSS, through Social Worker Nala Brown, told the Petitioners' that if they raised the issue again regarding the minor child's social security number and their intent to claim the minor child on their tax return, they would just remove the minor child from their home.

33. Montgomery County DSS did not state they would do so because it was in the child's best interest, but because they did not want to be challenged regarding that request.

34. The Minor Child was in the Petitioners' home for nearly five months and they did not express intent to transfer the Minor Child until AFTER the Petitioners' inquired as to the Minor Child's social security number.

35. Upon information and belief, the Petitioners' in this matter are not the only foster parents whom DSS has received to provide the social security number for the minor child to which they were entitled.

36. Upon information and belief, Petitioners' know of no other reason why Montgomery County DSS would refuse to provide that information unless it was posible for them to receive a financial benefit; said belief is based on the recorded statement of counsel for DSS, Attorney Blake.

37. On April 4, 2022, Attorney Blake told the Petitioners that if she were to meet and speak with the Parents, they would likely sign their parental rights over to Petitioners.

38. Prior to that statement, in February 2022, SW Brown said that the Mother stated she wanted to relinquish her rights. SW Brown informed Petitioners' when she spoke with the Mother

again, the Mother was not in a position to sign her parental rights over but stated that she

wanted the minor child to remain with the foster parents, the Petitioners.

39. Upon information and belief, Montgomery County DSS did not give the Parents the required

ten-day notice before removing the minor child from the home.

40. Upon information and belief, the parents were not provided with the due process they were

entitled.

41. Further, Montgomerty County DSS was required to give the Petitioners' reasonable notice

before removing the minor child from their home, according to the North Carolina Foster

Parents' Bill of Rights.

42. Montgomery County DSS violated the Petitioners' Due Process rights when they did not

allow them an opportunity to be heard or object to the transfer.

43. Montgomery County DSS had a duty to locate any potential kinship placements within the

first thirty days of the minor child's life, including any out-of-state or non-citizen relatives;

Montgomerty County DSS did not identify any next of kin or fictive kin willing to be a

placement provider for the minor child.

44. Upon information and belief, the Petitioners' are the only individuals in a position to

properly care for the minor child at this time.

45. Upon information and belief, Montgomery County DSS removed the Minor Child from

Petitioners' home without any reason falling under their required duty to investigate the

Minor Child's best interest.

46. Further, upon information and belief, the Minor Child's removal from the Petitioners' home

was not authorized or signend by a judge.

47. Without any formal authorization or investigation, Petitioners' move this Court to stay the prior order and return the minor child to Petitoners' home as ordered by the Court.

48. Further, due to Judge Nance, the presiding Judge over the May 2, 2022 hearing, recusing himself from all of the matters for the undersigned, Petitioners' move that this matter be continued upon entry of the stay order.

49. The current order of the court has the Minor Child as safe and cared for in the home of Petitioners.

50. Petitioners' have communicated their desire to adopt Minor Child, making her placement with Petitioners' appropriate.

WHEREFORE Petitioner prays as follows:

1. That this verified Petition be received by the Court as an affidavit for all purposes.

2. That the Petitioners' be allowed to intervene.

3. That the prior order of the court be stayed, and that the Minor Child be placed with the Petitioners.

4. That Montgomery County DSS transfer this matter to another agency due to their conflict with alleged violations of North Carolina Department of Health and Human Service law and Petitioners' Due Process.

5. That Attorney Blake be disqualified to further appear in the matter.

This the 2nd day of May, 2022.

Respectfully submitted,

**LAKE TILLERY LAW**

Brooke M. Crump
*Counsel for Petitioners*
NC State Bar No. 52684
brooke@laketillerylaw.com

STATE OF NORTH CAROLINA
COUNTY OF Montgomery

## VERIFICATION

I, Jennifer Bowles being duly sworn, deposes and says that s/he is the Plaintiff in the above-entitled action, that s/he has read the foregoing Complaint and knows the contents thereof; that the same are true of her own knowledge except as to those matters and things stated upon information and belief, and as to those things, s/he believes them to be true.

_____
Plaintiff's Signature

Sworn to and subscribed before me this the 2 day of May , 20 22 .

_____
Notary Public

[SEAL]

My Commission Expires: August 23, 2023

BROOKE M. CRUMP
Notary Public
Montgomery County, North Carolina
My Commission Expires
08/15/2023

# Exhibit 2

24 March 2021
Court-Appointed List
Suspension Order



EXHIBIT

2

**STATE OF NORTH CAROLINA**
**COUNTY OF MONTGOMERY**

**IN THE GENERAL COURT OF JUSTICE**
**DISTRICT COURT DIVISION**
**JUDICIAL DISTRICT 20A**

## ADMINISTRATIVE ORDER

WHERE AS, based on the inherent authority of the Chief District Court Judge and due to an ongoing investigation by the North Carolina State Bar, Attorney Brooke Crump is hereby suspended from the court appointed list for all cases.

This the _34th_ day of March, 2021.

**JOHN R. NANCE**
**CHIEF COURT JUDGE**
**JUDICIAL DISTRICT 20A**

# Exhibit 3

Grievance File
Number 21G0105

EXHIBIT
3

▲ **The North Carolina State Bar**
Office of Counsel

217 E. Edento[n]
Post Office B[ox]
Raleigh, North Carolina 27611
Telephone (919) 828-4620
Fax: (919) 834-8156
Web: www.ncbar.gov

July 26, 2021

**LETTER OF NOTICE**

Ms. Brooke McIntosh Crump
PO Box 396
Mount Gilead, NC 27306
Via email to brooke@laketillerylaw.com

      Re:    Grievance filed by The North Carolina State Bar
             Our file number: 21G0105

Dear Ms. Crump,

    This is to advise that a grievance alleging misconduct on your part as an attorney was received in this office from the above-named individual. To assist you in preparing a response to this letter, I am enclosing the "Substance of the Grievance." It is not a pleading of any sort but is simply a summary of what appears to be the basis of the grievance.

    Under 27 N.C. Admin. Code, Chapter 1, Subchapter B, Rule .0112(c) of the Discipline and Disability Rules of The North Carolina State Bar, you are required to submit a written response to this letter within 15 days of the date the letter is served upon you. Such response must be a full and fair disclosure of all of the facts and circumstances pertaining to your alleged misconduct. If you fail to respond within 15 days, the Chairman of the Grievance Committee may proceed under Rule .0112(f).

    **Under Rule .0112(d), a copy of your response may be provided to the complaining party unless you object thereto in writing. Please note your objection in your written response to the grievance.**

    **IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT <u>CARMEN H. BANNON</u> THE STAFF ATTORNEY ASSIGNED TO YOUR FILE AT (919) 828-4620 or email cbannon@ncbar.gov**

    Please give this matter your immediate attention.

              Sincerely,

              Katherine E. Jean
              Counsel

KEJ/jr
Enclosure

              **ACCEPTANCE OF SERVICE REQUESTED**

**FILE NUMBER:**   21G0105          **DATE FILE RECEIVED:**   16 February 2021

**Attorney/Respondent's Name**          **Complainant's Name**
Brooke M. Crump                         The North Carolina State Bar
PO Box 396
Mount Gilead, NC 27306

---

**THE SUBSTANCE OF GRIEVANCE:**

Removing Evidence from File: *Turner v. Hill*, Montgomery County file no. 20 CVD 345
Respondent represented one of the parties in *Rodney Turner v. Tiffany Hill*, Montgomery County file no. 20 CVD 345. During the child custody hearing, Respondent offered photographs into evidence. Rather than offer printed photographs, Respondent displayed the photographs on her iPad and her iPad was admitted into evidence. The judge suggested that this might not be the best approach, because all evidence would be maintained in the court file until the period for appeal expired. Nonetheless, Respondent offered the iPad into evidence. Before the appeal period expired, Respondent, Respondent's assistant, or Respondent's associate removed the iPad from the court file. Respondent's conduct constitutes common law obstruction of justice and violates N.C. Gen. Stat. § 14-221.2.

In addition to responding to the allegations set forth above, please:

1. Identify the person who removed the iPad from the court file.
2. State the date on which the iPad was removed from the court file.
3. Explain in detail who instructed the person to remove the iPad from the court file and set forth all instructions he or she gave regarding removal of the iPad.
4. Provide copies of all electronic or tangible documents relating in any way to removal of the iPad from the court file.
5. Provide a copy of the order resolving the matter that was at issue in the hearing at which the iPad was entered into evidence.
6. Provide a copy of your entire client file in *Rodney Turner v. Tiffany Hill*, Montgomery County file no. 20 CVD 345, including all communications with your client or with any other person.

Montgomery County Secured Leave
In 2020, Respondent did not appear for a scheduled court date in Montgomery County. When Chief District Court Judge Nance contacted Respondent's office to ask why Respondent was not in court, Respondent's assistant told Judge Nance that Respondent was in the hospital with COVID. When Senior Resident Superior Court Judge Bridges contacted Respondent, Respondent told Judge Bridges that her medical condition was not COVID-related. Respondent emailed the court on 22 July 2020 representing that she was "admitted to the ER" on that date and was "in need of entering a two week secured leave at this time." On 23 July 2020, Respondent sent another email to the court clarifying that her "secured leave request [was]

through August 7" and that she would return to "court on Monday August 10th." Respondent also explained that this "extended [leave] request [was] for non Covid-related health concerns." During this period of secured leave, Respondent posted pictures on Facebook showing Respondent on vacation in Mexico.

In addition to responding to the allegations set forth above, please provide the following information:

1. State whether you were "admitted to the ER" at any time during April through September 2020.
2. If you answered question #1 above in the affirmative, provide medical records reflecting that you were "admitted to the ER" and the dates of admission.
3. State whether you were in Mexico at any time from 1 July 2020 through 31 August 2020 and provide the dates when you were in Mexico.
4. Provide copies of all documents evidencing the date(s) when you were in Mexico at any time from 1 July 2020 through 31 August 2020, including but not limited to credit card bills, airline tickets and boarding passes, and hotel and dining invoices.
5. Provide a copy of your entire client file, including all communications with your client, in the Montgomery County case in which you did not appear for the scheduled court date.


Sanctions Imposed in <u>*Dozier v. Allgood & Troublefield*, Montgomery County file no. 21 CVS 41</u>
Respondent represented the defendants in *Win Dozier v. Sherri Allgood and Tonya Yvette Troublefield*, Montgomery County file no. 21 CVS 41. Dozier's complaint was personally served on Respondent's clients by sheriff's deputies. Respondent filed motions to dismiss arguing that service of process was insufficient because (a) "service by publication was not proper" and (b) the summons was defective. The motion also sought dismissal for lack of personal jurisdiction due to lack of service. The motions filed by Respondent did not comply with applicable Rules of Civil Procedure in that they failed to "state with particularity" the grounds for relief or provide any factual basis for the Rule 12(b) motions. There was no factual or legal basis for Respondent's arguments regarding ineffective service. Respondent contended without basis that a newspaper article that had been published constituted an attempt by the plaintiff to serve one of her clients by publication.

Plaintiff's counsel served discovery requests by mail and email to Respondent on 1 March 2021 (for Allgood) and 2 March 2021 (for Troublefield). On 8 April 2021, Respondent filed a motion for extension of time to respond to discovery. She did not serve the motion or otherwise notify opposing counsel. The motion was untimely, as the time to respond to discovery had already elapsed before it was filed. Respondent falsely stated in the motion that her clients had been served with discovery on 9 March 2021—a date that, if true, would have made her motion timely. Respondent served her clients' responses to the discovery requests on 11 May 2021. Contained in those responses was a false statement that Troublefield was a current client of the plaintiff's counsel's firm.

Due to the frivolous and/or false representations to the court described above, Respondent was sanctioned by the court for violating Rule 11 of the Rules of Civil Procedure.

In addition to responding to the allegations set forth above, please provide the following information:

1. Copies of your complete client files for Allgood and Troublefield, including all digital records and all communications.
2. A copy of the newspaper article you contended was an attempt by Dozier to serve one of your clients by publication.


*Turner v. Oakley (now Lagge)*, Randolph County file no. 19 CVD 1606

Respondent represented one of the parties in *Brian R. Turner v. Lindsay Oakley (now Lagge)*, Randolph County file no. 19 CVD 1606. During the summer of 2020, Judge Gavin presided over a custody hearing and an order on custody was entered 17 August 2020. Respondent filed a notice of appeal but did not order the transcript and did not timely settle the record. In December 2020, after the deadline to settle the record had passed, Respondent filed a motion to extend time. The motion was delivered to opposing counsel on a Thursday at noon. On Friday, Crump went to the courthouse and asked Judge Wilkins to sign an *ex parte* order granting her motion. There was no reason to go to Judge Wilkins, as Judge Gavin (who presided over the case) was also present in the courthouse. There was also no basis to have the order entered *ex parte*: Before the time to settle the record expired, an *ex parte* order was permissible, but after the time expired, notice and an opportunity to be heard were required. The *ex parte* order was entered on December 10 or 11 but wasn't served on opposing counsel until December 21 or 22.

When Judge Wilkins learned that the *ex parte* order extending time to settle the record had been improper, he entered another order setting aside the *ex parte* order for lack of notice. Respondent appealed that order.

When Respondent's appeal was docketed at the Court of Appeals, she told her client that the client was entitled to pick up the child and informed opposing counsel "as a courtesy" that her client would be retrieving the child. Respondent did not file a motion to stay the custody order in the trial court, so there was no factual or legal basis for this position.


**VIOLATIONS OF RPC INDICATED:**
Rule 1.1
Rule 1.3
Rule 3.1
Rule 3.3(a)(1)
Rule 3.4(a) & (c)
Rule 3.5(a)(4)C)
Rule 8.4(c) & (d)

STATE OF NORTH CAROLINA

WAKE COUNTY

BEFORE THE
GRIEVANCE COMMITTEE
OF THE
NORTH CAROLINA STATE BAR
21G0105

IN RE:  BROOKE MCINTOSH CRUMP,
Attorney

ACCEPTANCE OF SERVICE

This is to certify that Brooke McIntosh Crump has accepted service of the Letter of Notice issued concerning grievance file no. 21G0105.  Service of the Letter of Notice in the above-captioned case is hereby accepted and receipt of a copy of same is hereby acknowledged.  Respondent waives service by the methods set forth in 27 N.C. Admin. Code, Chapter 1, Subchapter B, Section .0112.

This the _____ day of _____, 2021.


_____
Brooke McIntosh Crump, Attorney

# The North Carolina State Bar
Office of Counsel

217 East Edenton Street (27601)
Post Office Box 25908
Raleigh, North Carolina 27611
Telephone (919) 828-4620
Fax: (919) 834-8156
Web: www.ncbar.gov

## WHAT TO EXPECT IN THE DISCIPLINARY PROCESS

The lawyer disciplinary process in North Carolina begins when a grievance is filed with the State Bar. A grievance is an allegation that the conduct of a lawyer licensed to practice law in North Carolina has violated one or more of the formal rules governing lawyer conduct. These rules are defined in the Rules of Professional Conduct. The State Bar's Grievance Committee evaluates grievances to determine whether a lawyer has violated those Rules and, if so, imposes appropriate discipline or refers the matter for a trial. The Rules of Professional Conduct can be found at the State Bar's website, www.ncbar.gov.

The Grievance Committee opens approximately 1300-1500 files a year. Every grievance is assigned to a staff attorney in the State Bar's Office of Counsel. The person who files the grievance is called "the complainant." The form for filing a grievance is available at the State Bar's website. The complainant **must** provide all information he or she believes the Grievance Committee should consider. The staff attorney **will not** call the complainant to see if the complainant has additional information that was not provided. The complainant will receive a letter acknowledging that the State Bar received the grievance. The letter will identify the grievance file number and the staff attorney assigned to the grievance.

In the initial evaluation, the staff attorney will make a determination whether the complainant's allegations, assumed at this stage to be true and provable, constitute a violation of the Rules of Professional Conduct. When the allegations, if true and provable, would not constitute a Rule violation, the grievance must be dismissed because the Grievance Committee has no authority to take action unless there is a violation of the Rules of Professional Conduct. When the allegations, if true and provable, would constitute a violation of the Rules of Professional Conduct, the staff attorney ordinarily sends a Letter of Notice to the lawyer complained about, who is called "the respondent." The Letter of Notice is accompanied by a Substance of Grievance detailing the allegations of professional misconduct and identifying the Rules implicated by the allegations. The respondent must provide a written response to the Letter of Notice within 15 days of receipt of the Letter of Notice. The last paragraph of the Letter of Notice identifies the staff attorney who is handling the grievance.

**All communications by the complainant or the respondent with the State Bar should be directed to the staff attorney assigned to the grievance, not to the person who signed the letter, and should reference the file number so the grievance can readily be located.**

When the staff attorney receives the respondent's response, the staff attorney will determine whether he or she has enough information to understand what happened in the case. If necessary, the staff attorney will conduct further inquiry. Further inquiry is not always necessary. In many cases, the staff attorney can fully understand the necessary facts from reviewing the grievance and the response and any documents provided by the complainant and the respondent. In some cases, a small amount of additional information is needed. In cases involving very complicated facts or facts which are difficult to locate, extensive information gathering is required. There are cases in which the Grievance Committee must wait for outside events to occur before acting on the grievance. One example of this is when a pending court case must be concluded before the grievance can be addressed.

When the appropriate review is completed, the staff attorney will write a Report of Counsel to the Grievance Committee. The grievance will then be reviewed by the Chair or by the Chair and a Vice Chair of the Committee. In evaluating the grievance, the Chair or the Chair and Vice Chair must keep in mind that any violation of the Rules of Professional Conduct must be proven by **clear, cogent and convincing evidence**. If the Committee determines that the evidence is not sufficient to prove a Rule violation, the Chair or the Chair and Vice Chair will dismiss the grievance. The complainant and the respondent will be notified in writing of the Chair or the Chair and Vice Chair's decision. There is no appeal of the dismissal of a grievance.

Katherine E. Jean, Counsel
Fern Gunn Simeon, David R. Johnson, Jennifer A. Porter, Margaret T. Cloutier, Carmen Hoyme Bannon,
Barry S. McNeill, G. Patrick Murphy, Susannah B. Cox, Joshua T. Walthall, Maria J. Brown, Alex G. Nicely,
Savannah B. Perry, J. Cameron Lee, Liza Foley, Robert W. Weston - Deputy Counsel
Leanor Bailey Hodge – Trust Account Compliance Counsel/Deputy Counsel

If the Chair or the Chair and Vice Chair conclude the evidence is sufficient to prove a Rule violation, the grievance will be placed on an agenda for consideration at one of the State Bar's quarterly meetings. The meetings occur in January, April, July and October. At the quarterly meeting, the grievance will be assigned to one of three subcommittees. Each subcommittee will meet separately, consider the grievances before it, and make its recommendations to the full Committee. The full Committee will then evaluate the grievance and determine whether the evidence is sufficient to prove a Rule violation. Unless and until the Grievance Committee imposes public discipline, identified below, information concerning the existence of a grievance is confidential.

The Grievance Committee can take any of the following actions:

a. Dismiss the grievance;
b. Issue a Letter of Caution (the conduct is not consistent with accepted standards of professionalism but is not technically a violation of the Rules of Professional Conduct);
c. Issue a Letter of Warning (the conduct is a minor, unintentional or technical violation of the Rules);
d. Issue an Admonition (this is permanent discipline but is not published)
e. Issue a Reprimand (this is permanent discipline sent to the lawyer's local newspaper and published on the State Bar website);
f. Issue a Censure (this is permanent discipline sent to the lawyer's local newspaper, published on the State Bar website and sent to the state and federal courts in North Carolina);
g. Refer the lawyer to the Lawyers Assistance Program (this is a program intended to help a lawyer with substance abuse or mental health issues);
h. Refer the lawyer to the Trust Account Compliance Program (this is a program intended to help a lawyer understand the requirements for operating a trust account to handle entrusted funds);
i. Refer the case to the Disciplinary Hearing Commission ("DHC") for trial (this happens in a small percentage of cases when the Grievance Committee believes the conduct is serious enough that the lawyer's license to practice law should be suspended or the lawyer should be disbarred from practicing law).

Other than in cases referred to the DHC for trial, the Grievance Committee can impose discipline directly.

Cases are tried before the Disciplinary Hearing Commission for two reasons: (1) the lawyer rejects discipline imposed by the Grievance Committee or (2) the Grievance Committee believes the conduct is sufficiently serious that suspension of the lawyer's license or disbarment is likely the appropriate discipline.
When a case is tried in the DHC, the staff attorney will file a civil action and the case will proceed according to the State Bar's Discipline and Disability Rules, the North Carolina Rules of Civil Procedure and the North Carolina Rules of Evidence. After a hearing, the DHC will enter an order imposing discipline or dismissing the case. Appeal from an order of the DHC is to the North Carolina Court of Appeals.

**What the State Bar CANNOT do:**

The State Bar **cannot** order a lawyer to pay money to anyone.

The State Bar **cannot** give anyone legal advice.

The State Bar **cannot** give an advisory opinion about whether a lawyer violated a Rule.

The State Bar **cannot** intervene in a pending court action or remove a lawyer from a case.

The State Bar **cannot** determine whether a lawyer committed malpractice, breached a contract or is otherwise liable to the complainant. A person who believes he or she has suffered damages because of legal malpractice, breach of contract or some other civil wrong **should not wait** for the Grievance Committee's action before deciding whether to pursue an independent legal action in the court system.

# **Exhibit 4**

# Grievance File Number 21G0665

EXHIBIT
4

**The North Carolina State Bar**
Office of Counsel

217 E. Edenton
Post Office Bo
Raleigh, North Carolina 27611
Telephone (919) 828-4620
Fax: (919) 834-8156
Web: www.ncbar.gov

September 14, 2021

**LETTER OF NOTICE**

Ms. Brooke McIntosh Crump
PO Box 396
Mount Gilead, NC 27306
Via email to brooke@laketillerylaw.com

      Re:    Grievance filed by The North Carolina State Bar
            Our file number: 21G0665

Dear Ms. Crump,

      This is to advise that a grievance alleging misconduct on your part as an attorney was received in this office from the above-named individual. To assist you in preparing a response to this letter, I am enclosing the "Substance of the Grievance." It is not a pleading of any sort but is simply a summary of what appears to be the basis of the grievance.

      Under 27 N.C. Admin. Code, Chapter 1, Subchapter B, Rule .0112(c) of the Discipline and Disability Rules of The North Carolina State Bar, you are required to submit a written response to this letter within 15 days of the date the letter is served upon you. Such response must be a full and fair disclosure of all of the facts and circumstances pertaining to your alleged misconduct. If you fail to respond within 15 days, the Chairman of the Grievance Committee may proceed under Rule .0112(f).

      **Under Rule .0112(d), a copy of your response may be provided to the complaining party unless you object thereto in writing. Please note your objection in your written response to the grievance.**

      **IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT <u>CARMEN H. BANNON</u> THE STAFF ATTORNEY ASSIGNED TO YOUR FILE AT (919) 828-4620 or email <u>cbannon@ncbar.gov</u>**

      Please give this matter your immediate attention.

                              Sincerely,

                              Katherine E. Jean
                              Counsel

KEJ/jr
Enclosure

                  **ACCEPTANCE OF SERVICE REQUESTED**

## SUBSTANCE OF GRIEVANCE

| | | | |
|---|---|---|---|
| **FILE NUMBER:** | 21G0665 | **DATE FILE RECEIVED:** | 26 August 2021 |

**Attorney/Respondent's Name**
Brooke M. Crump
PO Box 396
Mount Gilead, NC 27306
*brooke@laketillerylaw.com*

**Complainant's Name**
The North Carolina State Bar

---

**THE SUBSTANCE OF GRIEVANCE:**

Respondent represents the Defendants in *Win Dozier v. Sherri Allgood and Tonya Troublefield*, Montgomery County file 21-CVS-41. On 8 May 2021, Allgood signed the verification of her discovery responses, and Respondent notarized the verification.

On 28 June 2021 Respondent filed what purported to be a verified Answer on behalf of Allgood. Upon information and belief, the verification page attached to Allgood's Answer was forged: Allgood had not signed a verification of the Answer. Instead, Respondent altered Allgood's 8 May 2021 verification by whiting out and replacing the dates on both the signature and the notarization. Respondent then attached the altered verification to Allgood's Answer.

Respondent's actions in connection with the verification constituted common law forgery, were in violation of the Notary Public Act, and constituted a Class I misdemeanor pursuant to NCGS §10B-60(c)(1) and (2), as well as a Class I felony pursuant to NCGS §10B-60(d)(1).

**VIOLATIONS OF RULES OF PROFESSIONAL CONDUCT INDICATED:**

Rule 8.4(b)
Rule 8.4(c)
Rule 8.4(d)

The North Carolina State Bar
Office of Counsel

217 East Edenton Street (27601)
Post Office Box 25908
Raleigh, North Carolina 27611
Telephone (919) 828-4620
Fax: (919) 834-8156
Web: www.ncbar.gov

## WHAT TO EXPECT IN THE DISCIPLINARY PROCESS

The lawyer disciplinary process in North Carolina begins when a grievance is filed with the State Bar. A grievance is an allegation that the conduct of a lawyer licensed to practice law in North Carolina has violated one or more of the formal rules governing lawyer conduct. These rules are defined in the Rules of Professional Conduct. The State Bar's Grievance Committee evaluates grievances to determine whether a lawyer has violated those Rules and, if so, imposes appropriate discipline or refers the matter for a trial. The Rules of Professional Conduct can be found at the State Bar's website, www.ncbar.gov.

The Grievance Committee opens approximately 1300-1500 files a year. Every grievance is assigned to a staff attorney in the State Bar's Office of Counsel. The person who files the grievance is called "the complainant." The form for filing a grievance is available at the State Bar's website. The complainant **must** provide all information he or she believes the Grievance Committee should consider. The staff attorney **will not** call the complainant to see if the complainant has additional information that was not provided. The complainant will receive a letter acknowledging that the State Bar received the grievance. The letter will identify the grievance file number and the staff attorney assigned to the grievance.

In the initial evaluation, the staff attorney will make a determination whether the complainant's allegations, assumed at this stage to be true and provable, constitute a violation of the Rules of Professional Conduct. When the allegations, if true and provable, would not constitute a Rule violation, the grievance must be dismissed because the Grievance Committee has no authority to take action unless there is a violation of the Rules of Professional Conduct. When the allegations, if true and provable, would constitute a violation of the Rules of Professional Conduct, the staff attorney ordinarily sends a Letter of Notice to the lawyer complained about, who is called "the respondent." The Letter of Notice is accompanied by a Substance of Grievance detailing the allegations of professional misconduct and identifying the Rules implicated by the allegations. The respondent must provide a written response to the Letter of Notice within 15 days of receipt of the Letter of Notice. The last paragraph of the Letter of Notice identifies the staff attorney who is handling the grievance.

**All communications by the complainant or the respondent with the State Bar should be directed to the staff attorney assigned to the grievance, not to the person who signed the letter, and should reference the file number so the grievance can readily be located.**

When the staff attorney receives the respondent's response, the staff attorney will determine whether he or she has enough information to understand what happened in the case. If necessary, the staff attorney will conduct further inquiry. Further inquiry is not always necessary. In many cases, the staff attorney can fully understand the necessary facts from reviewing the grievance and the response and any documents provided by the complainant and the respondent. In some cases, a small amount of additional information is needed. In cases involving very complicated facts or facts which are difficult to locate, extensive information gathering is required. There are cases in which the Grievance Committee must wait for outside events to occur before acting on the grievance. One example of this is when a pending court case must be concluded before the grievance can be addressed.

When the appropriate review is completed, the staff attorney will write a Report of Counsel to the Grievance Committee. The grievance will then be reviewed by the Chair or by the Chair and a Vice Chair of the Committee. In evaluating the grievance, the Chair or the Chair and Vice Chair must keep in mind that any violation of the Rules of Professional Conduct must be proven by **clear, cogent and convincing evidence**. If the Committee determines that the evidence is not sufficient to prove a Rule violation, the Chair or the Chair and Vice Chair will dismiss the grievance. The complainant and the respondent will be notified in writing of the Chair or the Chair and Vice Chair's decision. There is no appeal of the dismissal of a grievance.

Katherine E. Jean, Counsel
David R. Johnson, Jennifer A. Porter, Margaret T. Cloutier, Carmen Hoyme Bannon, Barry S. McNeill,
G. Patrick Murphy, Susannah B. Cox, Maria J. Brown, Alex G. Nicely, Savannah B. Perry,
J. Cameron Lee, Elizabeth S. Foley, Robert W. Weston, Kelley A. DeAngelus63A vN" 7   GA"TK Deputy Counsel
Leanor Bailey Hodge – Trust Account Compliance Counsel/Deputy Counsel

If the Chair or the Chair and Vice Chair conclude the evidence is sufficient to prove a Rule violation, the grievance will be placed on an agenda for consideration at one of the State Bar's quarterly meetings. The meetings occur in January, April, July and October. At the quarterly meeting, the grievance will be assigned to one of three subcommittees. Each subcommittee will meet separately, consider the grievances before it, and make its recommendations to the full Committee. The full Committee will then evaluate the grievance and determine whether the evidence is sufficient to prove a Rule violation. Unless and until the Grievance Committee imposes public discipline, identified below, information concerning the existence of a grievance is confidential.

The Grievance Committee can take any of the following actions:

a. Dismiss the grievance;
b. Issue a Letter of Caution (the conduct is not consistent with accepted standards of professionalism but is not technically a violation of the Rules of Professional Conduct);
c. Issue a Letter of Warning (the conduct is a minor, unintentional or technical violation of the Rules);
d. Issue an Admonition (this is permanent discipline but is not published)
e. Issue a Reprimand (this is permanent discipline sent to the lawyer's local newspaper and published on the State Bar website);
f. Issue a Censure (this is permanent discipline sent to the lawyer's local newspaper, published on the State Bar website and sent to the state and federal courts in North Carolina);
g. Refer the lawyer to the Lawyers Assistance Program (this is a program intended to help a lawyer with substance abuse or mental health issues);
h. Refer the lawyer to the Trust Account Compliance Program (this is a program intended to help a lawyer understand the requirements for operating a trust account to handle entrusted funds);
i. Refer the case to the Disciplinary Hearing Commission ("DHC") for trial (this happens in a small percentage of cases when the Grievance Committee believes the conduct is serious enough that the lawyer's license to practice law should be suspended or the lawyer should be disbarred from practicing law).

Other than in cases referred to the DHC for trial, the Grievance Committee can impose discipline directly.

Cases are tried before the Disciplinary Hearing Commission for two reasons: (1) the lawyer rejects discipline imposed by the Grievance Committee or (2) the Grievance Committee believes the conduct is sufficiently serious that suspension of the lawyer's license or disbarment is likely the appropriate discipline.
When a case is tried in the DHC, the staff attorney will file a civil action and the case will proceed according to the State Bar's Discipline and Disability Rules, the North Carolina Rules of Civil Procedure and the North Carolina Rules of Evidence. After a hearing, the DHC will enter an order imposing discipline or dismissing the case. Appeal from an order of the DHC is to the North Carolina Court of Appeals.

**What the State Bar CANNOT do:**

The State Bar **cannot** order a lawyer to pay money to anyone.

The State Bar **cannot** give anyone legal advice.

The State Bar **cannot** give an advisory opinion about whether a lawyer violated a Rule.

The State Bar **cannot** intervene in a pending court action or remove a lawyer from a case.

The State Bar **cannot** determine whether a lawyer committed malpractice, breached a contract or is otherwise liable to the complainant. A person who believes he or she has suffered damages because of legal malpractice, breach of contract or some other civil wrong **should not wait** for the Grievance Committee's action before deciding whether to pursue an independent legal action in the court system.

# Exhibit 5

# Allgood Affidavit



EXHIBIT

5

# AFFIDAVIT

North Carolina

County of ___Montgomery___

___Sherri Harris Allgood_____, appearing before the undersigned notary and being duly
      *Name of principal*

sworn, says that:

1.   I am a defendant in a civil action filed by Wm Dozier  in Montgomery County, North Carolina, 21-CVS-41.  My attorney, Brooke

      Crump contacted me on September 14, 2021 and informed me that a Grievance had been filed against her with the North Carolina

2.   State Bar regarding the answer Ms. Crump filed on my behalf in the above-referenced matter. Ms. Crump informed me of the

      allegations and I deny them. I reviewed the answer drafted by my attorney and signed the verification filed on June 28, 2021.

                                              *Principal's Signature*

Sworn to (or affirmed) and subscribed before me this the _29th_ day of ___September____, 2021.

(Official Seal)
KAREN K BOWLES
NOTARY
PUBLIC
MONTGOMERY COUNTY, NC

                                              *Official Signature of Notary*

                                    Karen K Bowles , Notary Public
                                    *Notary's printed or typed name*

                                    My commission expires: April 11 2022

### OPTIONAL

This certificate is attached to a _____, signed by _____
                                *Title/Type of Document*                *Name of Principal Signer(s)*

on _____, and includes _____ pages.
            *Date*                          *# of pages*

# Exhibit 6

# Nance Recusal Orders



EXHIBIT

6

NORTH CAROLINA

MONTGOMERY COUNTY

IN MATTERS OF:

HAMILTON, ATLAS

IN THE GENERAL COURT OF JUSTICE
JUVENILE COURT DIVISION
21 JA 10

2022 APR -5  A 9: 51

)
)
)
)
)
)
)

**ORDER**

_____

      **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

      The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

      This the _____ day of April, 2022.

                             **JOHN R. NANCE**
                             **CHIEF DISTRICT COURT JUDGE**
                             **JUDICIAL DISTRICT 20A**

**NORTH CAROLINA**　　　　**IN THE GENERAL COURT OF JUSTICE**
　　　　　　　　　　　　　　　　**JUVENILE COURT DIVISION**
**MONTGOMERY COUNTY**　　　　　　**20 JA 8**

IN MATTERS OF:　　　　　　)
　　　　　　　　　　　　　　)
BOWDEN, LEO, V.　　　　　　)
　　　　　　　　　　　　　　)　　　**ORDER**
　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　)
_____　)

FILED

2022 APR -6 I A 9: 52

MONTGOMERY CO., C.S.C.

BY _____ mrcl

　　　**THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

　　　The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

　　　This the ___5th___ day of April, 2022.

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　**JOHN R. NANCE**
　　　　　　　　　　　　　　　　　　**CHIEF DISTRICT COURT JUDGE**
　　　　　　　　　　　　　　　　　　**JUDICIAL DISTRICT 20A**

NORTH CAROLINA

MONTGOMERY COUNTY

STATE OF NORTH CAROLINA )
                         )
                         )
        Plaintiff,       )
                         )
VS                       )
                         )
DONALD WORTH COTTON      )
        Defendant,       )
_____ )

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
19 CR 702087

**ORDER**

FILED
2022 APR -6 I A 9 55
MONTGOMERY CO., C.S.C.
BY_____ mpl

    **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

    The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

    This the ___5__ day of April, 2022.

                              _____
                              JOHN R. NANCE
                              CHIEF DISTRICT COURT JUDGE
                              JUDICIAL DISTRICT 20A

NORTH CAROLINA        IN THE GENERAL COURT OF JUSTICE
                                  DISTRICT COURT DIVISION

MONTGOMERY COUNTY              21 CR 7004235

STATE OF NORTH CAROLINA )
                               )
                               )
      Plaintiff,            )
                               )       **ORDER**
VS                            )
                               )
DONALD WORTH COTTON   )
      Defendant,       )
_____ )

     **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

     The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

     This the ___5th___ day of April, 2022.

                            JOHN R. NANCE
                            CHIEF DISTRICT COURT JUDGE
                            JUDICIAL DISTRICT 20A

NORTH CAROLINA

MONTGOMERY COUNTY

STATE OF NORTH CAROLINA )
                         )
                         )
        Plaintiff,       )
                         )
VS                       )
                         )
DONALD WORTH COTTON      )
        Defendant,       )
_____)

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
20 CR 700855

**ORDER**

        **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

        The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

        This the _____6th_____ day of April, 2022.

                                        JOHN R. NANCE
                                        **CHIEF DISTRICT COURT JUDGE**
                                        **JUDICIAL DISTRICT 20A**

NORTH CAROLINA

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION

MONTGOMERY COUNTY

20 CR 7000005

STATE OF NORTH CAROLINA )
                         )
                         )
         Plaintiff,      )
                         )          **ORDER**
VS                       )
                         )
ERICK MOLINA HERRERA     )
         Defendant,      )
_____ )

 

     **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

     The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

     This the _5th_ day of April, 2022.

                                       JOHN R. NANCE
                                       CHIEF DISTRICT COURT JUDGE
                                       JUDICIAL DISTRICT 20A

NORTH CAROLINA        IN THE GENERAL COURT OF JUSTICE
                           DISTRICT COURT DIVISION

MONTGOMERY COUNTY           20 CR 704336

| | |
|---|---|
| STATE OF NORTH CAROLINA | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | )       **ORDER** |
| VS | ) |
| | ) |
| JACOBS,CURTIS, E. | ) |
| **Defendant,** | ) |
| | ) |

        **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

        The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

        This the _5th_ day of April, 2022.

                                **JOHN R. NANCE**
                                **CHIEF DISTRICT COURT JUDGE**
                                **JUDICIAL DISTRICT 20A**

NORTH CAROLINA        IN THE GENERAL COURT OF JUSTICE

DISTRICT COURT DIVISION

MONTGOMERY COUNTY        20 CR 701196

STATE OF NORTH CAROLINA )
                         )
                         )
       **Plaintiff,**       )
                         )          **<u>ORDER</u>**
**VS**                     )
                         )
**LUNSFORD, THERESA A.**    )
       **Defendant,**     )
_____ )

      **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

      The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

      This the _5th_ day of April, 2022.

                                    **JOHN R. NANCE**
                                    **CHIEF DISTRICT COURT JUDGE**
                                    **JUDICIAL DISTRICT 20A**

NORTH CAROLINA       IN THE GENERAL COURT OF JUSTICE

                              DISTRICT COURT DIVISION

MONTGOMERY COUNTY            20 CR 701197

STATE OF NORTH CAROLINA )
                             )
                             )
       Plaintiff,          )
                             )      **ORDER**
VS                           )
                             )
LUNSFORD, THERESA A.    )
      Defendant,       )
_____ )

     **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

     The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

     This the 5th day of April, 2022.

                                   JOHN R. NANCE
                                   CHIEF DISTRICT COURT JUDGE
                                   JUDICIAL DISTRICT 20A

NORTH CAROLINA

MONTGOMERY COUNTY

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
20-CVD-000046

MATTHEW HURLEY,
    Plaintiff,

VS

JESSICA HURLEY,
    Defendant,

)
)
)
)
)
)
)
)
)

**ORDER**

    **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

    The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

    This the _____ day of April, 2022.

                    JOHN R. NANCE
                    CHIEF DISTRICT COURT JUDGE
                    JUDICIAL DISTRICT 20A

**NORTH CAROLINA**

**MONTGOMERY COUNTY**

**IN THE GENERAL COURT OF JUSTICE**
**DISTRICT COURT DIVISION**
**19-CVD-000145**

FILED

2022 APR -6 1 A 9:50

MONTGOMERY CO., C.S.C.

BY)

**LEON HINSON,**
    **Plaintiff,**

             )
             )    **ORDER**

**VS**

             )
             )

**KELLY HINSON,**
    **Defendant,**

             )
             )
             )


     **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

     The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

     This the _____ day of April, 2022.

                           **JOHN R. NANCE**
                           **CHIEF DISTRICT COURT JUDGE**
                           **JUDICIAL DISTRICT 20A**

NORTH CAROLINA

MONTGOMERY COUNTY

FILED

2022 APR -6 | A 9: 50

MONTGOMERY CO., C.S.C.

BY_____

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
17-CVD-000099

AMBER SELLERS,
    Plaintiff,      )
                   )
VS               )
                   )
JASE PARSON,
    Defendant,     )
                   )

**ORDER**

      **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

      The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

      This the _____ day of April, 2022.

                    JOHN R. NANCE
                    CHIEF DISTRICT COURT JUDGE
                    JUDICIAL DISTRICT 20A

NORTH CAROLINA

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION

MONTGOMERY COUNTY

13-CVD-000345

TERRY COOK,
     Plaintiff,

)
)
)

VS

)
)

**ORDER**

BRANDIE COOK,
     Defendant,

)
)
)
)

       **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

       The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

       This the ___ day of April, 2022.

                         JOHN R. NANCE
                         CHIEF DISTRICT COURT JUDGE
                         JUDICIAL DISTRICT 20A

NORTH CAROLINA

MONTGOMERY COUNTY

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
21-CVD-000340

FILED
2022 APR -6 A 9: 51
MONTGOMERY CO., C.S.C.
BY _____ mpl

TERRY COOK,
    Plaintiff,

VS

BRANDIE COOK,
    Defendant,

)
)
)
)
)
)
)
)
)

**ORDER**

    **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

    The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

    This the _6th_ day of April, 2022.

JOHN R. NANCE
CHIEF DISTRICT COURT JUDGE
JUDICIAL DISTRICT 20A

| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
|---|---|
| | DISTRICT COURT DIVISION |
| MONTGOMERY COUNTY | 21-CVD-000528 |

FILED
2022 APR -6 A 9: 5_
MONTGOMERY CO., C.S.C.
BY

KAMERON BATTEN,
    **Plaintiff,**

VS

HUNTER MEDLIN,
    **Defendant,**

)
)
)
)
)
)
)
)
)

**ORDER**

    **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

    The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

    This the _4th_ day of April, 2022.

JOHN R. NANCE
CHIEF DISTRICT COURT JUDGE
JUDICIAL DISTRICT 20A

**NORTH CAROLINA**

**MONTGOMERY COUNTY**

**IN THE GENERAL COURT OF JUSTICE**
**DISTRICT COURT DIVISION**
**91-CVD-00562**

FILED

2022 APR -6  A 9: 53

MONTGOMERY CO., C.S.C.

BY _____ mpl

| | |
|---|---|
| MONTGOMERY COUNTY CHILD SUPPORT ENFORCEMNT AGENCY | ) ) ) ) |
| CARRICK, RUBY | ) ) |
| Plaintiff, | ) ) |
| VS | ) ) |
| MABE, SANDY, MAULDIN Defendant, | ) ) ) |

**ORDER**

 

**THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

This the _5th_ day of April, 2022.

JOHN R. NANCE
CHIEF DISTRICT COURT JUDGE
JUDICIAL DISTRICT 20A

**NORTH CAROLINA**

**MONTGOMERY COUNTY**

**IN THE GENERAL COURT OF JUSTICE**
**DISTRICT COURT DIVISION**
**21-CVD-00451**

| | |
|---|---|
| **MONTGOMERY COUNTY** | ) |
| **CHILD SUPPORT** | ) |
| **ENFORCEMNT AGENCY** | ) |
| | ) |
| **BEAN, BRETT, L.** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **VS** | ) |
| | ) |
| **BEAN, NANCY, L.** | ) |
| **Defendant,** | ) |
| | ) |

**ORDER**

 THIS CAUSE coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

 The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

 This the 5d day of April, 2022.

JOHN R. NANCE
CHIEF DISTRICT COURT JUDGE
JUDICIAL DISTRICT 20A

**NORTH CAROLINA**

**MONTGOMERY COUNTY**

**IN THE GENERAL COURT OF JUSTICE**
**DISTRICT COURT DIVISION**
**20-CVD-00136**

2022 APR -6 1 A 9 53

MONTGOMERY CO., C.S.C.

BY _____ mpl

| | |
|---|---|
| MONTGOMERY COUNTY<br>CHILD SUPPORT<br>ENFORCEMNT AGENCY | ) <br> ) <br> ) <br> ) |
| NC FOSTER CARE | ) <br> ) |
|     Plaintiffs, | ) <br> ) |
| VS | ) <br> ) |
| YOUNG, JESSICA<br>    Defendant, | ) <br> ) <br> ) |

**ORDER**

    **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

    The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

    This the _5th_ day of April, 2022.

                          **JOHN R. NANCE**
                          **CHIEF DISTRICT COURT JUDGE**
                          **JUDICIAL DISTRICT 20A**

NORTH CAROLINA

MONTGOMERY COUNTY

**IN THE GENERAL COURT OF JUSTICE**
**DISTRICT COURT DIVISION**
**11-CVD-00137**

2022 APR -6  A 9: 54

MONTGOMERY CO., C.S.C.

BY _____ mpl

MONTGOMERY COUNTY )
CHILD SUPPORT )
ENFORCEMNT AGENCY )
)
CRUMP, EMILY H., )
    Plaintiff, )
)
VS )
)
CRUMP. JAMES, MATTHEW )
    Defendant, )
_____ )

**ORDER**

    **THIS CAUSE** coming sua sponte by the undersigned District Court Judge John R. Nance, the Court without making Findings of Facts or Conclusions of Law hereby recuses himself from all matters upon which Brooke McIntosh Crump appears as attorney of record or Guardian ad Litem.

    The Court Managers shall schedule another judge within District 20A to hear future hearings in the above-styled case.

    This the _____6th____ day of April, 2022.

                          **JOHN R. NANCE**
                          **CHIEF DISTRICT COURT JUDGE**
                          **JUDICIAL DISTRICT 20A**

# **Exhibit 7**

## Grievance File Number 22G0388

EXHIBIT

7

# The North Carolina State Bar
Office of Counsel

217 E. Edenton S
Post Office Box
Raleigh, North Carolina 27611
Telephone (919) 828-4620
Fax: (919) 834-8156
Web: www.ncbar.gov

April 27, 2022

**LETTER OF NOTICE**

Ms. Brooke McIntosh Crump
PO Box 396
Mount Gilead, NC 27306
Via email to brooke@laketillerylaw.com

Re:     Grievance filed by The North Carolina State Bar
        Our file number: 22G0388

Dear Ms. Crump,

This is to advise that a grievance alleging misconduct on your part as an attorney was received in this office from the above-named individual. To assist you in preparing a response to this letter, I am enclosing the "Substance of the Grievance." It is not a pleading of any sort but is simply a summary of what appears to be the basis of the grievance.

Under 27 N.C. Admin. Code, Chapter 1, Subchapter B, Rule .0112(c) of the Discipline and Disability Rules of The North Carolina State Bar, you are required to submit a written response to this letter within 15 days of the date the letter is served upon you. Such response must be a full and fair disclosure of all of the facts and circumstances pertaining to your alleged misconduct. If you fail to respond within 15 days, the Chairman of the Grievance Committee may proceed under Rule .0112(f).

**Under Rule .0112(d), a copy of your response may be provided to the complaining party unless you object thereto in writing. Please note your objection in your written response to the grievance.**

**IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT <u>CARMEN H. BANNON</u> THE STAFF ATTORNEY ASSIGNED TO YOUR FILE AT (919) 828-4620 or EMAIL <u>cbannon@ncbar.gov</u>.**

Please give this matter your immediate attention.

Sincerely,

Katherine E. Jean
Counsel

KEJ/jr
Enclosure

**ACCEPTANCE OF SERVICE REQUESTED**

# SUBSTANCE OF GRIEVANCE

| **FILE NUMBER:** 22G0388 | **DATE FILE RECEIVED:** April 18, 2022 |
|---|---|
| **Attorney/Respondent's Name**<br>Brooke M. Crump | **Complainant's Name**<br>The North Carolina State Bar |

## THE SUBSTANCE OF GRIEVANCE:

On 21 March 2022, Respondent attempted to file with the Montgomery County Clerk of Court a document captioned "Motion in the Cause." The filing, which requested that Chief District Court Judge John Nance recuse himself from all cases in which Respondent represents a litigant, was rejected by the Clerk's office because it was not associated with an existing case.

Rather than refiling the motion to recuse in one of her cases before the District Court, Respondent on 4 April 2022 filed a motion for temporary stay and petitions for writs of prohibition and supersedeas in the Court of Appeals. The COA petitions were filed in a juvenile case (In re A.H., Montgomery County file no. 21-JA-10) in which Respondent had recently filed a still-pending motion to intervene. In the COA filings, Respondent contended that Judge Nance (and "those serving under his supervision") should be disqualified from presiding over any matter in which Respondent is counsel. In the petition for writ of prohibition Respondent referenced the "Motion in the Cause" that was not accepted for filing, alleging that "instead of addressing her recusal motion when the Undersigned presented it to him, the Honorable Judge Nance continued the underlying hearing and acted as if the motion for recusal didn't happen." This characterization was misleading.

On 6 April 2022, the Court of Appeals dismissed Respondent's petition for writ of supersedeas and motion for temporary stay and denied her petition for writ of prohibition. That same day Respondent stated that she "still plan[s] to move forward with disqualification with any judge who has any knowledge of allegations of professional misconduct made against me." On 11 April 2022, Respondent filed a motion to recuse District Court Judge Thai Vang from all cases in which Respondent represents a litigant.

Respondent's claim that every District Court Judge in her district should be disqualified from hearing any case in which she represents a litigant is not well grounded in fact or law. As support for the motions and petitions referenced above, Respondent offered speculation, vague conclusory descriptions, mischaracterizations, hearsay, anonymous sources, misrepresentations, irrelevant anecdotes, and personal opinion. Respondent did not even *allege* that any of the judges are biased against her <u>clients</u>. Respondent did not, and cannot, offer legal authority for the proposition that any judge who is aware of alleged misconduct by an attorney is thereafter barred from presiding over any matter in which that attorney serves as counsel.

Respondent's ongoing effort to disqualify the entire District Court bench from all her cases is prejudicial to the administration of justice in that it interferes with the court's ability to conduct business and needlessly consumes court time and resources.

**VIOLATIONS OF RULES OF PROFESSIONAL CONDUCT INDICATED:**

Rule 3.1
Rule 3.3(a)(1)
Rule 8.2(a)
Rule 8.4(c) & (d)

**The North Carolina State Bar**

Office of Counsel

217 East Edenton Street (27601)
Post Office Box 25908
Raleigh, North Carolina 27611
Telephone (919) 828-4620
Fax: (919) 834-8156
Web: www.ncbar.gov

## WHAT TO EXPECT IN THE DISCIPLINARY PROCESS

The lawyer disciplinary process in North Carolina begins when a grievance is filed with the State Bar. A grievance is an allegation that the conduct of a lawyer licensed to practice law in North Carolina has violated one or more of the formal rules governing lawyer conduct. These rules are defined in the Rules of Professional Conduct. The State Bar's Grievance Committee evaluates grievances to determine whether a lawyer has violated those Rules and, if so, imposes appropriate discipline or refers the matter for a trial. The Rules of Professional Conduct can be found at the State Bar's website, www.ncbar.gov.

The Grievance Committee opens approximately 1300-1500 files a year. Every grievance is assigned to a staff attorney in the State Bar's Office of Counsel. The person who files the grievance is called "the complainant." The form for filing a grievance is available at the State Bar's website. The complainant **must** provide all information he or she believes the Grievance Committee should consider. The staff attorney **will not** call the complainant to see if the complainant has additional information that was not provided. The complainant will receive a letter acknowledging that the State Bar received the grievance. The letter will identify the grievance file number and the staff attorney assigned to the grievance.

In the initial evaluation, the staff attorney will make a determination whether the complainant's allegations, assumed at this stage to be true and provable, constitute a violation of the Rules of Professional Conduct. When the allegations, if true and provable, would not constitute a Rule violation, the grievance must be dismissed because the Grievance Committee has no authority to take action unless there is a violation of the Rules of Professional Conduct. When the allegations, if true and provable, would constitute a violation of the Rules of Professional Conduct, the staff attorney ordinarily sends a Letter of Notice to the lawyer complained about, who is called "the respondent." The Letter of Notice is accompanied by a Substance of Grievance detailing the allegations of professional misconduct and identifying the Rules implicated by the allegations. The respondent must provide a written response to the Letter of Notice within 15 days of receipt of the Letter of Notice. The last paragraph of the Letter of Notice identifies the staff attorney who is handling the grievance.

**All communications by the complainant or the respondent with the State Bar should be directed to the staff attorney assigned to the grievance, not to the person who signed the letter, and should reference the file number so the grievance can readily be located.**

When the staff attorney receives the respondent's response, the staff attorney will determine whether he or she has enough information to understand what happened in the case. If necessary, the staff attorney will conduct further inquiry. Further inquiry is not always necessary. In many cases, the staff attorney can fully understand the necessary facts from reviewing the grievance and the response and any documents provided by the complainant and the respondent. In some cases, a small amount of additional information is needed. In cases involving very complicated facts or facts which are difficult to locate, extensive information gathering is required. There are cases in which the Grievance Committee must wait for outside events to occur before acting on the grievance. One example of this is when a pending court case must be concluded before the grievance can be addressed.

When the appropriate review is completed, the staff attorney will write a Report of Counsel to the Grievance Committee. The grievance will then be reviewed by the Chair or by the Chair and a Vice Chair of the Committee. In evaluating the grievance, the Chair or the Chair and Vice Chair must keep in mind that any violation of the Rules of Professional Conduct must be proven by **clear, cogent and convincing evidence**. If the Committee determines that the evidence is not sufficient to prove a Rule violation, the Chair or the Chair and Vice Chair will dismiss the grievance. The complainant and the respondent will be notified in writing of the Chair or the Chair and Vice Chair's decision. There is no appeal of the dismissal of a grievance.

Katherine E. Jean, Counsel
Jennifer A. Porter, Senior Deputy Counsel
David R. Johnson, Carmen Hoyme Bannon, Barry S. McNeill, G. Patrick Murphy, Susannah B. Cox,
Maria J. Brown, Alex G. Nicely, Savannah B. Perry, J. Cameron Lee, Elizabeth S. Foley,
Robert W. Weston, Kelley A. DeAngelus, Thomas L. Crosby, B. Tessa Hale - Deputy Counsel
Leanor Bailey Hodge – Trust Account Compliance Counsel/Deputy Counsel

If the Chair or the Chair and Vice Chair conclude the evidence is sufficient to prove a Rule violation, the grievance will be placed on an agenda for consideration at one of the State Bar's quarterly meetings. The meetings occur in January, April, July and October. At the quarterly meeting, the grievance will be assigned to one of three subcommittees. Each subcommittee will meet separately, consider the grievances before it, and make its recommendations to the full Committee. The full Committee will then evaluate the grievance and determine whether the evidence is sufficient to prove a Rule violation. Unless and until the Grievance Committee imposes public discipline, identified below, information concerning the existence of a grievance is confidential.

The Grievance Committee can take any of the following actions:

a. Dismiss the grievance;
b. Issue a Letter of Caution (the conduct is not consistent with accepted standards of professionalism but is not technically a violation of the Rules of Professional Conduct);
c. Issue a Letter of Warning (the conduct is a minor, unintentional or technical violation of the Rules);
d. Issue an Admonition (this is permanent discipline but is not published)
e. Issue a Reprimand (this is permanent discipline sent to the lawyer's local newspaper and published on the State Bar website);
f. Issue a Censure (this is permanent discipline sent to the lawyer's local newspaper, published on the State Bar website and sent to the state and federal courts in North Carolina);
g. Refer the lawyer to the Lawyers Assistance Program (this is a program intended to help a lawyer with substance abuse or mental health issues);
h. Refer the lawyer to the Trust Account Compliance Program (this is a program intended to help a lawyer understand the requirements for operating a trust account to handle entrusted funds);
i. Refer the case to the Disciplinary Hearing Commission ("DHC") for trial (this happens in a small percentage of cases when the Grievance Committee believes the conduct is serious enough that the lawyer's license to practice law should be suspended or the lawyer should be disbarred from practicing law).

Other than in cases referred to the DHC for trial, the Grievance Committee can impose discipline directly.

Cases are tried before the Disciplinary Hearing Commission for two reasons: (1) the lawyer rejects discipline imposed by the Grievance Committee or (2) the Grievance Committee believes the conduct is sufficiently serious that suspension of the lawyer's license or disbarment is likely the appropriate discipline.
When a case is tried in the DHC, the staff attorney will file a civil action and the case will proceed according to the State Bar's Discipline and Disability Rules, the North Carolina Rules of Civil Procedure and the North Carolina Rules of Evidence. After a hearing, the DHC will enter an order imposing discipline or dismissing the case. Appeal from an order of the DHC is to the North Carolina Court of Appeals.

**What the State Bar CANNOT do:**

The State Bar **cannot** order a lawyer to pay money to anyone.

The State Bar **cannot** give anyone legal advice.

The State Bar **cannot** give an advisory opinion about whether a lawyer violated a Rule.

The State Bar **cannot** intervene in a pending court action or remove a lawyer from a case.

The State Bar **cannot** determine whether a lawyer committed malpractice, breached a contract or is otherwise liable to the complainant. A person who believes he or she has suffered damages because of legal malpractice, breach of contract or some other civil wrong **should not wait** for the Grievance Committee's action before deciding whether to pursue an independent legal action in the court system.

| STATE OF NORTH CAROLINA | BEFORE THE GRIEVANCE COMMITTEE OF THE NORTH CAROLINA STATE BAR 22G0388 |
|---|---|
| WAKE COUNTY | |
| IN RE: Brooke McIntosh Crump, Attorney Respondent | ACCEPTANCE OF SERVICE |

       I, Brooke McIntosh Crump, hereby certify that I received a copy of the Letter of Notice and Substance of Grievance issued concerning grievance file no. 22G0388. Service of the Letter of Notice in the above-captioned grievance is hereby accepted and I waive service of the Letter of Notice by the methods set forth in 27 N.C. Admin. Code, Chapter 1, Subchapter B, Section .0012.

       I hereby certify that I also received a copy of the 28 April 2022 Subpoena issued in connection with the above-referenced grievance. Service of the Subpoena is hereby accepted and I waive service of the Grievance Committee Subpoena by any other method.

       This the _____ day of _____, 2022.

 

_____
Brooke McIntosh Crump, Respondent

# Exhibit 8
22G0388 Subpoena



| STATE OF NORTH CAROLINA | BEFORE THE |
|---|---|
| | GRIEVANCE COMMITTEE |
| | OF THE |
| | NORTH CAROLINA STATE BAR |
| WAKE COUNTY | File No. 22G0388 |

| IN RE<br>CONFIDENTIAL GRIEVANCE INQUIRY | **SUBPOENA** |
|---|---|

Party Requesting Subpoena
☒ Office of Counsel ☐ Respondent

| | Name and Address of Person Subpoenaed | Alternate Address |
|---|---|---|
| **TO** | Brooke M. Crump<br>108 N. Main Street<br>Mt. Gilead, NC 27306 | |
| | Telephone No. | Telephone No. |

YOU ARE COMMANDED TO: (*check all that apply*):

☐ appear and testify, in the above entitled action, before the committee at the place, date and time indicated below.

☐ appear and testify, in the above entitled action, at a deposition at the place, date and time indicated below.

☒ appear and provide information for consideration by the committee in the above entitled action, at the place, date and time indicated below.

☐ produce and permit inspection and copying of the following items, at the place, and time indicated below.
  ☐ See attached list. (*List here if space sufficient*)

If you have questions concerning this subpoena, please contact Deputy Counsel Carmen Hoyme Bannon at cbannon@ncbar.gov.

| Name and Location of Place of Examination/Place to Produce | Date to Appear/Produce | |
|---|---|---|
| The North Carolina State Bar<br>217 E. Edenton Street<br>Raleigh, NC 27601 | 11 May 2022 | |
| | Time to Appear/Produce<br>10:00 | ☒ AM ☐ PM |
| Name and Address of Applicant or Applicant's Attorney<br>Carmen Hoyme Bannon, Deputy Counsel<br>The North Carolina State Bar<br>P.O. Box 25908<br>Raleigh, NC 27611 | Date<br>28 April 2022 | |
| | Signature | |
| Telephone No. 919 828-4620 | ☒ Chair, Grievance Committee ☐ Secretary at direction of Chair, Grievance Committee | |

**This subpoena is issued under the provisions of N.C. Gen. Stat. § 84-29 and 27 N.C. Admin. Code 1B.0112(f).**

## RETURN OF SERVICE

I certify this subpoena was received and served on the person subpoenaed as follows:

By: ☐ personal delivery
☐ registered or certified mail, return receipt requested and attached.
☐ telephone communication. (For use only by the sheriff's office for witness subpoenaed to appear and testify.)
☐ unable to serve this subpoena

| Service Fee<br>$ | ☐ Paid<br>☐ Due | Date Served | Signature of Authorized Server | Title |
|---|---|---|---|---|

## ACCEPTANCE OF SERVICE

I certify this subpoena was received by the undersigned:

| Date Received: | Signature: |
|---|---|

# **Exhibit 9**
# 16 June 2022 Email In Re 22G0388



From: **Carmen Bannon** cbannon@ncbar.gov
Subject: Written Response to Grievance 22G0388
Date: June 16, 2022 at 12:03 PM
To: Brooke Crump brooke@laketillerylaw.com
Cc: Becky Carroll BCarroll@ncbar.gov

Dear Ms. Crump,
I realized that after Mr. Ferguson withdrew from representing you, we did not follow up to set a date for your written response to grievance number 22G0388. The Letter of Notice is attached again for your convenience. As discussed during your interview at the State Bar, this file will also include review of the motions to intervene you filed in two DSS cases. Although the information you provided during the interview satisfies your obligation to respond to the State Bar regarding this matter, I wanted to give you an opportunity to submit any additional written response or documents that you want the Grievance Committee to consider. The file will be reviewed by the Committee at its July meeting, and written materials must be distributed to the Committee in advance of the meeting, so please provide any additional information that you would like to be considered,--about either the recusal motions or about the motions to intervene--within 15 days.

Sincerely,

**Carmen Hoyme Bannon**
Deputy Counsel
The North Carolina State Bar
P.O. Box 25908
Raleigh, NC 27611
919-719-9283 (direct)
Pronouns: she/her/hers

**From:** Carmen Bannon
**Sent:** Thursday, April 28, 2022 5:21 PM
**To:** Brooke Crump <brooke@laketillerylaw.com>
**Cc:** Becky Carroll <BCarroll@ncbar.gov>
**Subject:** RE: State Bar Subpoena

Dear Ms. Crump,

Thank you for responding so promptly. I am not able to delay scheduling the interview, so both the subpoena and the Letter of Notice are attached. Please return signed copies of (a) the Acceptance of Service and (b) the acceptance of service section at the bottom of the subpoena. Since you are available May 11, the subpoena sets the interview for that day. If you retain counsel to represent you regarding the grievance and your lawyer cannot participate on May 11, please ask your lawyer to contact me directly. (Regarding your question about remote participation: While we could probably arrange for an audio/video feed, logistics and our available technology don't allow for meaningful remote participation in interviews conducted in person at the State Bar. For example, during an in-person interview we will be referring to printed documents that would not displayed to someone who was watching a livestream.)

Re: your request for more information about the interview, it will be a conversation in a conference room with me, my paralegal, and another lawyer in my office. It is possible that a State Bar investigator or a member of the Grievance Committee may attend. Although many grievances can be adequately investigated through written correspondence with the respondent-lawyer, some situations are better

explored/explained through in-person conversation. For that reason, one of the Grievance Committee's investigative tools is this type of subpoena, which requires the lawyer to appear at the State Bar to discuss the allegations. The Committee has determined that this grievance would be better investigated via an interview than written back-and-forth. You may be asked to respond in writing at a later date, but for now you do not need to prepare a written response within 15 days as provided in the Letter of Notice. If a written response is needed, we will set a due date for some time after the interview.

I would be happy to answer any other questions you may have.

Sincerely,

**Carmen H. Bannon**
Deputy Counsel
The North Carolina State Bar
P.O. Box 25908
Raleigh, NC 27611
919-719-9283 (direct)
Pronouns: she/her/hers

---

**From:** Brooke Crump <brooke@laketillerylaw.com>
**Sent:** Thursday, April 28, 2022 12:20 PM
**To:** Carmen Bannon <cbannon@ncbar.gov>
**Cc:** Becky Carroll <BCarroll@ncbar.gov>
**Subject:** Re: State Bar Subpoena

> **[EXTERNAL EMAIL]** DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

Ms. Bannon,

I will accept service via email for both. At this time, I am available on Wednesday, May 11, 2022. However, I would ask that you first serve me with the Letter of Notice for the grievance and allow me time to review it before setting a date for the interview. Attorney Ed Ferguson of Ferguson Hayes Hawkins, PLLC, previously stated his intent to assist my recusal efforts. However, I have not yet retained counsel related for this grievance, and it is unlikely that I will be able to do so on such short notice.

Nevertheless, I would like to update him and inquire about his availability. If I can retain counsel, could they appear remotely? Further, can you provide me with more details regarding the interview? It is possible that once I understand its basis and receive the Letter of Notice, I will not find it prudent to seek counsel to accompany me. Thank you.

Brooke Crump
*Attorney at Law*
Lake Tillery Law
(910) 439-3070



**Brooke McIntosh Crump**
**Attorney at Law**

www.laketillerylaw.com
108 North Main Street
P.O. Box 396
Mount Gilead, NC 27306
(P) 910.439-3070
(F) 910-889-8229

*THIS PRIVILEGED AND CONFIDENTIAL ELECTRONIC COMMUNICATION IS INTENDED ONLY FOR THE ADDRESSEE.*
*IMPORTANT NOTICE TO EMAIL RECIPIENTS:*
Anyone who receives this email by error should treat it as confidential and is asked to call Lake Tillery Law at 855-LAW-LAKE,
reply by email: info@laketillerylaw.com or by fax (910) 889-8229. This email transmission may not be secure and may be
illegally intercepted. Do not read, forward or disseminate this communication unless you are the intended addressee as
unauthorized interception of this email is a violation of federal law. Any reliance on the information contained within by
someone who has not entered into a fee agreement with Lake Tillery Law is at one's own risk.
Counsel for Lake Tillery Law is licensed to practice law ONLY in North Carolina and will not advise anyone on a legal matter
not involving North Carolina law.

On Apr 27, 2022, at 1:00 PM, Carmen Bannon <cbannon@ncbar.gov> wrote:

Dear Ms. Crump,

I am writing to tell you that the Chair of the Grievance Committee has issued
a subpoena for you to appear at the State Bar and be interviewed regarding
a new grievance file (file no. 22G0388, involving your efforts to have all of the
District Court judges in your district disqualified from all of your cases). The
interview needs to be conducted as soon as possible, but I wanted to offer
you the opportunity to have input into scheduling before I send the subpoena.
Please tell me your preference among the following options:

- Monday, May 2 at 10:00 am or 1:00 pm
- Tuesday, May 3 at 1:00 pm
- Wednesday, May 4 at 10:00 am or 1:00 pm
- Thursday, May 5 at 1:00 pm
- Monday, May 9 at 10:00 am or 1:00 pm
- Wednesday, May 11 at 10:00 am or 1:00 pm
- Thursday, May 12 at 10:00 am 1:00 pm

The interview is not a deposition, but it may be audio-recorded to ensure that
we have a complete record of the discussion. If you wish to be represented
by counsel, your lawyer may accompany you to the interview.

In addition to telling me which of the dates and times above works best for
you, please indicate whether you will accept service of the Letter of Notice
and subpoena in file no. 22G0388, or if we need to serve you by some other
means.  If I do not hear back from you by close of business tomorrow, I will
set the interview for one of the available dates/times next week and send the
Letter of Notice and subpoena out for formal service.

Thank you for your time and attention to this matter,

**Carmen H. Bannon**
Deputy Counsel
The North Carolina State B

The North Carolina State Bar
P.O. Box 25908
Raleigh, NC 27611
919-719-9283 (direct)
Pronouns: she/her/hers

Please be advised that the contents of this message and any reply may be subject to disclosure under North Carolina law. Informal ethics inquiries and advisories communicated via electronic mail are confidential pursuant to Rule 1.6 of the Rules of Professional Conduct. Attorney Client Assistance Program communications and Lawyer Assistance Program client communications via electronic mail are also treated as confidential pursuant to Rule 1.6 of the Rules of Professional Conduct and N.C. Gen. Stat. 84-32.1.



LON packet
Crump...88.pdf

# Exhibit 10
## "Does Gender Raise The Ethical Bar?"
## Academic Publication



# DOES GENDER RAISE THE ETHICAL BAR?

# EXPLORING THE PUNISHMENT OF ETHICAL VIOLATIONS AT WORK

Jessica A. Kennedy

Owen Graduate School of Management

Vanderbilt University

jessica.kennedy@owen.vanderbilt.edu


Mary-Hunter McDonnell

The Wharton School

University of Pennsylvania

marymcd@wharton.upenn.edu


Nicole M. Stephens

Kellogg School of Management

Northwestern University

n-stephens@kellogg.northwestern.edu



Please direct correspondence to:

Jessica A. Kennedy

401 21st Ave. S

Nashville, TN 37203

jessica.kennedy@owen.vanderbilt.edu

Electronic copy available at: https://ssrn.com/abstract=2374812

**ABSTRACT**

We investigate whether women are targets of more severe punishment than men following ethical violations at work. Using an experimental design, Study 1 finds evidence that ethical behavior is more strongly prescribed for women than for men, even when they occupy an identical professional role. Study 2 manipulates the gender of a manager in a hypothetical scenario and finds that women are punished more severely than men for ethical violations at work. It also tests the scope of our theory by asking whether women are punished more for errors in general, or only for intentional ethical violations. Using field data, Study 3 examines how severely attorneys are punished for violating the American Bar Association's ethical rules. Female attorneys are punished more severely than male attorneys, after accounting for a variety of factors. Greater representation of women among decision-makers diminishes the gender disparity in punishment. Our research documents a new prescriptive stereotype faced by women and helps to explain the persistence of gender disparities in organizations. It highlights punishment severity as a novel mechanism by which institutions may derail women's careers more than men's.

*Keywords: Gender; Ethical Violations; Punishment; Stereotypes*

Electronic copy available at: https://ssrn.com/abstract=2730912

Over several decades, social scientists have unveiled evidence of persistent, multi-faceted discrimination against professional women seeking to rise in the ranks of their organizations. Women face greater challenges than men at many stages of their ascent, including when they obtain higher education (Milkman, Akinola, & Chugh, 2012), seek to enter organizations (Belliveau, 2005; Goldin & Rouse, 2000; Gorman 2005), and when their performance is evaluated to determine promotion or compensation (Beckman & Phillips, 2005; Belliveau, 2012; Castilla, 2008; Castilla, 2011; DiPrete and Soule, 1988; Fernandez-Mateo, 2009; Joshi, 2014; McGinn & Milkman, 2013; Olson & Becker 1983). At each stage, gender stereotypes bias judgments and decisions, hindering women's advancement (Amanatullah & Morris, 2010; Brescoll, 2011; Heilman, 2012; Rudman & Phelan, 2008). All of these decision contexts provide evidence that gender bias shapes the allocation of employment-related *rewards*. The net effect is that women receive less compensation (Dreher & Cox, 2000) and claim less authority (Bowles & McGinn, 2005; Wright, Baxter, & Birkelund, 1995) than their performance justifies (Heilman, 2012). As a consequence, women ascend the corporate hierarchy more slowly than their male counterparts.

In this research, we investigate another form of discrimination against women professionals: how gender bias shapes the allocation of employment-related *punishment*. Specifically, we ask whether women suffer more severe punishment than men for ethical violations at work. Harsher punishment could be one important but subtle way of subduing women who have achieved inroads into prestigious professions. Lower social tolerance for gender-based discrimination and the threat of legal liability have driven blatant discrimination underground in many workplaces, but discrimination persists in subtle forms (Berdahl, 2007; Brescoll, 2011; Cortina, 2008; Dipboye & Halverson, 2004; Ely & Meyerson, 2000; Ryan & Haslam, 2007).  Harsher punishment for ethical violations may be one important example of covert discrimination. As discussed, earlier research has established that it is more difficult for women to ascend in organizations. If women are punished more severely than men, they may also descend more quickly. In other words, harsher punishment could be another example of how women's professional status is more precarious than men's (Brescoll, Dawson, & Uhlmann, 2010; Ryan & Haslam, 2007).

Electronic copy available at: https://ssrn.com/abstract=2730012

Across three studies, we investigate the relationship between gender, the prescription to be ethical, and punishment for ethical violations. Consistent with prior research (Bowles & Gelfand, 2010; Brescoll et al., 2010; Castilla & Benard, 2010; Uhlmann & Cohen, 2005; Eagly, Makhijani, & Klonsky, 1992; Rudman, 1998; Williams & Tiedens, 2016), we expect women to be held to different standards than men. We extend prior work by examining *ethical* standards. We expect that women face an intensified prescriptive stereotype to be ethical and will be punished more severely than men for ethical violations at work. Punishment has significant implications for professionals' career outcomes (Butterfield, Trevino, Wade & Ball, 2005; Trevino, 1992). It reduces professionals' status in their field and has long-lasting effects, both psychologically (Arvey & Ivancevich, 1980) and professionally. When punished unfairly, people's job performance, commitment, and organizational citizenship behavior decline, while counterproductive behaviors increase (Cohen-Charash & Spector, 2001). If women systematically experience harsher punishment than men following ethical violations, this could help to explain well-documented disparities in pay, advancement, and job satisfaction (Bowles & McGinn, 2005; Ely, Stone, & Ammerman, 2014).

To examine the relationship between gender and punishment severity, we take a multi-method approach. We begin with an experimental survey exploring gender and the prescriptive stereotype to be ethical. We then test whether this stereotype translates into greater severity of punishment for women, relative to men, through a randomized, controlled laboratory experiment where the professional's role and ethical violation are held constant. The second study also tests whether the scope of our theory is correct by asking whether women are punished more severely for errors more broadly, or only for ethical violations, as we suggest. Finally, our third study tests whether the relationship between gender and punishment severity surfaces in a real-world field setting, using a sample of disciplinary hearings held to punish the ethical violations of attorneys in the U.S. In this field context, punishment decisions have important implications for individuals' careers. Our multi-method approach has significant advantages (Chatman & Flynn, 2005). By examining punishment severity in well-controlled laboratory experiments

Electronic copy available at: https://ssrn.com/abstract=2770012

designed to establish causality, we ensure that gender is the causal variable. By examining it in the field,

we ensure that the phenomenon is relevant and has significant consequences in organizational settings.

   Our research makes three important theoretical contributions. First, it documents disparate

punishment for ethical violations as a novel form of gender discrimination. By doing so, it contributes to a

body of research describing the forces that not only constrain but even *reverse* women's advancement at

work (Berdahl, 2007; Brescoll et al., 2010; Ryan & Haslam, 2007). Although researchers have largely

focused on how gender biases the perceptions of professionals (for reviews, see Cuddy, Glick, &

Beninger, 2011 and Rudman & Phelan, 2008), less is known about the behavioral outcomes of these

perceptions. Gender-biased perceptions can lead to unfair allocation of pay and promotions (Castilla &

Bernard, 2010; Desai, Chugh, & Brief, 2014) and also to unethical behaviors designed to undermine

women, such as sabotage (Rudman & Fairchild, 2004) and deception (Kray, Kennedy, & Van Zant,

2014). We find that discriminatory perceptions also manifest through punishments. Second, we find

evidence for a new prescriptive stereotype. People expect women to be more ethical than men. This may

help to explain why gender differences in ethics emerge (Franke, Crown, & Spake, 1997; Kennedy &

Kray, 2013; Kray & Haselhuhn, 2012). Finally, we extend knowledge of factors affecting punishment

severity (cf. Arvey & Ivancevich, 1980; Butterfield et al., 2005; Tetlock et al, 2007; Trevino, 1992;

Wiltermuth & Flynn, 2013), an important issue at work. Our research is the first to document that gender

predicts punishment severity.

**Gender and the Prescription to be Ethical**

   It is well-known that women and men face different social expectations. To date, researchers have

largely focused on stereotypes regarding warmth and competence (also known as communion and

agency) (Conway, Pizzamiglio, & Mount, 1996; Williams & Best, 1982). Because women have

traditionally held roles as homemakers rather than providers (Eagly, Wood, & Diekman, 2000), women

are expected to be more concerned with others and less assertive (Eagly & Karau, 2002; Heilman, 2001),

as well as warmer and less competent than men (Eagly & Mladinic, 1989; Fiske, Cuddy, Glick, & Xu,

Electronic copy available at: https://ssrn.com/abstract=2770012

2002). These stereotypes have a prescriptive quality (Burgess & Borgida, 1999; Eagly & Karau, 2002; Heilman, 2001). That is, women are expected to behave in ways consistent with these stereotypes and face negative consequences when their behavior deviates from them.

We propose that ethicality is another characteristic prescribed more strongly for women than men. Ethicality can be distinguished from warmth. For instance, Fiske et al. (2002) noted that warmth involves some traits related to morality (e.g., sincerity), but also that their scales confound moral traits with sociality (e.g., good-naturedness, warmth). More recent research has distinguished morality and warmth (Brambilla & Leach, 2014; Goodwin, Piazza, & Rozin, 2014), reasoning that important moral traits such as honesty, fairness, and loyalty can be displayed without social warmth (e.g., friendliness and enthusiasm) (Goodwin, 2015). Existing theories of gender (Eagly et al., 2000; Fiske et al., 2002), have focused on warmth, not morality. Because warmth and morality are not synonymous, it is not obvious that women would be held to higher standards of morality. For instance, Prentice and Carranza (2002) found that the prescription to be principled was weaker for women relative to men. Goodwin et al. (2014, p. 166) said, "It remains an open question whether moral information, in general, is valued equally in men and women, relative to warmth information."

We expect that women are held to a higher standard of ethicality in their professional performance than are men because of their historical association with communal roles (Eagly et al., 2000). Communal roles confer the responsibility of developing relationships with others and building community (Abele & Wojcizke, 2007, p. 754). Traits associated with morality, such as humility, commitment, and trustworthiness, play an important role in community-building, just as traits related to warmth, such as happiness, enthusiasm, and extroversion (Haidt, 2007). Prior theorists have suggested this possibility (Heilman, 2012), but it has not yet received empirical attention, though indirect evidence exists. For example, in their study of prescriptive gender stereotypes, Prentice and Carranza (2002) found that women faced intensified prescriptions to be spiritual and wholesome. Empirically, important ethical differences also emerge between women and men. Women are more prone to moral emotions of guilt and

Electronic copy available at: https://ssrn.com/abstract=2770012

shame (Cohen, Wolf, Panter, & Insko, 2011), they exhibit higher levels of moral character (Cohen, Panter, Turan, Morse, & Kim, 2014), more traditionally moral sociopolitical attitudes (Eagly, Diekman, Johannesen-Schmidt, & Koenig, 2004), greater moral outrage at ethical compromises (Kennedy & Kray, 2013), higher and less flexible ethical standards (Franke et al., 1997; Kray & Haselhuhn, 2012), and lower moral disengagement (Detert, Trevino, & Sweitzer, 2008). Women are also less accepting of the use of deception (Dreber & Johannesson, 2008) and unethical negotiating tactics (Robinson, Lewicki, & Donahue, 2000) to secure monetary payoffs. These ethical differences by gender could reflect women's internalization of the higher ethical standards we expect them to face. On the basis of this logic, we propose the following hypothesis:

**Hypothesis 1.** *Women face stronger prescriptions for ethical behavior than men.*

If women face stronger prescriptions of ethicality than men, people should react more negatively to women who violate ethical standards compared to men. One important behavioral consequence could be imposing harsher punishment on women who violate ethical standards, as compared to men.

**Punishing Ethical Violations**

Punishment is the application of an aversive event or removal of a pleasing event in response to undesirable behavior (Arvey & Ivancevich, 1980; Ball & Sims, 1991). The desire to punish ethical violations is a widely held human motive; it reaffirms a community's ethical standards following a breach (Durkheim, 1925/1976), establishes norms for appropriate behavior (Feldman & March, 1981), and is intended to restore victims' dignity (Rucker, Polifroni, Tetlock, & Scott, 2004). The challenge for those in a punishment-seeking mindset is to act fairly (Tetlock, 2002; Tetlock et al, 2007).

Gender discrimination is likely to be visible in the context of punishment because it can be difficult to ascertain the level of punishment that is fair for a situation. What constitutes an ethical violation is often ambiguous (Wiltermuth & Flynn, 2013), and people tend to over-estimate the extent to which others share their ethical views (Flynn & Wiltermuth, 2010). Because there is little consensus regarding ethical standards or how violations should be punished, the context is ripe for gender

Electronic copy available at: https://ssrn.com/abstract=2770012

discrimination, which tends to emerge when decision-makers are afforded substantial discretion under a

guise of objectivity (Castilla, 2008; Castilla & Benard, 2010; Uhlmann & Cohen, 2005). Under these

circumstances, gender may subconsciously influence evaluators' perceptions, leading to discrepant

outcomes that tend to systematically disfavor women (Gorman, 2005; Reskin, 2000).

       Seemingly irrelevant factors influence the severity of punishment (Ball & Sims, 1991), including

the power (Mooijman, van Dijk, Ellemers, & van Dijk, 2015; Wiltermuth & Flynn, 2013) and political

ideology of the punisher (Tetlock et al., 2007), the ambiguity of the violation (Tetlock et al., 2007), and a

sense of a threatened social order (Rucker et al., 2004). While research has not examined gender as a

predictor of punishment, there are reasons to think women could be punished *less* (not more) severely

than men for ethical violations.  People generally view women positively (Glick & Fiske, 1996) and see

them as well-intentioned (Fiske et al., 2002), so they may be inclined to give women's intentions the

benefit of a doubt or make external attributions for behavior that is at odds with benevolent stereotypes of

women's intentions. Moreover, higher-status perpetrators are punished more harshly (Fragale et al., 2009;

Tetlock et al., 2007), and women are often considered to hold lower status in society than men

(Ridgeway, 2001).

       Nevertheless, because ethical behavior is more strongly prescribed for women than men, we

predict that women will be punished more severely than men following an ethical violation at work.

Violations of gender stereotypes are met with punishment (for a review, see Rudman & Phelan, 2008),

and more severe punishment is given for more severe violations. Severity is subjective, however. To the

extent women are held to higher ethical standards than men, observers may perceive women's ethical

violations to be more severe than men's because the higher standard women are held to makes even minor

violations noticeable and worthy of condemnation. This pattern has been observed in other contexts, such

as negotiation. When women and men exhibit identical assertiveness, women incur greater dislike and

rejection than do men because people expect less assertiveness from women (Amanatullah & Tinsley,

2013). Existing empirical evidence provides preliminary support for this hypothesis regarding punishment

Electronic copy available at: https://ssrn.com/abstract=2770012

severity. Some research suggests women are punished more severely than men for violating norms through whistle-blowing (Rehg, Miceli, Near, & Van Scotter, 2008) or workplace deviance (Bowles & Gelfand, 2010). However, these studies do not directly focus on ethical violations and leave room for a deeper exploration of the issue. Whistle-blowing is of ambiguous ethicality (Waytz, Dungan, & Young, 2013) and perceptions of retaliation were self-reported in Rehg et al.'s (2008) data. Moreover, only one of Bowles and Gelfand's (2010) studies focused on gender, and it left the psychological mechanism unspecified. Here, we build on their findings to explore gender disparities in punishment in greater depth.

      **Hypothesis 2.** *Women will be punished more severely than men for committing an ethical violation in their profession.*

      To the extent that women receive harsher punishments than men for the same ethical violations, this is an important issue in organizations. Punishment equity requires that similar punishments are assigned for similar violations (Butterfield et al., 2005; Trevino, 1992). Harsh punishment leads to adverse effects like anxiety, aggression, withdrawal, and sabotage (Arvey & Ivancevich, 1980). Women could therefore suffer these adverse side effects more than men if punished in a discriminatory manner.

**Gender Composition of the Decision-Making Group as a Moderating Factor**

      One outstanding question is whether the gender disparity in punishment is affected by the representation of women among key decision-makers (cf. Duguid, 2011; Duguid, Lloyd, & Tolbert, 2012). Prior sociological work suggests that the gender composition of decision-makers serves as an important moderating factor for the level of discrimination present in work outcomes. When the people who control work outcomes are more demographically similar to those whom their decisions affect, discrimination diminishes (Gorman, 2005; Kulis, 1997; Konrad and Pfeffer, 1991; Pfeffer and Davis-Blake, 1987). For instance, Ely (1995) found evidence of stronger stereotyping in firms where women were under-represented in positions of power, and suggested that the presence of women might diminish stereotyping by making gender a less salient category. Drawing from this research, we predict that the

Electronic copy available at: https://ssrn.com/abstract=2770012

gender disparity in punishment severity is smaller when women are more highly represented among the decision-makers allotting punishment.

**Hypothesis 3.** *The gender of the decision-maker(s) responsible for allotting punishment moderates the extent to which women are punished more severely than men for similar ethical violations.*

## OVERVIEW OF STUDIES

We conducted three studies to test our hypotheses. Study 1 investigates the relation between gender and the prescriptive stereotype to be ethical. Study 2 explores punishment severity by manipulating a professional's gender in a hypothetical scenario, while holding other factors constant. The experimental design establishes that the gender of the individual who commits the ethical violation, rather than other factors, is the causal factor that drives differential punishment severity. Study 2 also compares punishment for ethical violations to punishment for accidental errors. By doing so, it tests our theoretical mechanism: To the extent that women are punished more severely than men due to a prescriptive stereotype to be ethical, we would expect harsher punishment only for ethical violations, but not for accidental errors. Study 3 tests whether the relationship between gender and punishment severity surfaces in a real-world field setting, where punishment decisions have important career implications. Additionally, Study 3 tests a key moderating factor: the representation of women among those assigning punishment.

## STUDY 1: DOES GENDER BIAS ETHICAL PRESCRIPTIONS?

Study 1 explored the prescription to be ethical using an experiment with a sample of working adults. We tested our first hypothesis that ethical behavior is more strongly prescribed for women than for men. Here and subsequently, we conducted our experiments in line with current recommendations for experimental research (Simmons, Nelson, & Simonsohn, 2011). We pre-determined our sample sizes and disclose all of the dependent variables that were measured.

**Methods**

Electronic copy available at: https://ssrn.com/abstract=2770012

***Sample.*** Participants ($N$ = 202) were recruited from an online pool. The sample was 45% women and had a mean age of 34.46 ($SD$ = 10.48) years. In prior studies recruited from this pool, we found participants to have 11.36 ($SD$ = 9.46) years of work experience, on average, with most (51%) employed full-time, some (24%) part-time, and 25% not currently employed outside the work they do on the web site.

***Design and procedure.*** The study used a 2-condition (Attorney's gender: Male, Female), between-participants design. First, participants read the following scenario describing an attorney. The scenario was designed to provide enough background information on the attorney for participants to feel they were making informed judgments, and to distract participants from gender as the topic of our investigation. Only the attorney's gender (as indicated by first name and pronouns) varied between conditions:

> *Imagine that you know a lawyer, Jennifer / John Thompson. She / he studied Political Science as an undergrad and went to Villanova University for law school. She / He is relatively young, but has a strong track record. You have only met Jennifer / John twice to date. You know that she / he is interested in art and wine, and enjoys running on the weekend. Jennifer / John is a litigator. In court, she / he mostly serves executives at business firms. For instance, Jennifer / John is currently defending a businessperson who served for the last 7 years as a key executive at EnviroHeat, a company that manufactures wood pellets, the material burned in pellet stoves to generate heat. Pellet stoves are environmentally friendly and are primarily used to warm homes. Jennifer's / John's client took the executive job as a favor to some investors. The market for pellet stoves has been brutal with oil prices so low. For 7 years, the executive worked hard for EnviroHeat, but the company had market-driven (not company-specific) problems. When oil prices dropped severely last year, company earnings declined further, and EnviroHeat's investors fired the executive and refused to pay severance. Investors claimed the executive was fired "for cause." Investors have some evidence that the executive spent too much time golfing during work hours, and tended to hire friends into important executive roles. Jennifer / John is suing the investors for her / his client to get the severance pay.*

Then, participants took a moment to imagine the attorney, Jennifer or John, and rated the degree to which they expected her/him to display a number of traits. We included traits measuring ethicality (e.g., loyal, trustworthy, has integrity), warmth (e.g., warm, agreeable), and competence (e.g., competent, capable).

***Ethical prescriptions measure.*** To measure ethical prescriptions, we asked participants to rate the extent to which they expected the lawyer to display 16 moral traits, using a scale from 1 (not at all) to 9 (very much). Nine traits (loyal, trustworthy, honest, principled, fair-minded, responsible, courageous,

Electronic copy available at: https://ssrn.com/abstract=2770012

dependable, and sincere) were drawn from Goodwin's (2015; Goodwin et al., 2014) list of high-morality, lower-warmth traits. We selected these traits in order to ensure that the study tested for a stereotype related to ethicality, not warmth. To those nine traits, we added three (ethical, has integrity, has good values) designed to increase face validity, and four (ruthless, immoral, selfish, greedy) that were reverse-scored. Together, the items formed a reliable scale ($\alpha$ = .96). Using the same 9-point scale, participants also reported their expectations of the lawyer's warmth and competence, using items from prior research (Fiske et al., 2002). To measure warmth, we used the terms enthusiastic, warm, sociable, and agreeable (.84). To measure competence, we used the terms confident, competent, intelligent, and capable ($\alpha$ = .93).

**Results**

To ensure that each trait scale measured a distinct construct, we first conducted a factor analysis on the 24 items. Using direct oblimin rotation, four distinct factors with eigenvalues greater than one emerged, explaining 75.97% of the variance. The factors corresponded to: positive ethicality (12 items, eigenvalue = 12.53, 52.20% of the variance), negative ethicality (4 items, eigenvalue = 3.49, 14.53% of the variance), warmth (4 items, eigenvalue = 1.98, 8.24% of the variance), and competence (4 items, eigenvalue = 1.23, 5.11% of the variance). Consistent with previous research, this analysis confirmed that ethicality and warmth are distinct constructs. For subsequent analyses, we combined positive and negative ethicality (reverse-scored) into one measure ($\alpha$ = .96).

We next conducted a repeated-measures ANOVA with the three trait scales (ethicality, warmth, and competence) as a within-participants factor. We included the attorney's gender and participant's gender as between-participant factors. Three main effects and an interaction emerged. First, a main effect for trait showed that participants perceived the attorney to be more competent ($M$ = 7.78, $SE$ = .08) than ethical ($M$ = 6.40, $SE$ = .10, $p$ < .001) or warm ($M$ = 6.55, $SE$ = .09), $F$ (2, 197) = 130.74, $p$ < .001, $\eta_p^2$ = .57. Ratings of ethicality and warmth were not significantly different, $p$ = .10. Second, a main effect of participant gender showed that women ($M$ = 7.08, $SE$ = .11) perceived the attorney more positively across the three dimensions than did men ($M$ = 6.75, $SE$ = .10), $F$ (1, 198) = 4.60, $p$ = .03, $\eta_p^2$ = .02. Finally, the

Electronic copy available at: https://ssrn.com/abstract=2770012

main effect for attorney's gender ($F (1, 198) = 3.92$, $p = .049$, $\eta_p^2 = .02$), was qualified by a trait X attorney's gender interaction, $F (2, 197) = 6.50$, $p = .002$, $\eta_p^2 = .06$. The interaction suggests that the attorney's gender impacted perceptions of him/her in terms of some traits, but not others.

To understand this interaction, we analyzed the three trait scales separately. Three separate ANOVAs included attorney's and participant's gender as between-participant factors. First, we explored our central research question: Was the attorney expected to be more ethical when she was female rather than male? A main effect of attorney's gender supported Hypothesis 1, $F (1, 198) = 12.35$, $p = .001$, $\eta_p^2 = .06$. The female attorney was expected to be more ethical ($M = 6.77$, $SE = .15$) than the male ($M = 6.04$, $SE = .15$). The pattern of means suggests that the attorney was expected to be ethical regardless of gender, as both means were above the scale mid-point, but this expectation was intensified the female lawyer. No other main effects or interactions emerged ($ps > .48$).

The attorney's gender did not impact warmth or competence stereotypes, perhaps because of the vivid description of the attorney's role that was uniformly provided. For warmth, only a main effect of participant gender emerged. Women ($M = 6.77$, $SE = .14$) expected the attorney to be warmer than did men ($M = 6.34$, $SD = .12$), $F (1, 198) = 5.38$, $p = .02$, $\eta_p^2 = .03$. No other main effects or interactions were significant ($ps > .33$). For competence, again, only a main effect of participant gender emerged. Women ($M = 7.99$, $SE = .12$) expected the attorney to be more competent than did men ($M = 7.57$, $SD = .11$), $F (1, 198) = 6.15$, $p = .01$, $\eta_p^2 = .03$. Other main effects and interactions were non-significant ($ps > .83$).

The results support Hypothesis 1. Women face intensified ethical prescriptions, even when in an identical professional role. Ethical characteristics are more strongly prescribed for women than for men.

### STUDY 2: PUNISHMENT SEVERITY IN A LABORATORY EXPERIMENT

In Study 2, we aimed to test whether gender affects how severely a professional is punished for an identical ethical violation. To do so, we used an experimental design. In addition, Study 2 tests a key boundary condition: whether women professionals are punished more for accidental mistakes or only for intentional ethical violations. We focus on ethical violations in light of the content of prescriptive gender

stereotypes. Because women face relaxed prescriptions surrounding competence-related qualities (Biernat & Kobrynowicz, 1997; Prentice & Carranza, 2002), we do not expect them to be punished more harshly than men for accidental mistakes at work. Thus, this moderating factor provides an additional test of our theoretical mechanism. If women face intensified ethical prescriptions, they should face more severe punishment than men for ethical violations but not accidental mistakes.

**Sample**

Master's of Business Administration students ($N = 194$) at two business schools completed a survey about work outcomes. Women comprised 35% of the sample. The average age was 26.55 years ($SD = 3.76$). The sample was 5% African American, 17% Asian, 74% Caucasian, 4% Latino/Hispanic, and 1% who selected "other" backgrounds.

**Design and Procedure**

The study employed a 2 (Target's gender: Woman, Man) X 2 (Intentionality: Accidental mistake, Ethical violation) between-participants design. Our expectation, which we confirm through a pre-test, was that only intentional violations are construed as ethical violations; in contrast, accidental mistakes are considered non-ethical violations. Participants were randomly assigned to one of the four conditions. They read a scenario about a hospital manager who filed an erroneous Medicare claim requesting larger payment for medical services than was actually owed. The error had serious negative consequences for the organization: the Medicare office discovered the error, accused the hospital of fraud, and assessed a heavy fine of $100,000. We manipulated the gender of the hospital manager by changing the name and pronouns used to refer to the manager. We also manipulated whether the error was an ethical violation by stating that it was made accidentally or intentionally. The scenario's full text read:

> *(Jake / Jill) Moranty, a 40-year-old single (man / woman), is employed as the lead manager of Bethany Central Hospital in Kansas City, Missouri. Moranty has worked at the hospital for twenty years. One of Moranty's employment duties is to fill out the monthly Medicare reimbursable claims report for all surgeries performed in the emergency ward. (Mr. / Ms.) Moranty fills out the paperwork and then, once the Medicare office receives the report, it pays the hospital the amount owed for the reported services. This month, Moranty filed an erroneous claims report. In it, (he / she) (accidentally / intentionally) reported several of the procedures twice, ultimately asking for $10,000 more than what the hospital was owed. The Medicare office*

Electronic copy available at: https://ssrn.com/abstract=2770012

*caught the discrepancy in the figures and has accused the hospital of Medicare fraud. The event has triggered an enormous amount of bad press for the hospital, and the hospital ultimately had to pay $100,000 to the federal government to settle the charges.*

This scenario has two key strengths. It describes an ethical violation that is non-relational (Dawson, 1992; Franke et al., 1997) and pro-organizational (Vadera & Pratt, 2013). Ethical violations in the context of close relationships (Dawson, 1992) or that benefit oneself (rather than the organization) (Amanatullah & Morris, 2010) could violate gender prescriptions of warmth. By examining a non-relational, pro-organizational ethical violation, we avoid this confound and provide a conservative test of our hypotheses. After reading this scenario, participants answered a series of questions measuring how severely they believed the hospital manager should be punished.

*Punishment severity measure.* To provide a measure of punishment severity, participants reported the most appropriate jail sentence for Moranty, using a scale from 0 to 500 days. This measure captured willingness to mete out a severe sentence.[1]

**Results**

*Pre-test results.* A pre-test with 103 respondents confirmed that the intentional error was perceived as an ethical violation, more so than the accidental mistake. Using a 7-point scale, respondents indicated their agreement that Moranty committed and ethical violation, acted unethically, was morally wrong, and that the incident had nothing to do with Moranty's ethical standards (reverse-scored) ($\alpha$ = .96). The intentional error was perceived as an ethical violation ($M$ = 5.83, $SD$ = 1.26) to a greater degree than the accidental mistake ($M$ = 2.78, $SD$ =1.34), $F$ = 141.03, $p$ < .001, $\eta_p^2$ = .59. Professional's gender ($F$ = 1.01, $p$ = .32, $\eta_p^2$ = .01) and the interaction term ($F$ = 0.77, $p$ = .38, $\eta_p^2$ = .01) were non-significant.

Our first analyses included a factor for the business school where data were collected. One main effect emerged. Students at one business school showed greater punishment severity toward the hospital

---

[1] On an exploratory basis, we also measured participants' punitive mindset ($\alpha$ = .85) (Tetlock, 2002; Tetlock et al., 2007) and their ratings of the professional's social status ($\alpha$ = .62). For punitive mindset, only a main effect of intentionality emerged, $F$ (1, 189) = 146.87, $p$ < .001, $\eta_p^2$ = .44 (other $p$s >.10). For social status, no statistically significant effects emerged ($p$s > .12).

Electronic copy available at: https://ssrn.com/abstract=2770012

manager. However, no significant interactions emerged so we collapsed across the samples. Analyses

including a covariate controlling for the sample yield virtually identical results to those shown below.

    ***Primary analyses.*** We analyzed the data using ANOVA with target's gender and the

intentionality of the error as between-participant factors. First, we asked: Did the target's gender affect

punishment severity for errors in general, or only for ethical violations, as we predicted? For punishment

severity, one main effect and an interaction emerged. A main effect emerged for intentionality, $F$ (1, 188)

= 30.43, $p < .001$, $\eta_p^2 = .14$. More severe punishments were recommended for ethical violations ($M =$

107.04 days, $SD = 141.83$) than for accidental mistakes ($M = 21.28$ days, $SD = 68.10$). The main effect

for target's gender was non-significant, $F$ (1, 188) = 0.76, $p = .39$, $\eta_p^2 = .004$. As expected, there was also

an interaction between target's gender and intentionality, $F$ (1, 188) = 4.91, $p = .03$, $\eta_p^2 = .03$.

    To explore the interaction, we examined gender differences in punishment severity within each

intentionality condition. The manager was punished more severely for an ethical violation relative to an

accidental mistake regardless of whether the manager was male ($t$ [97] = 2.76, $p = .007$, $d = 0.56$) or

female ($t$ [92] = 4.88, $p < .001$, $d = 0.98$). For an accidental mistake, no difference in punishment severity

emerged for the female versus male manager, $t$ [97] = -1.27, $p = .21$, $d = 0.25$. However, for an intentional

ethical violation, the female manager was punished more severely than the male manager, at a marginally

significant level, $t$ [92] = 1.74, $p = .09$, $d = 0.56$. Means are shown in Figure 1.

    These results provide preliminary support for Hypothesis 2. Following an ethical violation, a

manager was punished more severely when a woman rather than a man. No difference by target's gender

emerged for an accidental mistake. These findings provide additional support for the notion that women

face an intensified prescription to be ethical. In Study 3, we sought to replicate this finding using a larger,

field-based sample. The larger sample size also allows us to examine Hypothesis 3.

### STUDY 3: PUNISHMENT SEVERITY IN ATTORNEY DISCIPLINARY HEARINGS

    Study 3 extended knowledge by examining punishment severity in a field setting. To probe the

external validity of our findings in Study 2, we created an original database of archival decisions rendered

Electronic copy available at: https://ssrn.com/abstract=2770012

in attorney disciplinary hearings. We examined the severity of punishments applied to attorneys who had

violated the American Bar Association's (ABA) rules of professional conduct. Attorneys who are found

to have violated an ethical rule receive punishments of differing severity through these hearings, with

important implications for their subsequent careers and professional status. This database also allowed us

to explore how the representation of women among judges in the disciplinary hearings impacts

punishment severity.

      For many reasons, this setting provides an ideal test of our theory. First, punishment in this

setting is systematically documented, as the outcomes of attorney disciplinary hearings are reported in

publically available reports of court outcomes. Punishments meted out to professionals can take the form

of lower year-end bonuses, assignment to less desirable teams or projects, slower promotions, or removal

from leadership positions. These punishments are often private and rarely documented systematically, but

this data set offered a comprehensive record. Second, what constitutes an ethical violation is unusually

clear in this setting. The ABA's ethical rules for attorneys are carefully defined and attorneys are familiar

with them. In fact, admission to a state's bar requires attorneys to pass an ethics exam that tests their

knowledge of the ABA's Model Rules of Professional Conduct (MRPC). Moreover, reports of

disciplinary hearings explicitly document each rule that the attorney is accused of committing, allowing

for a controlled comparison of punishment across different types of ethical violations.  Third, punishment

severity in these cases is indexed in a straightforward way. In other settings, the severity of one type of

punishment relative to another is often ambiguous. Whether a lower bonus or a foregone promotion is

more severe is open to interpretation. In this setting, however, punishment severity has been thoughtfully

delineated by the ABA. Finally, the panel of judges overseeing these hearings receives explicit guidance

regarding how the rules should be applied and how to consider aggravating and mitigating factors in the

setting of punishments. The context thus provides a conservative test of our hypothesis. If women are

punished more severely in this context, even greater differentiation may be found in other contexts, where

judgment is less public, more intuitive and automatic, and parties may feel freer to act on biases.

Electronic copy available at: https://ssrn.com/abstract=2770012

**Sample**

We created a database of all states' attorney disciplinary cases heard by state-level appellate courts in the year 2008, as published in Westlaw's ALLSTATES database of legal cases. Westlaw is a comprehensive legal resource that includes a searchable database of decided cases.  From among these cases, we selected all of those cases that analyzed the alleged ethical violations using the current version of the MPRC, which made it possible to uniformly control for which ethical rules were violated in each case. The MRPC, written and promulgated by the ABA in 1983, codifies the ethical obligations of the legal profession. Although states are under no express obligation to adopt the MRPC, thirty-eight states had adopted the most recent version in full by 2008. Our final sample of cases applying the most recent version of the MRPC includes a total of 482 cases heard across 33 states. The states with the most cases in the sample are New Jersey (111 cases), Colorado (59 cases), Indiana and Kansas (each with 35 cases).

Critical to our immediate inquiry, the MRPC includes a set of uniform standards to govern the imposition of punitive sanctions for attorneys who violate the rules. These standards are intended to promote consistency in the application of punishment for ethical transgressions within and among separate jurisdictions. Here, the ABA provides a list of the possible sanctions for violations of the rules of professional conduct, as well as general standards for when each is appropriate. Possible sanctions include, in increasing severity: admonition (or private reprimand),[2] public reprimand (declaration of the impropriety of the lawyer's action, without interrupting the right to practice), probation (a period of increased scrutiny, without interrupting the right to practice), suspension (a temporary interruption in the lawyer's right to practice), and disbarment (extinguishing the transgressor's status as a lawyer).

**Measures**

*Punishment severity.* Our dependent variable, *punishment severity*, is an ordinal variable. It reflects different categories of disciplinary outcomes using levels specified by the ABA. Specifically, the variable is coded "0" if the attorney was publically reprimanded or censured, "1" if the attorney was put

---

[2] Because admonitions or private reprimands are not a matter of public record, this category of sanction is not represented in our sample of cases.

Electronic copy available at: https://ssrn.com/abstract=2770012

on probation, "2" if the attorney was suspended for a discrete amount of time, "3" if the attorney was

indefinitely suspended, and "4" if the attorney was disbarred. In cases where more than one category of

punishment was employed, we coded this variable as the more severe punishment. For example, if an

attorney was suspended for six months to be followed by a year of probation, we coded their punishment

as a suspension for a discrete amount of time.

   *Attorney's gender.* The attorney's gender was coded from the text of the disciplinary hearing

summaries as reported in Westlaw based on the name and pronoun (he/she) used to refer to the accused

attorney. We coded the gender variable "0" for men and "1" for women. Our sample included 83 cases

against female attorneys, or 17% of the full sample.

   *Percentage of women on judges' panel.*  Each hearing was overseen by a panel of judges. To

provide a test of Hypothesis 3, we include the percentage of women sitting on the judges' panel. The list

of judges involved in the hearing was reported in over half of our sample of cases. We identified each

judge's gender by matching their names to their pictures and biographies on court websites.

   *Control variables.* We control for a number of factors that influence punishment severity and

might act as third variables to create a spurious relationship between gender and punishment severity. To

control for the type of ethical violations committed in each case, we include fixed effects for each

individual rule –as codified in the MPRC-- that was found to be violated. Our full sample of cases

involves 39 discrete rules were violated.  Each rule is coded "1" if it was violated in a specific case and

"0" if it was not. Those violated most often include Rule 8.4, Misconduct (n= 313); Rule 1.3, Diligence

(n= 186); Rule 1.4, Communication (n= 181); Rule 1.15, Safekeeping Property (n= 141); and Rule 8.1,

Bar Admission and Disciplinary Matters (n= 114). To avoid overestimation of our models, we only

include controls for each rule that had at least 15 observations, thereby appearing in at least 3% of the full

sample of cases. For each case, we also included a control for the aggregated *total number of rules*

*violated* in the case. This count variable ranged from a low of 1 to a high of 13 rule violations.

Electronic copy available at: https://ssrn.com/abstract=2770012

To account for the possibility that the number of decision-makers involved in administering a punishment may affect the severity of the punishment rendered, we include a control for the *total number of judges on the hearing panel*, as reported in each case report.

Classical punitive theory in sociology suggests that the severity of punishment for an offense is likely to be systematically related to the economic value of the accused's professional contributions to society (Rusche & Kirchheimer, 1936). According to this perspective, attorneys may be less severely punished when they practice in states where there are fewer attorneys, making their services more valuable to the public. To account for this possibility, we include a variable capturing the general economic market in which disparate states' legal labor systems are embedded by controlling for the *per capita legal saturation.* This variable reflects the number of lawyers per 10,000 residents within the US state in which each disciplinary hearing was held (DC inclusive). This data was compiled for 2008 and made publically available by AveryIndex. Descriptive statistics and correlations are shown in Table 1.

**Statistical Methods**

Because our dependent variable, *punishment severity*, is coded as an ordinal variable, we employ ordered logistic regression using the *ologit* command in Stata 14. This model essentially allows for the application of the standard logit model – which is applied to dichotomous outcome variables – to dependent variables that consist of more than two categories that have a natural underlying order to them. As a robustness check, we replicate our results with a simple probit model predicting the likelihood of the highest category of punishment: disbarment. In these models, the dependent variable is coded "1" if the accused was disbarred, and "0" if the accused received any lesser form of punishment.

To control for potential heteroskedasticity, we employed robust standard errors across all models, clustered by the state in which the case took place (e.g., Nordgren & McDonnell, 2011). Clustering standard errors in this manner also takes into account the likelihood that state courts will afford greater precedential value to their own past cases than to cases held in other states. If so, disciplinary hearing outcomes will be correlated more closely within-state than between-states.

Electronic copy available at: https://ssrn.com/abstract=2770012

**Results**

  Results are shown in Table 2. Model 1 includes all 482 cases in the full sample. Models 2-5 include controls for the number of judges sitting on the panel and the percentage of female judges on the panel. Because only a subset of the cases in the larger sample disclosed the judges empaneled for the hearing, the number of observations in Models 2-5 (n= 270) is lower than that in Model 1. Models 3 and 5 include the interaction of the disciplined attorney's gender with the percentage of female judges on the hearing panel, testing Hypothesis 3.

  Replicating the same pattern of findings observed in Study 2, in Study 3 we find robust support across all models for our hypothesis that women are punished more severely than men. In Models 1-3, we find a significant positive association between gender and punishment severity. This finding suggests that, controlling for the ethical violation committed, female attorneys in these cases are generally assigned more severe punishments for their offense, relative to their male counterparts. This finding is replicated in the probit models depicted in Models 4-5, which suggests that women are more likely to be disbarred than men, controlling for the precise ethical violation committed. Post-estimation margins analysis of Model 4 with all control variables held to their means indicates that females have a 106% higher likelihood of being disbarred than males (at .35 and .17, respectively).

  We also find strong support for Hypothesis 3, as the interaction of the disciplined attorney's gender with the percentage of female judges on the hearing panel is both negative and significant in both models. This indicates that the extent of discriminatory punishment is mitigated when women are more highly represented among the disciplinary hearing decision-makers. To assist with the interpretation of this finding, we plot the predicted values derived from post-estimation margins analysis of Model 3 in Figure 2. As the figure shows, when the percentage of females on the judges' panel was 1 standard deviation below the mean, a female attorney's likelihood of being disbarred is more than twice that of a male attorney. However, the likelihood of being disbarred is nearly identical between males and females when the percentage of women on the judges' panel is one standard deviation above the mean. This result

Electronic copy available at: https://ssrn.com/abstract=2770012

suggests that greater representation of women among decision-makers who allot punishment can temper disparate punishments allotted to male and female professionals.

## GENERAL DISCUSSION

It is vital for punishment to be distributed equitably based on the severity of the actions committed (Trevino, 1992). Yet, in the current research, we find evidence that the gender of the actor committing the ethical violation matters. Specifically, women face intensified prescriptions to be ethical and they tend to incur more severe punishments than men following ethical violations. These findings have important theoretical and practical implications.

### Theoretical Contributions

Our research documents a new barrier faced by women in organizations. It is well-known that professional women face steeper social penalties for behaving in ways that benefit their careers, such as participating actively (Brescoll, 2011), displaying high levels of performance (Rudman & Fairchild, 2004), and negotiating (Bowles, Babcock, & Lai, 2007). We break new ground by documenting that women are also held to a higher *ethical* standard as they strive to excel in their careers, and suffer disproportionate punishment when they violate this prescription.

The ethical double standard is especially problematic because women are likely to think and act similarly to men when they hold the same occupational roles (Eagly et al., 2000). In Franke et al.'s (1997) meta-analysis, men's and women's ethical perceptions showed 84% overlap, and ethical differences diminished in samples with greater work experience. These trends spell trouble for professional women.

Punishment severity may be one mechanism by which women lose professional status more easily than men after achieving it. People appoint women to more precarious leadership roles (Ryan & Haslam, 2007) and accord them less status than men following mistakes (Brescoll et al., 2010). They also target professional women with incivility, harassment, and deception (Berdahl, 2007; Cortina, 2008; Kray et al., 2014). In light of this mistreatment, it is perhaps not surprising that women's professional

Electronic copy available at: https://ssrn.com/abstract=2770012

satisfaction is lower than men's, even among highly qualified women who have ostensibly had excellent

opportunities for advancement (Ely et al., 2014).

      Our findings could also imply that downward spirals are more likely to emerge within the careers

of women. When people are punished unjustly, their citizenship behavior and performance decline

(Cohen-Charash & Spector, 2001), precipitating additional status losses and further punishment, possibly

culminating in their leaving the workplace. People who feel treated unfairly become disaffected and are

more likely to protest, resign, and cheat (Tyler, 1990). Although we cannot speak to whether women feel

treated unjustly following ethical violations, we show that they have reason to do so.

      Our research also helps to explain why gender differences in ethical attitudes and behaviors

emerge (Franke et al., 1997; Gilligan, 1982; Kennedy & Kray, 2013; Kray & Haselhuhn, 2012): People

believe that women should be more ethical than men. Our work suggests women receive this message not

only during childhood socialization but also within their work organizations (cf. Ely & Padavic, 2007).

**Practical Contributions**

      Our research suggests that organizations need to establish more systematic approaches to

punishing ethical violations in order to avoid unfairly disadvantaging women. When punishments are left

to managerial discretion, they are not applied equitably. Instead, punishment is biased by the gender of

the person who has committed an ethical violation, to the detriment of women's careers. The fact that this

trend emerged in attorney disciplinary cases, where ethical rules are relatively codified and the process of

deliberation is unusually structured, highlights the robustness of the effect.

      Although we believe responsibility for equitable punishment lies with those who mete it out, our

findings do suggest that professional women should take a conservative approach to ethical decision-

making. Inferences drawn about ethical standards from norms set by male colleagues are not necessarily

useful for women, as higher standards are prescribed for them.

      In addition, our research suggests that it may be especially important for women to refute false

accusations of unethical behavior. Apologies convey empathy (Brooks, Dai, & Schweitzer, 2014), and

Electronic copy available at: https://ssrn.com/abstract=2770012

may therefore be intuitively appealing to women who seek to conform to warmth prescriptions. However, because ethical violations are viewed more negatively for women than men, apologies may be especially damaging and ineffective as compared to denials of wrongdoing (Kim, Ferrin, Cooper, & Dirks, 2004).

**Future Directions**

Future research could explore correctives for the bias we document. Tetlock et al.'s (2007) fair-but-biased-yet-correctible (FBC) model holds that people try to correct their judgment when they perceive that it strays from their own private standards of good judgment. Discriminatory punishment is likely to be unintentional. Therefore, transparent decision-making processes with accountability for outcomes (Castilla, 2008, 2011; Castilla & Benard, 2010; Lerner & Tetlock, 1999; Tetlock & Mitchell, 2009) may enable those responsible for setting punishments to detect and correct their gender-related biases.

Future research could also examine how gender affects the fairness of other dimensions of punishment. For instance, Butterfield et al. (2005) summarized the importance of contingency (i.e., association with particular behavior), constructiveness, causal accounts, timeliness, and privacy for equitable punishment. It is possible that women suffer not only more severe punishments than men, but also worse treatment along these other dimensions. To the extent that women suffer more diffuse, unconstructive, unjustified, untimely, or public criticism, it could make sense that they respond more negatively and emotionally, as recently suggested by Nobel Laureate Sir Tim Hunt (Bever, 2015).

**Conclusion**

Our investigation breaks new ground by describing an important, but under-studied form of discrimination: more severe punishments for women than men, following an ethical violation. To help explain this phenomenon, we also document a new prescriptive gender stereotype: Women are expected to be more ethical than men, even when they hold an identical professional role. Our findings have important implications for women's careers. It may be necessary for managers to more closely monitor punishments for gender discrimination if they wish to ensure equal opportunity in their organization.

Electronic copy available at: https://ssrn.com/abstract=2770012

**REFERENCES**

Abele, A. E., & Wojciszke, B. 2007. Agency and communion from the perspective of self versus others.
*Journal of Personality and Social Psychology*, 93: 751–763.

Amanatullah, E. T., & Morris, M. W. 2010. Negotiating gender roles: Gender differences in assertive
negotiating are mediated by women's fear of backlash and attenuated when negotiating on behalf
of others. *Journal of Personality and Social Psychology*, 98: 256-267.

Amanatullah, E. T., & Tinsley, C. H. 2013. Punishing female negotiators for asserting too much…or not
enough: Exploring why advocacy moderates backlash against assertive female negotiators.
*Organizational Behavior and Human Decision Processes*, 120: 110-122.

Arvey, R. D., & Ivancevich, J. M. 1980. Punishment in organizations: A review, propositions, and research
suggestions. *Academy of Management Review*, 5: 123–132.

Ball, G. A., & Sims, H. P. 1991. A conceptual analysis of cognition and affect in organizational punishment.
*Human Resource Management Review*, 1: 227–243.

Beckman, C. M. & Phillips, D. J. 2005. Interorganizational determinants of promotion: Client leadership
and the attainment of women attorneys. *American Sociological Review*, 70: 678-701.

Belliveau, M. A. 2005. Blind ambition? The effects of social networks and institutional sex composition on
the job search outcomes of elite coeducational and women's college graduates. *Organization
Science*, 16: 134-150.

Belliveau, M. A. 2012. Engendering inequity? How social accounts create vs. merely explain unfavorable
pay outcomes for women. *Organization Science,* 23: 1154-1174.

Berdahl, J. L. 2007. The sexual harassment of uppity women. *Journal of Applied Psychology,* 92: 425-437.

Bever, L. Nobel prize-winning scientist Tim Hunt resigns after commenting on "the trouble with girls."
*Washington Post*. Retrieved from https://www.washingtonpost.com/news/morning-
mix/wp/2015/06/11/nobel-prize-winning-scientist-tim-hunt-resigns-position-after-commenting-
on-the-trouble-with-girls/

Biernat, M., & Kobrynowicz, D. 1997. Gender- and race-based standards of competence: Lower minimum

Electronic copy available at: https://ssrn.com/abstract=2770012

standards but higher ability standards for devalued groups. *Journal of Personality and Social Psychology,* 72: 544-557.

Bowles, H. R., Babcock, L., & Lai, L. 2007. Social incentives for gender differences in the propensity to initiate negotiations: Sometimes it does hurt to ask. *Organizational Behavior and Human Decision Processes,* 103: 84-103.

Bowles, H. R., & Gelfand, M. 2010. Status and the evaluation of workplace deviance. *Psychological Science,* 2: 49-54.

Bowles, H. R., & McGinn, K. L. 2008. Untapped potential in the study of negotiation and gender inequality in organizations. In J. P. Walsh & A. P. Brief (Eds.) *Academy of Management Annals*, 2: 99-132.

Brambilla, M., & Leach, C. W. 2014. On the importance of being moral: The distinctive role of morality in social judgment. *Social Cognition*, 32: 397-408.

Brescoll, V. L., Dawson, E., & Uhlmann, E. L. 2010. Hard won and easily lost: The fragile status of leaders in gender-stereotype-incongruent occupations. *Psychological Science,* 1640-1642.

Brescoll, V. L. 2011. Who takes the floor and why: Gender, power, and volubility in organizations. *Administrative Science Quarterly,* 56: 622-641.

Brooks, A. W., Dai, H., & Schweitzer, M. E. 2014. I'm sorry about the rain! Superfluous apologies demonstrate empathic concern and increase trust. *Social Psychological and Personality Science,* 5: 467-474.

Burgess, D. & Borgida, E. 1999. Who women are, who women should be: Descriptive and prescriptive gender stereotyping in sex discrimination. *Psychology, Public Policy, and Law,* 5: 1-28.

Butterfield, K. D., Treviño, L. K., Wade, K. J., & Ball, G. A. 2005. Organizational punishment from the manager's perspective: An exploratory study. *Journal of Managerial Issues, 17*: 363–382.

Castilla, E. J. 2008. Gender, race, and meritocracy in organizational careers. *American Journal of Sociology*, 113: 1479-1526.

Castilla, E. J., & Benard, S. 2010. The paradox of meritocracy in organizations. *Administrative Science*

Electronic copy available at: https://ssrn.com/abstract=2770012

*Quarterly,* 55: 543-676.

Castilla, E. J. 2011. Bringing managers back in: Managerial influences on workplace inequality.

    *American Sociological Review,* 76: 667-694.

Chatman, J. A., & Flynn, F. J. 2005. Full-cycle micro-organizational behavior research. *Organization*

    *Science,* 16: 434-447.

Cohen-Charash, Y., & Spector, P. E. 2001. The role of justice in organizations: A meta-analyis.

    *Organizational Behavior and Human Decision Processes,* 86: 278-321.

Cohen, T. R. Panter, A. T., Turan, N., Morse, L., & Kim, Y. 2014. Moral character in the workplace.

    *Journal of Personality and Social Psychology,* 107: 943-963.

Cohen, T. R., Wolf, S. T., Panter, A. T., & Insko, C. A. 2011. Introducing the GASP scale: A new

    measure of guilt and shame proneness. *Journal of Personality and Social Psychology,* 100: 947-

    966.

Conway, M., Pizzamiglio, M. T., & Mount, L. 1996. Status, communality, and agency: Implications for

    stereotypes of gender and other groups. *Journal of Personality and Social Psychology*, 71: 25-38.

Cortina, L. M. 2008. Unseen injustice: Incivility as modern discrimination in organizations. *Academy of*

    *Management Review*, 33: 55-75.

Cuddy, A. J. C., Glick, P., & Beninger, A. 2011. The dynamics of warmth and competence judgments,

    and their outcomes in organizations. *Research in Organizational Behavior,* 31: 73-98.

Dawson, L. M. 1992. Will feminization change the ethics of the sales profession? *Journal of Personal*

    *Selling & Sales Management*, 13: 21-32.

Desai, S. D., Chugh, D., & Brief, A. P. 2014. The implications of marriage structure for men's workplace

    attitudes, beliefs, and behaviors toward women. *Administrative Science Quarterly*, 59: 330–365.

Detert, J. R., Trevino, L. K., & Sweitzer, V. L. 2008. Moral disengagement in ethical decision making: A

    study of antecedents and outcomes. *Journal of Applied Psychology*, 93: 374-391.

Dipboye, R. L., & Halverson, S. K. 2004. Subtle (and not so subtle) discrimination in organizations. In R.

Electronic copy available at: https://ssrn.com/abstract=2770012

W. Griffin & A. M. O'Leary-Kelly (Eds.), *The dark side of organizational behavior*. San

Francisco: John Wiley & Sons.

DiPrete, T. A., & Soule W. T. 1988. Gender and promotion in segmented job ladder systems. *American Sociological Review*, 53: 26-40.

Dreber, A., & Johannesson, M. 2008. Gender differences in deception. *Economics Letters*, 99: 197–199.

Dreher, G. F., & Cox, T. H. 2000. Labor market mobility and cash compensation: The moderating effects of race and gender. *Academy of Management Journal,* 43: 890-900.

Duguid, M. 2011. Female tokens in high-prestige work groups: Catalysts or inhibitors? *Organizational Behavior and Human Decision Processes,* 116: 104-115.

Duguid, M. M., Lloyd, D. L., & Tolbert, P. S. 2012. The impact of categorical status, numeric representation, and work group prestige on preference for demographically similar others: A value threat approach. *Organization Science,* 23: 386-401.

Durkheim, E. 1925/1976. The elementary forms of the religious life (2nd ed.). London: Allen and Unwin.

Eagly, A. H., Diekman, A. B., Johannesen-Schmidt, M. C., & Koenig, A. M. 2004. Gender gaps in sociopolitical attitudes: A social psychological analysis. *Journal of Personality and Social Psychology,* 87: 796-816.

Eagly, A. H., & Karau, S. J. 2002. Role congruity theory of prejudice toward female leaders. *Psychological Review,* 109: 573-598.

Eagly, A. H., Makhijani, M. G., & Klonsky, B. G. 1992. Gender and the evaluation of leaders: A meta-analysis. *Psychological Bulletin,* 111: 3-22.

Eagly, A. H., & Mladinic, A. 1989. Gender stereotypes and attitudes toward women and men. *Personality and Social Psychology Bulletin,* 15: 543-558.

Eagly, A. H., Wood, W., & Diekman, A. B. (2000). Social role theory of sex differences and similarities: A current appraisal. In T. Eckes, & H. M. Trautner (Eds.), *The developmental social psychology of gender* (pp. 123-174). Mahwah, NJ: Lawrence Erlbaum.

Electronic copy available at: https://ssrn.com/abstract=2770012

Ely, R. J. 1995. The power in demography: Women's social constructions of gender identity at work. *Academy of Management Journal, 38,* 589-634.

Ely, R. J., & Meyerson, D. E. 2000. Theories of gender in organizations: A new approach to organizational analysis and change. *Research in Organizational Behavior, 22,* 103-151.

Ely, R., & Padavic, I. 2007. A feminist analysis of organizational research on sex differences. *Academy of Management Review,* 32: 1121-1143.

Ely, R., Stone, P., & Ammerman, C. 2014. Rethink what you 'know' about high-achieving women. *Harvard Business Review,* 92: 101–109.

Feldman, M. S., & March, J. G. 1981. Information in organizations as signal and symbol. *Administrative Science Quarterly,* 26: 171-186.

Fernandez-Mateo, I. 2009. Cumulative gender disadvantage in contract employment. *American Journal of Sociology,* 114: 871-923.

Fiske, S. T., Cuddy, A. J., Glick, P., & Xu, J. 2002. A model of (often mixed) stereotype content: Competence and warmth respectively follow from perceived status and competition. *Journal of Personality and Social Psychology*, 82: 878–902.

Flynn, F. J., & Wiltermuth, S. S. 2010. Who's with me? False consensus, brokerage, and ethical decision making in organizations. *Academy of Management Journal,* 53: 1074-1089.

Fragale, A. R., Rosen, B., Xu, C., & Merideth, I. 2009. The higher they are, the harder they fall: The effects of wrongdoer status on observer punishment recommendations and intentionality attributions. *Organizational Behavior and Human Decision Processes,* 108: 53-65.

Franke, G. R., Crown, D. F., & Spake, D. F. 1997. Gender differences in ethical perceptions of business practices: A social role theory perspective. *Journal of Applied Psychology*, 82: 920–934.

Gilligan, C. 1982. *In a different voice: Psychological theory and women's development*. Cambridge, MA: Harvard University Press.

Glick, P., & Fiske, S. T. 1996. The ambivalent sexism inventory: Differentiating hostile and benevolent

Electronic copy available at: https://ssrn.com/abstract=2770012

sexism. *Journal of Personality and Social Psychology*, 70: 491–512.

Goldin, C. & Rouse, C. 2000. Orchestrating impartiality: The impact of 'blind' auditions on female

   musicians." *American Economic Review*, 90: 715-41.

Goodwin, G. P., Piazza, J., & Rozin, P. 2014. Moral character predominates in person perception and

   evaluation. *Journal of Personality and Social Psychology,* 106: 148-168.

Goodwin, G. P. 2015. Moral character in person perception. *Current Directions in Psychological Science,*

   24: 38-44.

Gorman, E. H. 2005. Gender stereotypes, same-gender preferences, and organizational variation in the

   hiring of women: Evidence from law firms. *American Sociological Review*, 70: 702-28.

Haidt, J. 2007. The new synthesis in moral psychology. *Science,* 316: 998-1002.

Heilman, M. E. 2001. Description and prescription: How gender stereotypes prevent women's ascent up

   the organizational ladder. *Journal of Social Issues,* 57: 657-674.

Heilman, M. E. 2012. Gender stereotypes and workplace bias. *Research in Organizational Behavior,* 32:

   113-135.

Joshi, A. 2014. By whom and when is women's expertise recognized? The interactive effects of gender

   and education in science and engineering teams. *Administrative Science Quarterly*, 59: 202–239.

Kennedy, J. A., & Kray, L. J. 2013. Who is willing to sacrifice ethical values for money and social

   status?: Gender differences in reactions to ethical compromises. *Social Psychological and*

   *Personality Science*, 5: 52–59.

Kim, P. H., Ferrin, D. L., Cooper, C. D., and Dirks, K. T. 2004. Removing the shadow of suspicion: The

   effects of apology vs. denial for repairing competence-versus integrity-based trust violations.

   *Journal of Applied Psychology*, 89: 104-118.

Konrad, A. M., & Pfeffer, J. 1991. Understanding the hiring of women and minorities in educational

   institutions. *Sociology of Education,* 64: 141-157.

Kray, L. J., & Haselhuhn, M. P. 2012. Male pragmatism in negotiators' ethical reasoning. *Journal of*

Electronic copy available at: https://ssrn.com/abstract=2770012

*Experimental Social Psychology*, 48: 1124–1131.

Kray, L. J., Kennedy, J. A., & Van Zant, A. B. 2014. Not competent enough to know the difference? Gender stereotypes about women's ease of being misled predict negotiator deception. *Organizational Behavior and Human Decision Processes*, 125: 61–72.

Kulis, S. 1997. Gender segregation among college and university employees. *Sociology of Education,* 70: 151-173.

Lerner, J. S., & Tetlock, P. E. 1999. Accounting for the effects of accountability. *Psychological Bulletin,* 125: 255-275.

McGinn, K. L., & Milkman, K. L. 2013. Looking up and looking out: Career mobility effects of demographic similarity among professionals. *Organization Science,* 24: 1041-1060.

Milkman, K. L., Akinola, M., & Chugh, D. 2012. Temporal distance and discrimination: An audit study in academia. *Psychological Science,* 23: 710-717.

Mooijman, M., van Dijk, W. W., Ellemers, N., & van Dijk, E. 2015. Why leaders punish: A power perspective. *Journal of Personality and Social Psychology,* 109: 75-89.

Olson, C. A., & Becker, B. E. 1983. Sex discrimination in the promotion process. *Industrial and Labor Relations Review*, 36: 624-41.

Pfeffer, J., & Davis-Blake, A. 1987. The effect of the proportion of women on salaries: The case of college administrators. *Administrative Science Quarterly,* 32: 1-24.

Prentice, D. A., & Carranza, E. (2002). What women and men should be, shouldn't be, are allowed to be, and don't have to be: The contents of prescriptive gender stereotypes. *Psychology of Women Quarterly*, 26: 269–281.

Rehg, M. T., Miceli, M. P., Near, J. P., & Van Scotter, J. R. 2008. Antecedents and outcomes of retaliation against whistleblowers: Gender differences and power relationships. *Organization Science*, 19: 221-240.

Reskin, B. F. 2000. The proximate causes of employment discrimination. *Contemporary Sociology*, 29:

319-28.

Ridgeway, C. L. 2001. Gender, status, and leadership. *Journal of Social Issues,* 57: 637-655.

Robinson, R. J., Lewicki, R. J., & Donahue, E. M. 2000. Extending and testing a five factor model of

ethical and unethical bargaining tactics: Introducing the SINS scale. *Journal of Organizational*

*Behavior*, 21: 649–664.

Rucker, D. D., Polifroni, M., Tetlock, P. E., & Scott, A. L. 2004. On the assignment of punishment: The

impact of general-societal threat and the moderating role of severity. *Personality and Social*

*Psychology Bulletin,* 30: 673-684.

Rudman, L. A. 1998. Self-promotion as a risk factor for women: The costs benefits of

counterstereotypical impression management. *Journal of Personality Social Psychology*, 74: 629–

645.

Rudman, L., & Fairchild, K. 2004. Reactions to counterstereotypic behavior: The role of backlash in

cultural stereotype maintenance. *Journal of Personality and Social Psychology,* 87: 157-176.

Rudman, L. A., & Phelan, J. E. 2008. Backlash effects for disconfirming gender stereotypes in

organizations. *Research in Organizational Behavior*, 28: 61–79.

Ryan, M. K., & Haslam, S. A. 2007. The glass cliff: Exploring the dynamics surrounding the appointment

of women to precarious leadership positions. *Academy of Management Review,* 32: 549-572.

Simmons, J. P., Nelson, L. D., & Simonsohn, U. 2011. False-positive psychology: Undisclosed flexibility

in data collection and analysis allows presenting anything as significant. *Psychological Science,*

22: 1359-1366.

Tetlock, P. E. 2002. Social functionalist frameworks for judgment and choice: Intuitive politicians,

theologians, and prosecutors. 2002. *Psychological Review*, 109: 451-471.

Tetlock, P. E., Visser, P. S., Singh, R., Polifroni, M., Scott, A., Elson, S. B., Mazzocco, P., & Rescober,

P. 2007. People as intuitive prosecutors: The impact of social-control goals on attributions of

responsibility. *Journal of Experimental Social Psychology*, 43: 195-209.

Electronic copy available at: https://ssrn.com/abstract=2770012

Tetlock, P. E., & Mitchell, G. 2009. Implicit bias and accountability systems: What must organizations do
    to prevent discrimination? *Research in Organizational Behavior,* 29: 3-38.

Trevino, L. K. 1992. The social effects of punishment in organizations: A justice perspective. *Academy of
    Management Review,* 17: 647-676.

Tyler, T. R. 1990. *Why people obey the law*. New Haven, CT: Yale University Press.

Uhlmann, E. L., & Cohen, G. L. 2005. Constructed criteria: Redefining merit to justify discrimination.
    *Psychological Science,* 16: 474-480.

Vadera, A. K., & Pratt, M. G. 2013. Love, hate, ambivalence, or indifference? A conceptual examination
    of workplace crimes and organizational identification. *Organization Science,* 24: 172-188.

Waytz, A. Dungan, J., & Young, L. 2013. The whistleblower's dilemma and the fairness-loyalty tradeoff.
    *Journal of Experimental Social Psychology,* 49: 1027-1033.

Williams, J. E., & Best, D. L. 1982. Measuring sex stereotypes: A thirty nation study. Newbury Park, CA:
    Sage.

Williams, M. J., & Tiedens, L. Z. 2016. The subtle suspension of backlash: A meta-analysis of penalties
    for women's implicit and explicit dominance behavior. *Psychological Bulletin,* 142, 165-197.

Wiltermuth, S. S., & Flynn, F. J. 2013. Power, moral clarity, and punishment in the workplace. *Academy
    of Management Journal,* 56: 1002-1023.

Wright, E. O., Baxter, J., & Birkelund, G. E. 1995. The gender gap in workplace authority: A cross-
    national study. *American Sociological Review,* 60: 407-435.

Electronic copy available at: https://ssrn.com/abstract=2770012

**TABLE 1**

**Descriptive Statistics and Correlations among Variables in Study 3**

| Variable | N | M | SD | 1 | 2 | 3 | 4 | 5 |
|----------|---|---|----|----|----|----|----|----|
| 1. Female attorney gender | 482 | 0.17 | 0.37 | -- | | | | |
| 2. Punishment severity | 482 | 1.89 | 1.31 | .08 | -- | | | |
| 3. Total rules violated | 482 | 3.13 | 2.13 | .02 | .32*** | -- | | |
| 4. Attorneys per capita | 482 | 22.78 | 56.95 | -.07 | .18*** | .01 | -- | |
| 5. Number of judges on panel | 270 | 5.36 | 2.02 | -.01 | -.37 | -.07 | -.37*** | -- |
| 6. Percentage of female judges | 270 | 0.25 | 0.19 | -.11 | .16* | .05 | .17** | .30*** |

$*\ p < .05.\ **\ p < .01.\ ***\ p < .001.$

Electronic copy available at: https://ssrn.com/abstract=2770012

**TABLE 2**

**Regression Models Predicting the Severity of Punishment in Study 3**

| | Ordinal Logistic Regressions of Categorical Punishment | | | Probit Regressions of Likelihood of Disbarment | |
| --- | --- | --- | --- | --- | --- |
| | Model 1 | Model 2 | Model 3 | Model 4 | Model 5 |
| *Independent Variables* | | | | | |
| Female Gender | 0.424* | 1.046** | 2.110*** | 0.567* | 1.383*** |
| | (0.18) | (0.37) | (0.58) | (0.26) | (0.33) |
| Female Gender x Percentage Female Judges | | | -4.867* | | -4.066** |
| | | | (2.08) | | (1.30) |
| *Control Variables* | | | | | |
| Total Rules Violated | 0.408+ | 0.587+ | 0.576+ | 0.683*** | 0.673** |
| | (0.24) | (0.31) | (0.30) | (0.21) | (0.21) |
| Attorneys Per Capita | 0.006*** | 0.008*** | 0.008*** | 0.004*** | 0.005*** |
| | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) |
| Number of Judges on Panel | | 0.204* | 0.233* | 0.131+ | 0.167* |
| | | (0.09) | (0.09) | (0.07) | (0.07) |
| Percentage of Female Judges on Panel | | 0.229 | 0.628 | 0.006 | 0.375 |
| | | (0.99) | (0.91) | (0.78) | (0.76) |
| Fixed Effects for Rules Violated | YES | YES | YES | YES | YES |
| Fixed Effects for State | YES | YES | YES | YES | YES |
| Constant | ^^ | ^^ | ^^ | -2.937*** | -3.260*** |
| | | | | (0.67) | (0.65) |
| Observations | 482 | 270 | 270 | 270 | 270 |
| Log Pseudolikelihood | -586.38 | -303.19 | -300.46 | -119.97 | -116.92 |
| Pseudo R^2 | 0.1 | 0.14 | 0.15 | 0.22 | 0.24 |

Robust standard errors, clustered by state, in parentheses.
^^Because ordinal logistic regression results in multiple intercepts, we have omitted the constant for these models.
+ *p* < .10; * *p* < .05; ** *p* < .01; *** *p* < .001

Electronic copy available at: https://ssrn.com/abstract=2770012

**FIGURE 1**

**Punishment Severity in Study 2**



**FIGURE 2**

**Predicted Likelihood of Disbarment by Attorney's Gender in Study 3**



Electronic copy available at: https://ssrn.com/abstract=2770012